# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 11/15/2019 01:04 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Salcedo, Deputy Clerk

PLD-CV-001

**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Defyne Holdings, LLC., a limited liability company; (See Attachment 1 for additional Defendants)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Emperor Entertainment, Inc., a California corporation; Hamidreza Pousti, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Northwest District - Los Angeles

Los Angeles Superior Court, 6230 Sylmar Avenue, Van Nuys, California 91401

CASE NUMBER:
*(Número del Caso):*

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ross K. Reghabi, Esq./Bar # 206339,24007 Ventura Blvd.,#205, Calabasas Ca. 91302, (747)333-5151

DATE: 11/15/2019                    Clerk, by                    Sherri R. Carter Executive Officer / Clerk of Court
*(Fecha)*                          *(Secretario)* _____ Angelica Salcedo _____ , Deputy
                                                                                  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation) [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

| SHORT TITLE: | CASE NUMBER: | MC-025 |
|---|---|---|
| Emperor Entertainment v. Defyne, et al. | | |

**ATTACHMENT** (Number): ONE

*(This Attachment may be used with any Judicial Council form.)*

Additional Defendants:

Francesco DiStefano, an individual; DiStefano Enterprises, LLC., a limited liability company; Kash Capital, LLC., a limited liability company; HSBC Bank USA, National Association, a business organization form unknown; and DOES 1 through 50, inclusive.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page __1__ of __1__

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

1

Ross K. Reghabi, Esq. / Bar # 206339
**SOUTHERN CALIFORNIA LAW GROUP**

2

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302

3

E-mail:        reghabi@scalg.com

4

Telephone:     (747)333-5151
Facsimile:     (818)584-3169

5

6

Attorney for Plaintiffs, Emperor Entertainment, et al.

7

8

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

### FOR THE COUNTY OF LOS ANGELES

10

11

**EMPEROR ENTERTAINMENT, INC., a California Corporation; HAMIDREZA POUSTI, an individual,**

12

13

**Plaintiffs,**

14

vs.

15

16

17

**DEFYNE HOLDINGS, LLC., a limited liability company; FRANCESCO DiSTEFANO, an individual; DiSTEFANO ENTERPRISES, LLC., a limited liability company;  KASH CAPITAL, LLC., a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION, a business organization form unknown; and DOES 1 through 50, Inclusive,**

18

19

20

21

22

23

**Defendants.**

**CASE NO:**

**COMPLAINT FOR DAMAGES:**

1. **BREACH OF CONTRACT;**
2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**
3. **INTENTIONAL MISREPRESENTAION AND FRAUD;**
4. **NEGLIGENCE MISREPRESENTATION;**
5. **RESTITUTION AND UNJUST ENRICHMENT;**
6. **CONVERSION.**
7. **VIOLATION OF BUSSINESS & PROFESSIONAL CODE, § 17200;**

24

25

**COME NOW** Plaintiffs who complains and alleges against Defendants, and each of

26

them, as follows:

27

/   /   /   /

28

/   /   /   /

- 1 -

COMPLAINT

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1. At all times herein mentioned, Plaintiff, **Emperor Entertainment, Inc.,** (hereinafter "**Emperor**"), was and now is a California Corporation, formed under the laws of the State of California with its principal place of business in the County of Los Angeles, State of California.

2. At all times herein mentioned, Plaintiff, **Hamidreza Pousti,** (hereinafter "**Pousti**"), was and now is a resident of the County of Los Angeles, State of California and an operator of Emperor.

3. At all times herein mentioned, Defendant **Defyne Holding, LLC.,** (hereinafter "**Defyne**") was and now is a Limited liability company formed in Georgia and doing business in California and various states, through its agents, as Defyne Payments, engaged in the credit card processing services business. At all times herein mentioned, Defyne represented it was a registered ISO of Wells Fargo Bank, N.A., in California.

4. At all times herein mentioned, Defendant **Francesco DiStefano,** (hereinafter "**DiStefano**"), was and now an individual acting in California as agent and employee of the other named Defendant and various Defendants named herein as DOES. At all times herein mentioned, Defendant DiStefano was also the owner and operator of DiStefano Enterprises, LLC.

5. At all times herein mentioned, Defendant DiStefano was within the course and scope of his employment as an agent and employee of other named and un-named Defendants.

6. At all times herein mentions, Defendant **DiStefano Enterprises, LLC.,** (hereinafter "**DiStefano, LLC.**") was and now is a Limited Liability Company, representing itself as "Payment Logistics" and doing business in California and various states, on behalf of other Defendants, herein and owned and operated by Defendant DiStefano.

7. At all times herein mentioned, Defendant **Kash Capital, LLC.,** (hereinafter "**Kash**") was

and now is a Limited Liability Company, representing itself as credit card fund transfer service and doing business in California and various states, on behalf of other Defendants herein.

8.   At all times herein mentioned, Defendant **HSBC Bank USA, National Association** (Hereinafter **"HSBC"**) was and now is a business organization form unknown with branches in every state and engaged in the banking business doing business in California.

9.   Plaintiffs are ignorant of the true names and capacities, whether individual, corporate, associate, partnership, or otherwise of each of the Defendants sued herein as Does 1 through 50, inclusive, and therefore sues said Defendants by such fictitious names.  Plaintiffs will seek leave to amend this Complaint to reflect their true names and capacities as they are ascertained pursuant to Code of Civil Procedure §474.

10. Plaintiffs are informed and believe and, based upon such information and belief, allege that each of the Defendants named herein as a Doe was and is negligently, intentionally, or both negligently and intentionally responsible in some manner for the occurrences herein alleged, and the injuries and/or damages suffered by Plaintiffs as herein alleged were the direct and proximate result of, and caused by the acts and omissions of the Defendants.

11. Plaintiffs are informed and believe and, based upon such information and belief, allege that at all times herein mentioned, each and every one of the Defendants was and now is the agent, servant, or employee of each and every other Defendant and was in doing the things herein alleged, acting within the course and scope of said agency, service or employment.

12. Plaintiffs are informed and believe and, based upon such information and belief, allege that at all times herein mentioned, each of the Defendants ratified and approved the acts, omissions, representations, and other activities of each and every other Defendant.

13. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne,

- 3 -

COMPLAINT

approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne. Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne. Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

14. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments. He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs by Defyne and HSBC. DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

15. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

16. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

17. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank

- 4 -

account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

18.  At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

19.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

20.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

21. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

22. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.

23.  Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

24. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

- 5 -

COMPLAINT

25.  Plaintiffs relied on the representations and was induced by them to sign what it believed to be true.  Plaintiffs would not have signed the document if the true facts had been known to them.

### FIRST CAUSE OF ACTION
### FOR BREACH OF CONTRACT
### Against All Defendants

26.  Plaintiffs alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 25 of the Complaint as though set forth at length herein.

27.  In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne.  Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne.  Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

28.  Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments.  He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs b y Defyne and HSBC.  DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

29. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

- 6 -

30. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

31. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank account. Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

32. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

33. As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business. Plaintiff Pousti further purchased new kitchen and other equipment for the business.

34. When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

- 7 -

COMPLAINT

35. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

36. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.

37. Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

38. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

39. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true. Plaintiffs would not have signed the document if the true facts had been known to them.

40. At all times herein mentioned, Plaintiffs have performed or have been excused from performing all of the acts, conditions, and covenants required to be performed by them under the contract.

41. Defendants, and each of them, have repeatedly breached the contract by reason of their actions as set forth herein above.

42. As a proximate result of Defendants' breach of contract, Plaintiffs have been damaged in an amount unknown at this time and according to proof at trial.

## SECOND CAUSE OF ACTION
## FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Against All Defendants.

43. Plaintiffs allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 42 of the Complaint as though set forth at length herein.

- 8 -

COMPLAINT

44. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne.  Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne.  Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

45.  Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments.  He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs by Defyne and HSBC.  DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

46. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

47. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

48.  Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank

- 9 -

account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

49. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

50.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

51.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

52.  The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

53. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.  Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

54. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

55. Plaintiffs relied on the representations and was induced by them to sign what it believed

- 10 -

COMPLAINT

to be true.  Plaintiffs would not have signed the document if the true facts had been known to them.

56. In or about August 2019, Defendants, and each of them, breached their implied covenant of good faith and fair dealing in the contract they entered into with Plaintiffs.

57. Defendants, and each of them, unfairly interfered with Plaintiffs' right to receive the benefit of the contract because Defendants and each of them had knowledge, or should have had knowledge but still failed to inform Plaintiffs of same.

58. As an actual and proximate result of the breach of the said covenant by Defendants and each of them as set forth above, Plaintiffs are harmed due to the fact that Plaintiffs were prevented from receiving the benefits of their agreement with Defendants.

## THIRD CAUSE OF ACTION
## FOR INTENTIONAL MISREPRESENTATION AND FRAUD
### Against All Defendants.

59. Plaintiffs allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 58 of the Complaint as though set forth at length herein.

60. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne.  Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne.  Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

61. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments.  He further represented that the loan which

would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs b y Defyne and HSBC. DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

62. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

63. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

64. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank account. Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

65. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

66. As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business. Plaintiff Pousti further purchased new kitchen and other equipment for the business.

- 12 -

67. When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

68. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

69. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised. Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

70. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

71. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true. Plaintiffs would not have signed the document if the true facts had been known to them.

72. Misrepresentation or otherwise Failure to disclose material facts by Defendants, and each of them was with the intent to induce reliance on the part of Plaintiffs to enter into the agreement. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true.

73. Plaintiffs would not have entered into the agreement if the true facts had been known to them.

74. As a direct and proximate result of Defendants', and each of them, intentional failure to

- 13 -

COMPLAINT

disclose their true intents, Plaintiffs have been harmed and suffered damages in an amount according to proof at the time of trial.

75. In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice entitling Plaintiff to punitive damages in the sum according to proof at the time of trial.

## FOURTH CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENATION
### Against All Defendants.

76. Plaintiffs alleges and incorporate herein by reference each and every allegation as contained in paragraphs 1 through 68 of the Complaint as though set forth at length herein.

77. Defendants made the representations to Plaintiffs that Defendants, and each of them, would protect Plaintiffs' interest with no reasonable grounds for believing them to be true, in that Plaintiffs are informed and believe, and base on such information and belief, allege that Defendants did not communicate to Plaintiffs accurate information and negligently failed to fulfil their duty to Plaintiffs as grantors, to communicate to Plaintiffs knowledge they had, or should have had. They, at least, negligently failed and refused to do so.  Therefrom, Defendants were aware that without such information they could not accurately make the representations herein alleged; and at all times thereafter, Defendants concealed from Plaintiff their true intentions and did not make the alleged representations accurately. Defendants, and each of them, in failing to disclose material facts to Plaintiffs had reasonable grounds to believe that the omitted facts were in fact untrue and failed to disclose with the intent to induce reliance on the part of Plaintiffs to enter in a lease agreement.

78.  As a direct and proximate result of Defendants' conduct and failure, Plaintiffs have been harmed/suffered major loss of its property in an amount according to proof at the time of trial.

- 14 -

79. Plaintiffs' reliance on Defendants' negligent misrepresentation was substantial factor in causing harm to Plaintiffs due to the fact that had Plaintiffs been aware of proper information, Plaintiff would have never relied and agreed to enter into the agreement.

## FIFTH CAUSE OF ACTION
## FOR RESTUTUTION AND UNJUST ENRICHMENT
### Against All Defendants.

80. Plaintiff alleges and incorporates herein by reference each and every allegation as contained in paragraphs 1 through 72 of the Complaint as though set forth at length herein.

81. Defendants, and each of them, through their agent and employee DiStefano received approximately $55,000.00 from Plaintiff by misrepresenting material facts and disclosing their true intentions.

82. As a direct and proximate result of Defendants' misconduct, they have been unjustly enriched at the expense of Plaintiffs in an amount according to proof at the time of trial.

83. As a further direct and proximate result of Defendants' misconduct, to prevent them from being unjustly enriched at the expense of Plaintiffs, Plaintiffs also seek as order of this Court requiring Defendants to disgorge and turn over to Plaintiff the $55,000.00

## SIXTH CAUSE OF ACTION
## FOR CONVERSION
### Against All Defendants.

84. Plaintiffs allege and incorporate herein by reference each and every allegation as contained in paragraphs 1 through 83 of the Complaint as though set forth at length herein.

85. At all times herein mentioned, Defendants, and each of them, had a legal duty to maintain all funds received from Plaintiffs, including but not limited to the $55,000.00 in cash towards securing the promised business loan.

86. Plaintiffs are informed and believe and, based on such information and belief, allege that Defendants named in this cause of action, have converted said funds for their own use and benefit

- 15 -

1    by refusing to repay the $55,000.00

2        87.  Commencing August 2019 through present, Defendants, and each of them, have

3    converted the funds provided to them which acts constituted an actual and substantial interference

4

5    with plaintiffs' right of ownership and possessory interests in the funds.

6        88. Between the time of Defendants' conversion and the filing of this action, Plaintiffs

7    properly expended in pursuit of the property exclusive of attorney's fees and costs associated with

8    preparation for litigation in an amount according to proof at trial.

9        89. Plaintiffs have duly demanded that Defendants, named in this cause of action, return

10   said funds, but Defendants have failed and refused, and continue to fail and refuse, to make such

11   payments and return such assets.

12

13                              **SEVENTH CAUSE OF ACTION**
     **FOR UNFAIR BUSINESS PRACTICES UNDER BUSINESS AND PROFESSION CODE**

14                                  **17200, ET SEQ.**
                                **Against All Defendants.**

15

16       87. Plaintiffs allege and incorporates herein by reference each and every allegation

17   contained in paragraphs 1 through 87 of the Complaint as though set forth at length herein.

18       88. Defendants and Does 1-50 committed unlawful, unfair, and fraudulent business practices

19   or acts, as defined by *Business and Professions Code Section 17200*, and as set forth herein.

20       89. Defendants' conduct in holding themselves out as competent and duly licensed credit

21   card processing company and a business loan broker was an unfair business practice in that they

22   unlawfully rendered professional services and received monies to which they were not entitled as

23   a matter of law.

24

25       90. Defendants received the benefit of the agreement with Plaintiffs while engaging in the

26   unfair business practice of receiving unlawful monies while failing to disclose to Plaintiff the

27   unlawful activity.

28       91. Plaintiffs entered into the agreement with Defendants in reliance on the mistaken belief

                                        - 16 -

that it was represented by a qualified and duly licensed business opportunities broker.

92. Plaintiffs allege that Defendants, and each of them, in doing the acts alleged herein Above have engaged in unfair and or unlawful business practices by engaging in such unfair business practices, thereby inducing and causing Plaintiffs to suffer "injury in fact" and to lose money or property rights as a result of such unfair acts, in violation of the Act, including but not necessarily limited to, *Business & Professions Code section 17200* which provides "as used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business practice..."

93. As a direct and proximate result of the above-referenced acts of Defendants and Does 1-50, and each of them, Plaintiffs sustained "injury in fact" and lost money or property as a result of such unfair acts [*Business & Professions Code section 17204*], and are therefore entitled to restitution of money lost as a result of Defendants' unfair business practices as well as equitable relief in the form of an order requiring defendants, and each of them, to show cause, if any they have, why they should not be enjoined from continuing their unlawful business practices during the pendency of this action, and for a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants and Does 1-50, and each of them from engaging in the unlawful business practices described herein.

94. Plaintiffs also seek exemplary damages by this Honorable Court in order to deter Defendants' and each of them future conduct in the amount to be determined at the time of trial.

**WHEREFORE**, Plaintiffs demand judgment against defendants, and each of them, for the following:

**Damages as to First and Second Causes of Action:**

1. Compensatory Damages;

2. Interest according to legal rate of 10% per annum or as provided by law;

- 17 -

COMPLAINT

3.  Reasonable Attorney's fees;

4.  Injunctive Relief;

5.  Punitive and exemplary Damages;

6.  Restitution damages;

7.  Cost of lawsuit; and

8.  Such further relief as court deemed appropriate.

Dated: November 15, 2019

SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq. / Plaintiffs' Attorney

- 18 -

COMPLAINT

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Ross K. Reghabi, Esq., SBN# 206339
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard Suite 205
Calabasas, California 91302
TELEPHONE NO. (747)333-5151   FAX NO. (818)584-3169
ATTORNEY FOR *(Name):* Plaintiffs, Emperor Entertainment, Inc., et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 6230 Sylmar Avenue
MAILING ADDRESS: Same
CITY AND ZIP CODE: Van Nuys, California 91401
BRANCH NAME: Northwest District - Van Nuys

CASE NAME:
Emperor Entertainment v. Defyne, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[✓] Other contract (37)
**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [✓] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [ ] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary b.[✓] nonmonetary; declaratory or injunctive relief c.[✓] punitive
4. Number of causes of action *(specify):* 7
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 15, 2019
Ross K. Reghabi, Esq.
_____
(TYPE OR PRINT NAME)                     (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.**  If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1.  This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet.  In item 1, you must check one box for the case type that best describes the case.  If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below.  A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.**  A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit.  A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading.  A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.**  In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) (*if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto*)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability (*not asbestos or
  toxic/environmental*) (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) (*not civil
  harassment*) (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    (*not medical or legal*)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract (*not unlawful detainer
      or wrongful eviction*)
  Contract/Warranty Breach–Seller
    Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage (*not provisionally
  complex*) (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent
    domain, landlord/tenant, or
    foreclosure*)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (*if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential*)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  (*arising from provisionally complex
  case type listed above*) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment (*non-
    domestic relations*)
  Sister State Judgment
  Administrative Agency Award
    (*not unpaid taxes*)
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (*not specified
  above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-
    harassment*)
  Mechanics Lien
  Other Commercial Complaint
    Case (*non-tort/non-complex*)
  Other Civil Complaint
    (*non-tort/non-complex*)

**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition (*not specified
  above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

| SHORT TITLE: Emperor v. Defyne | CASE NUMBER |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

| This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court. |
|---|

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ✓YES    CLASS ACTION? ☐ YES  LIMITED CASE? ☐ YES    TIME ESTIMATED FOR TRIAL 5-7 ___ HOURS/✓DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.3.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office
11. Mandatory Filing Location (Hub Case)

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| Auto Tort | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| Other Personal Injury/ Property Damage/Wrongful Death Tort | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2.<br><br>2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1., 4.<br><br>1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4.<br>1., 4.<br><br>1., 3.<br>1., 4. |

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Emperor v. Defyne | CASE NUMBER |
|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☑ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: Emperor v. Defyne | CASE NUMBER |
|---|---|

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 6. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

| SHORT TITLE: Emperor v. Defyne | CASE NUMBER |
|---|---|

**Item III. Statement of Location:** Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3 on Page 1,** as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case. | ADDRESS: 16101 Ventura Boulevard, Suite 160 |
|---|---|
| ☐ 1. ☐ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11. | |

| CITY: Encino | STATE: Ca | ZIP CODE: 91436 | |
|---|---|---|---|

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Van Nuys___ courthouse in the ___Northwest___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.3, subd.(a).

Dated: __November 15, 2019__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/15).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 3/15)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
Van Nuys Courthouse East
6230 Sylmar Avenue, Van Nuys, CA 91401

### NOTICE OF CASE ASSIGNMENT
### UNLIMITED CIVIL CASE

**Reserved for Clerk's File Stamp**

FILED
Superior Court of California
County of Los Angeles

11/15/2019

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____, Deputy

Angelica Salcedo

Your case is assigned for all purposes to the judicial officer indicated below.

CASE NUMBER:
19VECV01638

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|
| ✔ Michael J. Convey | U | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 11/19/2019
      (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By Angelica Salcedo_____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California County of Los Angeles**



**Los Angeles County Bar Association Litigation Section**

**Los Angeles County Bar Association Labor and Employment Law Section**



**Consumer Attorneys Association of Los Angeles**



**Southern California Defense Counsel**



**Association of Business Trial Lawyers**



**California Employment Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆Los Angeles County Bar Association Litigation Section◆

◆ Los Angeles County Bar Association Labor and Employment Law Section◆

◆Consumer Attorneys Association of Los Angeles◆

◆Southern California Defense Counsel◆

◆Association of Business Trial Lawyers◆

◆California Employment Lawyers Association◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| COURTHOUSE ADDRESS: | |
|---|---|
| PLAINTIFF: | |
| DEFENDANT: | |

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

    a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

    b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

    c. Exchange of names and contact information of witnesses;

    d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

    e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

    f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

    g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| LACIV 229 (new)<br>LASC Approved 04/11 | **STIPULATION – EARLY ORGANIZATIONAL MEETING** | Page 1 of 2 |
|---|---|---|

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lasuperiorcourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
   (INSERT DATE)                                   (INSERT DATE)
   complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

The following parties stipulate:

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR PLAINTIFF)

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR DEFENDANT)

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR _____)

Date:

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR _____)

_____                    ➤   _____
(TYPE OR PRINT NAME)                                     (ATTORNEY FOR _____)

LACIV 229 (new)
LASC Approved 04/11          **STIPULATION – EARLY ORGANIZATIONAL MEETING**

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| **TELEPHONE NO.:**          **FAX NO.** (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   - ☐     Request for Informal Discovery Conference
   - ☐     Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).
4. **For a Request for Informal Discovery Conference, <u>briefly</u> describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, <u>briefly</u> describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER: | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | | CASE NUMBER: |
|---|---|---|
| | | |

iii.   Be filed within two (2) court days of receipt of the Request; and

iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

c.   No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

d.   If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied.  If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

e.   If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.   If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.   The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.   Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.   Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.   References to "days" mean calendar days, unless otherwise noted.  If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

LACIV 036 (new)
LASC Approved 04/11

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

Date:

_____

(TYPE OR PRINT NAME)

➢ _____

(ATTORNEY FOR PLAINTIFF)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR DEFENDANT)

➢ _____

(ATTORNEY FOR _____)

➢ _____

(ATTORNEY FOR _____)

➢ _____

(ATTORNEY FOR _____)

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

11/19/2019

Sherri R. Carter, Executive Officer / Clerk of Court

By Elizabeth B. Vince Cruz, Deputy
Elizabeth B. Vince Cruz

**COURTHOUSE ADDRESS:**
Van Nuys Courthouse East
6230 Sylmar Avenue, Van Nuys, CA 91401

**PLAINTIFF:**
Emperor Entertainment, Inc., a California Corporation  et al

**DEFENDANT:**
Defyne Holdings, LLC., a limited liability company et al

## NOTICE OF CASE MANAGEMENT CONFERENCE

**CASE NUMBER:**
19VECV01638

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith; and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date:<br>03/16/2020 | Time:<br>8:30 AM | Dept.:<br>U |
|---|---|---|

NOTICE TO DEFENDANT:   THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT  FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b) and California Rules of Court, rule 2.2 et seq.

Dated:  11/19/2019

Michael J. Convey / Judge
Judicial Officer

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in  Van Nuys , California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Khosro Reghabi
24007 Ventura Blvd Ste 205
Calabasas, CA 91302

Sherri R. Carter, Executive Officer / Clerk of Court

Dated:  11/19/2019

By  Elizabeth B. Vince Cruz
Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

**NOTICE OF
CASE MANAGEMENT CONFERENCE**

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter Three

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

Van Nuys Courthouse East
6230 Sylmar Avenue, Van Nuys, CA 91401

Emperor Entertainment, Inc., a California Corporation et al

Skyvue Holdings, LLC, a limited liability company et al

NOTICE OF CASE MANAGEMENT CONFERENCE

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date | Time | Dept |
|---|---|---|
| 01/15/2020 | 8:30 | NW |

NOTICE TO DEFENDANT:  THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including, but not limited to, an order establishing a discovery schedule, an order referring the case to Alternative Dispute Resolution (ADR), an order reclassifying the case, an order setting subsequent conference and the trial date, or other orders to achieve the goals of the Trial Court Delegation Act (Gov. Code, § 68600 et seq.).

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to CCP Section 177.5, FRC Local Rule 8.35, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608 subdivision (b), and California Rules of Court rule 2.2 et seq.

Dated: 11/19/2019

Michael J. Convey / Judge
Judicial Officer

CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

[ ] by depositing in the United States mail at the courthouse in Van Nuys, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

[ ] by personally giving the party notice upon filing of the complaint.

Khosro Rashidi
16007 Ventura Blvd Ste 206
Encino, CA 91301

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/19/2019                                          by: Elizabeth S. Vance Cruz
                                                          Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
LAOSB-Case

NOTICE OF
CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter Three

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

COURTHOUSE ADDRESS:
Van Nuys Courthouse East
6230 Sylmar Avenue, Van Nuys, CA 91401

**FILED**
Superior Court of California
County of Los Angeles
**11/21/2019**
Sherri R. Carter, Executive Officer / Clerk of Court
By _____ Deputy
Saak Guladzhyan

PLAINTIFF(S):
Emperor Entertainment, Inc., a California Corporation  et al

DEFENDANT(S):
Defyne Holdings, LLC., a limited liability company et al

NOTICE OF CASE REASSIGNMENT AND ORDER FOR
PLAINTIFF TO GIVE NOTICE (Dates Remain)

CASE NUMBER:
19VECV01638

TO THE PLAINTIFF(S) AND PLAINTIFF'S ATTORNEY OF RECORD OR PLAINTIFF(S) IN PROPRIA PERSONA:

You are hereby notified that effective <u>01/02/2020</u>, an order was made that the above-entitled action, previously assigned to <u>Michael J. Convey</u> is now and shall be assigned to <u>Theresa M. Traber</u> as an Individual Calendar (IC), direct calendaring judge for all purposes, including trial, in department <u>U</u> at <u>Van Nuys Courthouse East</u>.

(See Chapter 3, Los Angeles Court Rules) All matters on calendar in this case will remain set on the dates previously noticed, in the department indicated above unless otherwise ordered by the court.

Notice is further given that plaintiff in propria persona or counsel for the plaintiff is ordered to give notice of this all-purpose case assignment by serving a copy of the notice on all parties to this action within 10 days of service of this notice by the court, and file proof of service thereof within 12 days of this notice. Failure to timely give notice and file proof of service may lead to imposition of sanctions pursuant to Code of Civil Procedure section 177.5 or otherwise.

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: <u>11/21/2019</u>

By <u>Saak Guladzhyan</u>
Deputy Clerk

**NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE**
**(Dates Remain)**

(Proposed LACIV 252)
LASC Approved 00-00

Local Rules Chapter 3

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
| COURTHOUSE ADDRESS:<br>Van Nuys Courthouse East<br>6230 Sylmar Avenue, Van Nuys, CA 91401 | FILED<br>Superior Court of California<br>County of Los Angeles<br>11/21/2019<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: Saak Ghulyan, Deputy |
| PLAINTIFF(S):<br>Emperor Entertainment, Inc., a California Corporation et al | |
| DEFENDANT(S):<br>Delfino Holdings, LLC, a limited liability company et al | |
| NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE (Dates Remain) | CASE NUMBER:<br>19VECV01338 |

TO THE PLAINTIFF(S)/ AND PLAINTIFF'S ATTORNEY OF RECORD / PLAINTIFF(S) IN PROPRIA PERSONA:

You are hereby notified that effective 01/02/2020 an order was made that the above-entitled action previously assigned to Michael J. Convey is now and shall be assigned to Therese M. Traber as an Individual Calendar (IC), direct calendaring judge for all purposes, including trial, in department U at Van Nuys Courthouse East (See Chapter 3, Los Angeles Court Rules). All matters on calendar in this case will remain set on the dates previously noticed, in the department indicated above unless otherwise ordered by the court.

Notice is further given that plaintiff in propria persona or counsel for the plaintiff is ordered to give notice of this all-purpose case assignment [illegible] action within 10 days of service of this notice by the court and file proof of service thereof within 15 days of this notice. Failure to timely give notice and file proof of service may lead to imposition of sanctions pursuant to Code of Civil Procedure section 177.5 or otherwise.

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/21/2019 By Saak Ghulyan
Deputy Clerk

NOTICE OF CASE REASSIGNMENT AND ORDER FOR PLAINTIFF TO GIVE NOTICE
(Dates Remain)

LACIV 193 (Rev. 09/...)
LASC Approved 05-06

Local Rules Chapter 3

## PROOF OF SERVICE BY MAIL

1    I am over the age of eighteen years and not a party to the within action. My employment address

2

3    where the mailing occurred is 24007 Ventura Boulevard, Suite 205, Calabasas, California 91302.

4    I am familiar with the business practices for collection and processing of correspondence for

5    mailing with the United States Postal Service at the aforementioned address and a true copy of the within

6    **Notice of Case Assignment AND Notice of Case Management Conference** was deposited in the mail on

7    December 3, 2019 following such business practices and in such manner as to cause it to be deposited

8    within the United States Postal Service that same day in the ordinary course of business addressed to all

9    such attorneys or parties addressed as follows:

10   Mr. D. Pearson Beardsley
     Agent for Service for Defyne Holdings, LLC.
11   200 Galleria Parkway, Suite 1850
     Atlanta, GA 30339
12

13   I declare under penalty of perjury under the laws of the State of California that the

14   foregoing is true and correct.

15   Executed December 3, 2019, in Calabasas, California.

16

17

18   **Moe Nadim**

19

20

21

22

23

24

25

26

27

28

Electronically FILED by Superior Court of California, County of Los Angeles on 12/31/2019 12:35 PM Sherri R. Carter, Executive Officer/Clerk of Court, by I. Barnes, Deputy Clerk

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State, Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| **Ross K Reghabi (206339)**<br>**Steve Ruiz <ruiz@scalg.com>**<br>**SOUTHERN CALIFORNIA LAW GROUP**<br>**24007 Ventura Boulevard**<br>**Calabasas, CA 91302** | |

| TELEPHONE NO.: | FAX NO. *(Optional)*: |
|---|---|
| E-MAIL ADDRESS *(Optional)*: | |
| ATTORNEY FOR *(Name)*: | **EMPEROR ENTERTAINMENT, INC., A CALIFORNIA CORPORATION; HAMIDREZA POUSTI, AN INDIVIDUAL** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

| STREET ADDRESS: | **6230 Sylmar Avenue** |
|---|---|
| MAILING ADDRESS: | **6230 Sylmar Avenue** |
| CITY AND ZIP CODE: | **Van Nuys 91401** |
| BRANCH NAME: | **Northwest District, Van Nuys Courthouse East** |

| PLAINTIFF/PETITIONER: | **EMPEROR ENTERTAINMENT, INC., A CALIFORNIA CORPORATION; HAMIDREZA POUSTI, AN INDIVIDUAL** | CASE NUMBER: |
|---|---|---|
| DEFENDANT/RESPONDENT: | **DEFYNE HOLDINGS, LLC, A LIMITED LIABILITY COMPANY; FRANCESCO DISTEFANO; ET AL.** | **19VECV01638** |

| **DECLARATION OF NON SERVICE** | Ref. No. or File No.:<br>**19vecv01638** |
|---|---|

I declare that I am and was on the dates herein mentioned, over the age of 18 years, not a party to nor interested in the above entitled action, and competent to be a witness therein.

I received the following documents for service:
   **SUMMONS; COMPLAINT; CIVIL CASE COVER SHEET; CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION; NOTICE OF CASE ASSIGNMENT; ADR PACKET**

I attempted to serve          **FRANCESCO DISTEFANO**
at the address of          **157 OAK MILL STREET, ADDISON, IL 60101**

and was unable to effect service for the following reasons:
   **12/21/2019 12:22 PM: Per JOHN DOE, WHO REFUSED TO GIVE NAME, RESIDENT, a male contact ... I spoke with the defendants grandfather over the camera doorbell. He stated the defendant lives in Coral Gables Florida.**

Fee for service: **$ 85.00**

I am not a registered California process server; my name, address, phone number, and county of registration and number are:

   **Nancy Porter**
   **316 W 2nd St. 3rd Floor Los Angeles, CA 90012**
   **213-621-9999**
   **Illinois Department of Financial and Professional Regulation - PERC, #129-020264**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.
Date:      12/21/2019

_____
          Nancy Porter
   (PRINTED NAME OF DECLARANT)

_____
   (SIGNATURE OF DECLARANT)

BY FAX

REF: **19vecv01638**

Ross K. Reghabi (SBN: 206339)
**SOUTHERN CALIFORNIA LAW GROUP**
24007 Ventura Blvd., Ste. 205
Calabasas, California 91302
E-mail:      reghabi@scalg.com
Telephone:   (747) 333-5151
Facsimile:   (818) 584-3169

Attorneys for Plaintiffs,
EMPEROR ENTERTAINMENT, INC.,
HAMIDREZA POUSTI

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES – NORTHWEST DISTRICT

| | |
|---|---|
| EMPEROR ENTERTAINMENT, INC., a California corporation; HAMIDREZA POUSTI, an individual<br><br>        Plaintiff,<br><br>vs.<br><br>DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO DISTEFANO, an indivdua; DISTEFANO ENTERPRISES LLC, a limited liability company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION, a business organization form unknown; and DOES 1 through 50, inclusive,<br><br>        Defendants. | Case No.: 19VECV01638<br><br>**EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND FOR ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; DECLARATION OF HAMIDREZA POUSTI**<br><br>Assigned for all purposes to:<br>Hon. Judge Michael Convey, Dept. U<br><br>Hearing:<br>Date: December 24, 2019<br>Time: 8:30 a.m.<br>Dept.: U<br><br>Action filed: November 15, 2019<br>Trial: None set |

**TO THE COURT AND ALL PARTIES AND THEIR RESPECTIVE**

**ATTORNEYS OF RECORD:**

Plaintiffs hereby apply ex parte for a Temporary Restraining Order ("TRO"),

restraining and enjoining Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns,

partners, employees, and any individual or entity acting in concert with DEFYNE

HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a

Preliminary Injunction:

- 1 -

1. Making, publishing, republishing, uttering, orally or in writing any false, misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;

2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the litigation herein.

FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, shall:

4. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5. Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant to the TMF/MATCH list.

This Application for preliminary injunctive relief as set forth in the proposed Temporary Restraining Order filed herewith, is made upon the grounds that the conduct sought to be enjoined if allowed to occur and continue to occur will cause immediate and irreparable harm to Plaintiffs in that the Plaintiffs business will be unable to accept any credit cards for the services and goods which it provides on a daily basis to its immediate community. Defendants conduct has effectively strangled all of Plaintiffs assets and bank

- 2 -

accounts such that he cannot withdraw any funds on any account. Also, Plaintiffs would be unable to conduct any business at its prominent location during the Holiday Season, the damages and pecuniary relief which could be afforded to the Plaintiffs due to the Defendants actions are difficult to ascertain because of the nature of the restaurant business. Also, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Plaintiff because Plaintiff will lose clients who intended to use credit cards for the transactions and the loss of income from the processing credit cards vis a vis cash transactions or checks is extremely difficult to calculate with exact certainty.

As an independent basis for injunctive relief, Plaintiffs apply for said relief pursuant to California Business & Professions Code, section 17200 et seq. which allows for injunctive relief in action such as the one herein.

Plaintiff also requests the Court to issue an Order to Show Cause pursuant to California Rules of Court, Rule 3.1150, affording Plaintiff the opportunity to appear and show why a Preliminary Injunction should not issue restraining and enjoining in the same manner for the remainder of this litigation.

This Application is based upon the California Code of Civil Procedure sections 525 et seq., and California Rules of Court, Rule 3.1150 and California Rules of Court, Rules 3.1200 et seq.; upon the attached Memorandum of Points and Authorities; the Declaration of Ross K. Reghabi, Hamidreza Pousti, filed herewith, and upon the Complaint on file herein, the records and files in this action, and upon such further evidence and argument as may be presented prior to or at the time of hearing on the motion.

Dated: December 23, 2019                SOUTHERN CALIFORNIA LAW GROUP

By: _____
Ross K. Reghabi, Esq.
Attorney for Plaintiffs,
Emperor Entertainment, Inc., Hamidreza Pousti

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................... 5

DECLARATION OF ROSS K. REGHABI, ESQ. ................................................ 6

DECLARATION OF HAMIDREZA POUSTI..................................................... 14

MEMORANDUM OF POINTS AND AUTHORITIES..................................... 18

   I.     INTRODUCTION ................................................................................. 18

   II.     TEMPORARY RESTRAINING ORDER MAY ISSUE GREAT AND IRREPARABLE INJURY WILL RESULT TO THE APPLICANT UNLESS THE OFFENDING CONDUCT IS IMMEDIATELY RESTRAINED ................................. 22

   III.    AN INJUNCTION IS WARRANTED IN THIS ACTION ................................. 23

   IV.    EX PARTE RELIEF IS PERMITTED UNDER THESE CIRCUMSTANCES AND DEFENDANT/CROSS-COMPLAINANT HAS COMPLIED WITH CALIFORNIA RULES OF COURT.................................................................... 25

      a.   Showing Required for Ex Parte Relief ............................................... 26

      b.   Compliance with Document and Notice Requirements for Ex Parte Application for TRO and OSC ........................................................................................ 26

   V.     CONCLUSION................................................................................... 27

[PROPOSED] TEMPORARY RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION ................................................................................................ 28

- 4 -

# TABLE OF AUTHORITIES

Cases

*Chico Feminist Women's Health Center v. Scully*
    (1989) 208 Cal. App. 3d. 230, 256 Cal. Rptr. 194 ........................................................ 22
*Church of Christ in Hollywood v. Superior Court*
    (2002) 99 Cal. App. 4th 1244, 121 Cal. Rptr. 2d 810 .................................................. 21
*Cohen v. Board of Supervisors*
    (1985) 40 Cal.3d 277, 219 Cal.Rptr. 467, 707 P.2d 840 ............................................... 24
*Gray v. Bybee*
    (1943) 60 Cal. App. 2d 564, 141 P.2d 32 ..................................................................... 22
*Trader Joes Co. v. Progressive Campaigns*
    (1999) 73 Cal. App. 4th 425, 86 Cal. Rptr. 2d 442 ...................................................... 24
*Whyte v. Schlage Lock Co.*
    (2002) 101 Cal. App. 4th 1443, 125 Cal. Rptr. 2d 277 ................................................. 24

Statutes

Code of Civil Procedure, §525 ............................................................................................ 23
Code of Civil Procedure, §526 ............................................................................................ 23
Code of Civil Procedure, §527 .............................................................................. 21, 23, 26

Rules

California Rules of Court, rule 3.1150 ........................................................................ 22, 25
California Rules of Court, rule 3.1201 ............................................................................... 25
California Rules of Court, rule 3.1202 ............................................................................... 25
California Rules of Court, rule 3.1203 ............................................................................... 25

- 5 -

**DECLARATION OF ROSS K. REGHABI, ESQ.**

I, ROSS K. REGHABI, ESQ., declare:

1.   I am an attorney licensed to practice law in all the courts of the State of California, and represent the Plaintiffs in the action herein. The following facts are known to me to be true and correct to my personal knowledge and if called upon to testify as to these facts I could and would competently do so.

2.   On November 11, 2019, I filed the Complaint in this action against the Defendants. A true and correct copy of the Complaint is attached and incorporated herein by reference as **Exhibit 1.** Plaintiff Emperor Entertainment, Inc., ("Emperor") is a California corporation doing business as "Cabaret Tehran," in Encino, California, as a restaurant, food, beverage, and live entertainment provider. Plaintiff Hamidreza Pousti ("Hamid") is an officer of the corporation. (Plaintiffs are collectively referred to as "Plaintiffs".)

3.   On or about August and September 2019, Defendant Francesco Distefano ("Francesco") represented to Plaintiffs that he was an agent working on behalf of the several Defendants. Francesco fraudulently made a series of misrepresentations to Plaintiffs including that Francesco had secured a loan of over $1,000,000 from Defyne and HSBC bank to Emperor. (*See*, *Declaration of Hamidreza Pousti*.) Francesco and Plaintiffs had engaged in more than two month process and negotiation during which Francesco showed to Plaintiffs fraudulent and manipulated documents which showed final approval and transfer of the above-mentioned loan. (*Id.* at ¶¶ 6, 12, 13.)

4.   As a result of Francesco's actions and in reliance on his misrepresentations Plaintiffs entered into several contracts for events for special customers which required substantial investment. (*Id.* at ¶13.) However, when Plaintiffs finally found out about Francesco's misrepresentations and fraudulent conduct with regard to the loan, Plaintiffs were unable to meet the requirements for contracted events and as a result Plaintiffs lost a substantial number of its long-term customers, money, and reputation in the community. (*Id.* at ¶¶13, 14.)

5.  Also, as a result of Francesco's fraudulent misrepresentation Plaintiffs are now facing multiple legal actions, including more than $250,000 charge backs by its customers. (*Id.* at ¶14.)

6.  On October 22, 2019, I contacted Defyne Holding, LLC's executive employees, Liad Chazan, Stephen Palazzo, Duayne Haskett, and the Retrieval and Chargeback Department. I informed Defendant Defyne and its officers about Francesco's fraudulent conduct during and within the scope of his engagement or employment with Defyne. Furthermore, I informed Defendant Defyne about the Plaintiffs' risks of harm which would occur if Defyne did not investigate Distefano's action. A true and correct copy of the October 22, 2019, letter to Defyne is attached and incorporated herein by reference as **Exhibit 2. Specifically, I informed Defyne's executive employees that Plaintiffs would be subject to multiple legal proceedings, including more than $250,000 chargebacks *because of Francesco's actions.***

7.  On October 30, 2019, Defyne's attorneys responded to my inquiries. A true and correct copy of the October 30, 2019, letter is attached and incorporated herein by reference as **Exhibit 3.** Defyne's lawyer attempted to distance its relationship with Francesco by stating that Francesco was merely an "independent contractor" of Defyne who "referred" clients to Defyne. **Defyne's attempt to distance itself is fruitless because this action specifically arises from that engagement wherein Francesco acted as an agent of Defyne for the $1 million loan for Plaintiffs.**

8.  On November 7, 2019, Defyne contacted Plaintiffs and informed Plaintiffs, that it had closed Plaintiffs' Merchant Account due to excessive chargebacks. A true and correct copy of the letter is attached and incorporated herein by reference as **Exhibit 4.**

9.  **Instead of making any efforts to investigate the fraudulent conduct of its own agents, Defyne has chosen to take an offensive position in an effort to reduce its exposure to risk and damages due to its agent's fraudulent conduct instead Defyne published false and misleading information about Plaintiffs. Any liability, delay, or misconduct on the contracts in this action were borne from the Defendants actions.**

- 7 -

10. On November 11, 2019, I wrote to Defyne's counsel to demand investigation of Defyne's agent, Francesco Distefano which, Defyne's agents have admitted refers clients to Defyne. I wrote to Defyne's counsel about Francesco's misrepresentations and fraudulent conduct and included copies of prior correspondence. Moreover, I wrote to Defyne's counsel that during all communications between Plaintiffs and Francesco, Francesco clearly and unequivocally represented that he was an agent of Defyne and that he was directly supervised by Liad Chazan, Defyne's Vice President of Financial Operations. A true and correct copy of my November 11, 2019, Letter to Defyne is attached and incorporated herein by reference as **Exhibit 5.**

11. Sometime between the November 11, 2019 letter and November 15, 2019, Defyne reported Plaintiffs account and "blacklisted" Emperor's Merchant Account. Defyne made such negative report about Plaintiffs' Merchant Account to the TMF/MATCH list created by MasterCard which is used throughout the credit card processing industry. This effectively prevents Emperor from conducting business. Defyne made such report knowing the circumstances surrounding the fraudulent transaction initiated by Francesco.

12. On November 15, 2019, Defyne's counsel, Greg Michell, wrote that Plaintiffs "are required to reimburse Defyne Holdings, LLC . . . for any and all customer chargebacks and related fees. Despite receiving repeated notices regarding a significant amount of chargebacks, they have failed to respond to fulfill that contractual responsibility." A true and correct copy of the November 15, 2019, letter from Greg Michell is attached and incorporated herein by reference as **Exhibit 6.** Mr. Michell went on to attach a purported "Merchant Agreement" between his client and Plaintiffs.

13. The purported "Merchant Agreement" has several misrepresentations which appear on its face, (a) the signature which appears on pages three and four in the "Merchant Application and Agreement" is not that of Hamidreza Pousti, (b) the Merchant's Name is identified as "Caber**n**et Tehran" which is not Plaintiffs' dba or trade name, (c) page one of the Merchant Application and Agreement identifies Version 1.3.1 0122**19** of the document on the lower left hand footer of the page, page two of the Merchant Application

- 8 -

1   identifies Version 1.3.**0** 1220**18**, page three returns to Version 1.3.1 0122**19**, but states

2   "Defye Payments . . ." as the titular service provider, then page four returns to document

3   Version 1.3.1 0122**19** and "Defyne Payments," and (d) the Terms and Conditions which

4   apparently require signature or initials on each page, has not been signed or initialed by

5   any party in this action. A true and correct copy of the *severely misleading* "Merchant

6   Agreement" is attached and incorporated herein by reference as **Exhibit 7.**

7       14. Moreover, assuming for the sake of argument, the purported "Merchant

8   Agreement" were in fact the agreement between the parties, and the Court were to accept

9   and affirm Defyne's purported agreement, paragraph 26 of the Terms and Conditions

10  states:

11          "No party shall be liable for any default or delay in the performance of its
            obligations under the Merchant Agreement if and to the extent such default
12          or delay is caused, directly or indirectly, by (i) fire, flood, earthquake,
            elements of nature or other acts of God; (ii) any terrorist attacks or outbreak
13          or escalation of hostilities, war, riots or civil disorders in any country; (iii)
            any act or omission of the other party or any government authority; (iv) any
14          labor disputes (whether or not employees' demands are reasonable or within
            the party's power to satisfy); or (v) the nonperformance by a third party for
15          any similar cause beyond the reasonable control of such party, including,
            without limitation, failures or fluctuations in telecommunications or other
16          equipment. In any such event, the nonperforming party shall be excused
            from any further performance and observance of the obligations so affected
17          only for as long as such circumstances prevail and such party continues to
            use commercially reasonable efforts to recommence performance or
18          observance as soon as practicable. Notwithstanding anything to the contrary
            in this Section, your failure to receive payment or funds from a third party
19          shall not excuse the performance of your obligations to us under the
            Merchant Agreement."
20

21      15. Francesco, acting on behalf of Defyne, a party to the fraudulent "Merchant

22  Agreement," wrongfully misrepresented and mislead Plaintiffs. Plaintiffs have attempted,

23  within reason to reach out to Defendant Defyne and requested an investigation into the

24  fraudulent loan. Plaintiffs have informed Defyne about the reason for the chargebacks all

25  in a commercially reasonable manner. But Defendants and each of them have failed to

26  cure their performance. According to the agreement, Plaintiffs are excused from paying

27  the chargeback on Defendant Defyne's demand while the Defendant Defyne through its

28  agent Francesco has not fulfilled its commitments to transfer the $1 million loan!

16. On November 26, 2019, Defendant Defyne's counsel issued another demand for payment of chargebacks, even after having been informed of the several issues concerning Francesco Distefano. **Defyne's counsel continues to avoid any investigation into the fraudulent actions by its agent Francesco Distefano.**

17. Now, Plaintiffs accounts have been frozen and blacklisted because Defendant Defyne's report to the Mastercard Match/TMF list. Credit Card Service companies will not work with him, his bank accounts have been frozen, and he cannot run his business because of Fracesco's fraudulent conduct, and Defyne's actions which completely avoid investigation into its own agent. A true and correct copy of US Bank Statement print outs showing NSF and Returned Checks are attached and incorporated herein by reference as **Exhibit 8.**

18. Plaintiff seeks a Temporary Restraining Order against Defendants, DEFYNE HOLDINGS, LLC, pending hearing on a Preliminary Injunction. Said Temporary Restraining Order should issue because defendants are engaging in the conduct which severely limits Plaintiffs ability to conduct his restaurant business as he will not be able to process credit cards, or find an alternative credit card processing company. Defendant DEFYNE'S report to Mastercard's TMF/MATCH has essentially blacklisted Plaintiffs business throughout the industry. Therefore, Plaintiffs request the Court restrain and enjoin Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a Preliminary Injunction:

   a. Making, publishing, republishing, uttering, orally or in writing any false, misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;

   b. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk

Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

   c. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, individually, disputed chargebacks totaling approximately $250,000 beyond the action herein.

19. Furthermore, Plaintiffs request the Court order Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, shall:

   a. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals working on its behalf, intend to and do hereby expressly execute any and all acts to remove any negative entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

   b. DEFYNE HOLDINGS, LLC, its agents, assigns partners, employees and individuals working on its behalf, will execute any and all further documentation or act necessary for removal of any negative remark, false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiffs as a high-risk merchant to the TMF/MATCH list.

20. Plaintiffs are currently unable to process credit card transactions because Defyne blacklisted Plaintiffs and their Merchant Account throughout the entire credit card processing industry. Credit card processing is an essential commodity and service in the restaurant business. Defyne has put a hold on Plaintiffs business. Also, Plaintiff does not have access to his bank accounts due to Defyne blacklisting Plaintiffs.

21. There is a high likelihood that Plaintiff will prevail at the trial of the within action based on all the evidence which is presented in this application, based on the purported

- 11 -

"Merchant Agreement" and based on the Defendants failure to uphold their own purported agreement.

22. Defendant will suffer no harm if the TRO is granted, in that any contractual claims which they may have pursuant to any claims in this action arising between the parties are preserved to the extent any of the agreements are enforceable. On the other hand, Plaintiffs are suffering irreparable harm unless an injunction is issued – Plaintiffs business cannot function without a credit card processing service.

23. For the above reasons and in light of the facts presented, a Temporary Restraining Order should be immediately issued to prevent further harm to Plaintiff.

24. D. Pearson Beardsley of Pearson Law Group, LLC is defendant, Defyne Holdings, LLC's registered agent for service of process, his address is 16 Towne Park Drive, Lawrenceville, Georgia 30044, telephone number 770-277-0272, and fax number 770-277-0273.  On December 23, 2019, at 8:55 a.m., I advised opposing parties for Defendant Defyne Holdings, LLC, by means of a fax letter of the date, time, place and nature of this Ex Parte Application and the conduct sought to be enjoined. Opposing counsel will probably oppose this Application. A true and correct copy of the notice sent to counsel is attached and incorporated herein by reference as **Exhibit 15.**

25. Greg Michell, of Stanley, Ersey & Buckley, LLP, was retained to represent Defendant Defyne Holdings, LLC, in the prelitigation of this action, his address is 1230 Peachtree Street, N.E., Suite 2400, Atlanta Georgia 30309, telephone number 404-835-6200, fax number 404-835-6221, and email address gmichell@seblaw.com. I advised opposing parties for Defendant Defyne Holdings, LLC, by means of a fax letter of the date, time, place and nature of this Ex Parte Application and the conduct sought to be enjoined. Opposing counsel will probably oppose this Application.

26. Defendant Francesco DiStefano is not represented by counsel. His address is 1001 S. Main Street, Suite 49, Kalispell, Montana 59901, telephone 406-233-9699 extension 1001, fax number 815-487-4905, email address francesco@distefanoenterprisesllc.com. I advised opposing parties for Defendant Francesco DiStefano, and DiStefano Enterprises,

1 LLC, by means of a fax letter of the date, time, place and nature of this Ex Parte

2 Application and the conduct sought to be enjoined. Opposing counsel will probably

3 oppose this Application.

4     27. I declare under penalty of perjury under the laws of the State of California that the

5 foregoing is true and correct, and this declaration was executed on this December 23,

6 2019, at Calabasas, California.

7

8 Ross K. Reghabi, Esq.
Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 13 -

1

**DECLARATION OF HAMIDREZA POUSTI**

2   I, Hamidreza Pousti, declare:

3       1.  I am a party to this action, and the President of Emperor Entertainment, authorized

4   to speak on its behalf as to the following. The following information is personally known

5   to me to be true and correct, except as to those matters stated on information or belief. If

6   called upon to testify as to these matters, I could and would completely testify thereto.

7       2.  On or about August and September 2019, Defendant Francesco Distefano

8   ("Francesco") represented to me and my employees or agents, that he was an agent

9   working on behalf of the Defyne Holdings, LLC, ("Defyne") a credit card payment

10  processing company. A true and correct copy of Francesco's driver's license is attached

11  and incorporated herein by reference as **Exhibit 9.**

12      3.  At all times during our conversations, Francesco had represented that he could help

13  me as an agent of Defyne to obtain a loan from Defyne and HSBC bank.

14      4.  I had been looking to obtain a loan for Emperor Entertainment, Inc. ("Emperor")

15  for the purpose of updating some of the facilities at Cabaret Tehran. Cabaret Tehran has

16  been in the restaurant and entertainment business since 1973. In the last few years I have

17  been managing the restaurant and entertainment through and by Emperor doing business

18  as Cabaret Tehran.

19      5.  When I spoke with Francesco he promised that he would help me obtain a $1

20  million dollar loan through Defyne.

21      6.  The loan would be used for the purpose of updating the Cabaret Tehran facilities

22  on Ventura Boulevard, in Encino, California. The $1 million loan would be secured by

23  future restaurant receipts. Francesco worked toward that end by first providing me with a

24  credit card reading device that would process the monthly credit card receipts for the

25  restaurant. Francesco informed me that he needed to obtain an accurate record of receipts

26  for the purpose of obtaining the $1 million loan. I agreed that the device could be installed

27  at Cabaret Tehran, and that each transaction could be processed by Defyne for the purpose

28

of obtaining the $1 million loan. A true and correct copy of those records are attached and incorporated herein by reference as **Exhibit 10.**

7.  On or about August 26, 2019, Francesco provided me with a loan agreement with an organization known as Kash Capital. A true and correct copy of the loan agreement is attached and incorporated herein by reference as **Exhibit 11.**

8.  I cannot remember exactly when, but shortly after executing the August 26, 2019, Loan Agreement, Francesco informed me that the agreement Kash Capital could not provide the loan, and the loan would be made through HSBC bank.

9.  Due to the delay in obtaining the loan, Francesco provided me with an HSBC credit card to use while the funds were made available. A true and correct copy of the redacted credit card is attached and incorporated herein by reference as **Exhibit 12.**

10. On or about September 10, 2019, after repeated demands for the financing, Francesco informed me that the loan was secured, and the funds would be transferred to my account. Francesco sent me several photographs of a transfer of the funds to "Emperor Entertainment, Inc. Hamidreza Pousti."  A true and correct copy of the photographs are attached and incorporated herein by reference as **Exhibit 13.** The funds have not been transferred and were never transferred, to Emperor Entertainment, Inc. or to me.

11. As a result of Francesco's actions and in reliance on his misrepresentations Emperor Entertainment, Inc. entered into several contracts for events for special customers which required substantial investment. However, when I finally realized Francesco's fraudulent conduct with regard to the loan, Emperor was unable to meet the requirements for contracted events and as a result Emperor lost a substantial number of its long-term customers, money, and reputation in the community.

12. Also, as a result of Francesco's fraudulent misrepresentation Emperor and I, are now facing multiple legal actions, including more than $250,000 charge backs by Emperor's customers. Several clients made deposits for concerts and events with deposits for musicians to play at the restaurant, and those events were cancelled because of Defyne and Francesco's actions. A true and correct copy of Emperor's US Bank statements

- 15 -

showing NSF and Returned Checks are attached and incorporated herein by reference as **Exhibit 8.**

13. On or about October 2019, Francesco represented that he had reached Defyne's Vice President, Liad Chazan to cure the delay in funding. Francesco represented that Liad was his direct supervisor working with Defyne. A true and correct copy of several emails between Francesco and Defyne are attached and incorporated herein by reference as **Exhibit 14.**

14. **The emails were forwarded to my associate and Francesco represented that the loan had been funded and the problems resolved. But again, Francesco misrepresented the true facts and the loan and funds have not been transferred to me or Emperor's accounts.**

15. On or about late October 2019, my lawyer, Ross Reghabi, and I contacted Defyne Holdings, LLC to inform it about the wrongdoings of its agent Francesco. A true and correct copy of my lawyer's letter to Defyne are attached and incorporated herein by reference as **Exhibit 2.**

16. Defyne has taken action against Emperor by blacklisting Emperor in the MATCH/TMF list created by Mastercard and submitting a false, misleading, and fraudulent report about Emperor's actions. Defyne has knowingly sought to damage the reputation and business of Emperor to avoid dealing with its own impropriety and using little known techniques.

17. Defyne claims I had a contract, "Merchant Agreement" with Defyne, but my signature does not appear on any of the pages in the fraudulent agreement. A true and correct copy of the disputed "Merchant Agreement" is attached and incorporated herein by reference as **Exhibit 7.** By way of example, my signature does appear on the Kash Capital Agreement, **Exhibit 11**, the signatures on the "Merchant Agreement" are not my signatures.

18. Defyne is effectively shutting down my business, I cannot access my personal funds, I cannot access the business funds, in any bank.

- 16 -

19. Moreover, Emperor Entertainment, Inc. doing business as Cabaret Tehran, cannot function as efficiently and effectively as a restaurant without a Credit Card Processing provider. Defyne's actions, listing Emperor on MATCH/TMF has resulted in an industry wide black mark on Emperor. Emperor cannot process credit cards which is deadly to any business in this day and age.

20. I request the Court Order Defyne to remove the false, misleading, and fraudulent marks on the MATCH/TMF list, and to do anything within its power to remove the false, misleading, and fraudulent marks on Emperor Entertainment made to MATCH/TMF lists, so that Emperor may transact business.

21. If the Court does not issue such an injunction, Emperor Entertainment will be unable to process any credit card transactions during the entire holiday season, Emperor Entertainment will be effectively shut down and lose any and all goodwill and prospective economic relations, the damages are extremely difficult to calculate.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct and that this declaration was executed on this 18th day of December 2019.

Hamidreza Pousti,
President, Emperor Entertainment, Inc.,
Declarant

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **I.     INTRODUCTION**

3      On November 11, 2019, Plaintiffs filed the Complaint in this action against the

4  Defendants. A true and correct copy of the Complaint is attached and incorporated herein

5  by reference as **Exhibit 1.** Plaintiff Emperor Entertainment, Inc., ("Emperor") is a

6  California corporation doing business as "Cabaret Tehran," in Encino, California, as a

7  restaurant, food, beverage, and live entertainment provider. Plaintiff Hamidreza Pousti

8  ("Hamid") is an officer of the corporation. (Plaintiffs are collectively referred to as

9  "Plaintiffs".)

10     On or about August 2019 through September 2019, Defendant Francesco Distefano

11 ("Francesco") represented to Plaintiffs that he was the agent of Defendant Defyne

12 Holdings, LLC ("Defyne"). Defendant Francesco told Plaintiffs that he could obtain a

13 $1million loan for Emperor, and Plaintiffs represented the loan would be used for

14 updating the facilities at the popular restaurant Cabaret Tehran in Encino, California.

15 Francesco made several representations indicating the loan was funded, and that

16 Francesco had transferred the funds to Plaintiffs bank account. But the funds were never

17 transferred.

18     On or about August and September 2019, Defendant Francesco Distefano

19 ("Francesco") represented to Plaintiffs that he was an agent working on behalf of the

20 several Defendants. Francesco fraudulently made a series of misrepresentations to

21 Plaintiffs including that Francesco had secured a loan of over $1,000,000 from Defyne

22 and HSBC bank to Emperor. (*See*, *Declaration of Hamidreza Pousti*, ¶¶ 11, 12.)

23 Francesco and Plaintiffs had engaged in more than two month process and negotiation

24 during which Francesco misrepresented and manipulated documents which showed final

25 approval and transfer of the above-mentioned loan. (*Id.* at ¶¶ 6, 12, 13.)

26     As a result of Francesco's actions and in reliance on his misrepresentations Plaintiffs

27 entered into several contracts for events for special customers which required substantial

28 investment. (*Id.* at ¶13.) However, when Plaintiffs finally found out about Francesco's

- 18 -

fraudulent conduct with regard to the loan, Plaintiffs were unable to meet the requirements for contracted events and as a result Plaintiffs lost a substantial number of its long-term customers, money, and reputation in the community. (*Id.* at ¶13.)

Also, as a result of Francesco's fraudulent misrepresentation Plaintiffs are now facing multiple legal actions, including more than $250,000 charge backs by its customers. (*Id.* at ¶14.)

On October 22, 2019, Plaintiffs counsel contacted Defyne Holding, LLC's executive employees, Liad Chazan, Stephen Palazzo, Duayne Haskett, and the Retrieval and Chargeback Department. Plaintiffs' counsel informed Defendant Defyne and its officers about Francesco's fraudulent conduct during and within the scope of his engagement or employment with Defyne. Furthermore, Plaintiffs' counsel informed Defendant Defyne about the Plaintiffs' risks of harm which would occur if Defyne did not investigate Distefano's action. A true and correct copy of the letter to Defyne is attached and incorporated herein by reference as **Exhibit 2. Specifically, Plaintiffs' counsel informed Defyne's executive employees that Plaintiffs would be subject to multiple legal proceedings, including more than $250,000 chargebacks *because of Francesco's actions.***

On October 30, 2019, Defyne's attorneys responded to Plaintiffs' counsel's inquiries. A true and correct copy of the October 30, 2019, letter is attached and incorporated herein by reference as **Exhibit 3.** Defyne's lawyer attempted to distance its relationship with Francesco by stating that Francesco was merely an "independent contractor" of Defyne who "referred" clients to Defyne. **Defyne's attempt to distance itself is fruitless because this action specifically arises from that engagement wherein Francesco acted as an agent of Defyne for the $1 million loan for Plaintiffs.**

On November 7, 2019, Defyne contacted Plaintiffs and informed Plaintiffs, that it had closed Plaintiffs' Merchant Account due to excessive chargebacks. A true and correct copy of the letter is attached and incorporated herein by reference as **Exhibit 4.**

**Instead of making any efforts to investigate the fraudulent conduct of its own agents, Defyne has chosen to take an offensive position in an effort to reduce its exposure to risk and damages due to its agent's fraudulent conduct. Any liability, delay, or misconduct on the contracts in this action were borne from the Defendants actions.**

On November 11, 2019, Plaintiffs' counsel wrote to Defyne's counsel to demand investigation of Defyne's agent, Francesco Distefano which, Defyne has admitted refers clients to Defyne. Plaintiffs' counsel wrote to Defyne's counsel about Francesco's misrepresentations and included copies of prior correspondence. Moreover, Plaintiffs' counsel wrote to Defyne's counsel that during all communications between Plaintiffs and Francesco, Francesco clearly and unequivocally represented that he was an agent of Defyne and that he was directly supervised by Liad Chazan, Defyne's Vice President of Financial Operations. A true and correct copy of my November 11, 2019, Letter to Defyne is attached and incorporated herein by reference as **Exhibit 5.**

Sometime between the November 11, 2019 letter and November 15, 2019, Defyne reported Emperor's Merchant Account and "blacklisted" Emperor's Merchant Account. Defyne made the false, misleading, and fraudulent negative report about Plaintiffs' Merchant Account to the TMF/MATCH list created by MasterCard which is used throughout the credit card processing industry. Defyne made such report knowing about the circumstances surrounding the fraudulent transaction initiated by Francesco.

On November 15, 2019, Defyne's counsel, Greg Michell, wrote that Plaintiffs "are required to reimburse Defyne Holdings, LLC . . . for any and all customer chargebacks and related fees. Despite receiving repeated notices regarding a significant amount of chargebacks, they have failed to respond to fulfill that contractual responsibility." A true and correct copy of the November 15, 2019, letter from Greg Michell is attached and incorporated herein by reference as **Exhibit 6.** Mr. Michell went on to attach a purported "Merchant Agreement" between Defyne and Plaintiffs.

The purported "Merchant Agreement" has several misrepresentations which appear on its face, (a) the signature which appears on pages three and four in the "Merchant Application and Agreement" is not that of Hamidreza Pousti, (b) the Merchant's Name is identified as "Caber**n**et Tehran" which is not Plaintiffs' dba or trade name, (c) page one of the Merchant Application and Agreement identifies Version 1.3.**1** 0122**19** of the document on the lower left hand footer of the page, page two of the Merchant Application identifies Version 1.3.**0** 1220**18**, page three returns to Version 1.3.**1** 0122**19**, but states "Defye Payments . . ." as the titular service provider, then page four returns to document Version 1.3.1 012219 and "Defyne Payments," and (d) the Terms and Conditions which apparently require signature or initials on each page, has not been signed or initialed by any party in this action. A true and correct copy of the *severely misleading* "Merchant Agreement" is attached and incorporated herein by reference as **Exhibit 7.**

Moreover, assuming for the sake of argument, the purported "Merchant Agreement" were in fact the agreement between the parties, and the Court were to accept and affirm Defyne's purported agreement, paragraph 26 of the Terms and Conditions states:

> "No party shall be liable for any default or delay in the performance of its obligations under the Merchant Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a third party for any similar cause beyond the reasonable control of such party, including, without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the nonperforming party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this Section, your failure to receive payment or funds from a third party shall not excuse the performance of your obligations to us under the Merchant Agreement."

Francesco, acting on behalf of Defyne, a party to the fraudulent "Merchant Agreement," wrongfully misrepresented and mislead Plaintiffs. Plaintiffs have attempted, within reason to reach out to Defendant Defyne and requested an investigation into the

fraudulent loan. Plaintiffs have informed about the reason for the chargebacks all in a commercially reasonable manner. But Defendants and each of them have failed to cure their performance. According to the fraudulent agreement, Plaintiffs are excused from paying the chargeback on Defendant Defyne's demand while the Defendant Defyne through Francesco has not fulfilled its commitments to transfer the $1 million loan.

On November 26, 2019, Defendant Defyne's counsel issued another demand for payment of chargebacks, even after having been informed of the several issues concerning Francesco Distefano. **Defyne's counsel continues to avoid any investigation into the fraudulent actions by its agent Francesco Distefano.**

Now, Plaintiffs accounts have been frozen and blacklisted because Defendant Defyne's report to the Mastercard Match/TMF list. Credit Card Service companies will not work with him, his bank accounts have been frozen, and he cannot run his business because of Fracesco's fraudulent conduct, and Defyne's actions which completely avoid investigation into its own agent. (*Declaration of Hamid Pousti*, ¶¶ 12, 18, 19.)

Plaintiffs therefore request the Court issue a preliminary injunction forbidding Defendants from making false, misleading, or fraudulent remarks about Plaintiffs, and that Defendants take any and all actions necessary to remove the Plaintiffs from the MATCH/TMF list.

## II.   TEMPORARY RESTRAINING ORDER MAY ISSUE GREAT AND IRREPARABLE INJURY WILL RESULT TO THE APPLICANT UNLESS THE OFFENDING CONDUCT IS IMMEDIATELY RESTRAINED

A TRO may issue when "it appears from the facts shown by affidavit or by the verified complaint [or cross-complaint] that great or irreparable injury will result to the applicant before the matter can be heard on notice . . ." (Code of Civil Procedure, § 527(c)(1).)

The Court should evaluate two interrelated factors when deciding whether or not to issue a temporary restraining order. The first is the likelihood that the plaintiff or cross-complainant will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the restraining order is denied, as compared to the harm that

- 22 -

the defendant is likely to suffer if the order is issued. (*Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal. App. 4th 1244, 1251, 121 Cal. Rptr. 2d 810.

A TRO is distinguishable from a preliminary injunction in the following respects: It may be issued ex parte; a bond, though commonly required, is not essential; and it is of short duration, normally expiring at the time of the hearing on the preliminary injunction. (*Chico Feminist Women's Health Center v. Scully* (1989) 208 Cal. App. 3d. 230, 237, 256 Cal. Rptr. 194.)

The granting or denial of a temporary restraining order is discretionary with the trial judge and amounts to a mere preliminary or interlocutory order to keep the subject of the litigation in status quo pending the determination of the action on its merits. (*Gray v. Bybee* (1943) 60 Cal. App. 2d 564, 571, 141 P.2d 32.)

As stated in the declarations of Ross K. Reghabi, Esq. and Hamidreza Pousti, if Defendant Defyne Holdings, LLC, and its agents, are not immediately restrained and enjoined from engaging in/continuing to engage in the aforesaid conduct, Plaintiffs Emperor Entertainment, Inc. and Hamidreza Pousti, will suffer great and irreparable harm. On the other hand, Defendant Defyne Holdings, LLC will not likely suffer any great damages by reason of granting the TRO because Defyne will retain any and all *enforceable* contractual interest.

For the above reasons, a Temporary Restraining Order should be immediately issued to prevent further harm to the Plaintiffs as alleged and set forth in the attached declaration.

## III.    AN INJUNCTION IS WARRANTED IN THIS ACTION

> A party requesting a preliminary injunction may give notice of the request to the opposing or responding party either by serving a noticed motion under Code of Civil Procedure section 1005 or by obtaining and serving an order to show cause ("OSC").

California Rules of Court, rule 3.1150(a).

> If the action is initiated the same day a TRO or an OSC is sought, the complaint must be filed first. The moving party must provide a file stamped copy of the complaint to the judge who will hear the application. If an Application is made in an existing case, the moving party must request that the court file be made available to the judge hearing the application.

California Rules of Court, rule 3.1150(b).

1    In the instant case, Plaintiff has requested that the court file by made available in

2    Department U, at the time of making this application by means of a request to the judicial

3    assistant or clerk of Department U, or by filing the instant motion with a Copy of the

4    Complaint. Also, Los Angeles Superior Court has transitioned to an electronic filing

5    system, and all files are now available to Departments at the touch of a button or

6    something similar to a button.

7    Cross-complainant requests that the instant injunction be issued based upon the

8    evidence presented by declarations and the Complaint on file herein, submitted with this

9    application.

10       An injunction is a writ or order requiring a person to refrain from a
         particular act. It may be granted by the court in which the action is brought,
11       or by a judge thereof; and when granted by a judge, it may be enforced as an
         order of the court.

12

13   Code of Civil Procedure, §525.

14       A Preliminary Injunction is proper in the following circumstances:

15       (1) When it appears by the complaint that the plaintiff is entitled to the relief
         demanded, and such relief, or any part thereof, consists in restraining the
16       commission or continuance of the act complained of, either for a limited
         period or perpetually.
17       (2) When it appears by the complaint or affidavits that the commission or
         continuance of some act during the litigation would produce waste, or great
18       or irreparable injury, to a party to the action.
         (3) When it appears, during the litigation, that a party to the action is doing,
19       or threatens, or is about to do, or is procuring or suffering to be done, some
         act in violation of the rights of another party to the action respecting the
20       subject of the action, and tending to render the judgment ineffectual.
         (4) When pecuniary compensation would not afford adequate relief.
21       (5) Where it would be extremely difficult to ascertain the amount of
         compensation which would afford adequate relief.
22       (6) Where the restraint is necessary to prevent a multiplicity of proceedings.
         (7) Where the obligation arises from a trust.

23

24   Code of Civil Procedure, §526(a).

25       A preliminary injunction may be granted at any time before judgment upon
         a verified complaint, or upon affidavit if the complaint in the one case, or
26       affidavits in the other, show satisfactorily that sufficient grounds exist
         therefore. No preliminary injunction shall be granted without notice to the
27       opposing party.

28   Code of Civil Procedure, §527(a).

- 24 -

To obtain a preliminary injunction, the plaintiff/cross-complainant must establish that the defendant/cross-defendant should be restrained from the challenged activity pending trial. *Trader Joes Co. v. Progressive Campaigns* (1999) 73 Cal. App. 4th 425, 429, 86 Cal. Rptr. 2d 442.

As with a Temporary Restraining Order, the Court weighs two interrelated factors; the likelihood the moving party will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction. *Whyte v. Schlage Lock Co.* (2002) 101 Cal. App. 4th 1443, 1449, 125 Cal. Rptr. 2d 277.

> This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]

*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286, 219 Cal.Rptr. 467, 471, 707 P.2d 840, 844, (citing, (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70, 196 Cal.Rptr. 715, 672 P.2d 121).

Moreover, California Business & Professions Code states, "[a]ny person who engages, has engaged, or proposed to engage in unfair competition may be enjoined in any court of competent jurisdiction." (Business & Professions Code, §17203.)

As shown in the Declarations submitted herewith, sufficient grounds exist such that the Court should issue a preliminary injunction in this matter. If Defyne proceeds with blacklisting Emperor's creditworthiness, then Defyne will destroy Emperor Entertainment, Inc.'s business because it won't be able to accept a single credit card at its restaurant. If the Court issued the injunction and Defyne were ordered to remove the derogatory, false, misleading and fraudulent report on MATCH/TMF, then Defyne would retain any ***enforceable*** rights and interest in contract. Thus, Defyne's harm if the injunction is issued is *de minimis*.

**IV.    EX PARTE RELIEF IS PERMITTED UNDER THESE CIRCUMSTANCES AND DEFENDANT/CROSS-COMPLAINANT HAS COMPLIED WITH CALIFORNIA RULES OF COURT**

- 25 -

### a. Showing Required for Ex Parte Relief

California Rules of Court, rule 3.1150 provides that "[a]pplications for ex parte temporary restraining orders are governed by the ex parte rules in chapter 4 of this division."

> An application [for an ex parte application] must make an affirmative factual showing in a declaration containing competent testimony based on personal knowledge or irreparable harm, immediate damger, or any other statutory basis for granting relief ex parte."

California Rules of Court, rule 3.1202(c).

As shown by the attached declarations of Ross K. Reghabi, Hamidreza Pousti, there is an imminent and present danger that the conduct sought to be enjoined violates Plaintiffs.

### b. Compliance with Document and Notice Requirements for Ex Parte Application for TRO and OSC

> An ex parte application for an order must be accompanied by an affidavit or declaration showing: (1) that, within the applicable time period under (b) [no later than 10:00 a.m. the court day before the ex parte appearance], the applicant informed the opposing party when and where the application would be made; or (2) that the applicant in good faith attempted to inform the opposing party but was unable to do so, specifying the efforts made to inform the opposing party; or (3) that, for reasons specified, the applicant should not be required to inform the opposing attorney.

California Rules of Court, rule 3.1201.

> A party seeking an ex parte order must notify all parties no later than 10:00 a.m. the court day before the ex parte appearance, absent a showing of exceptional circumstances that justify a shorter time for notice.

California Rules of Court, rule 3.1203(a).

When notice of an ex parte application is given, the person giving notice must:

> (1) State with specificity the nature of the relief to be requested and the date, time, and place for the presentation of the application; and
> (2) Attempt to determine whether the opposing party will appear to oppose the application.

California Rules of Court, rule 3.1204(a).

> An ex parte application must be accompanied by a declaration regarding notice stating:
> (1) The notice given, including the date, time, manner, and name of the

- 26 -

party informed, the relief sought, any response, and whether opposition is expected and that, within the applicable time under rule 3.1203, the applicant informed the opposing party where and when the application would be made;
(2) That the applicant in good faith attempted to inform the opposing party but was unable to do so, specifying the efforts made to inform the opposing party; or
(3) That, for reasons specified, the applicant should not be required to inform the opposing party.

California Rules of Court, rule 3.1204(b).

"No temporary restraining order shall be granted without notice to the opposing party . . . ." (Code of Civil Procedure, §527(c).)

As stated in the Declaration of Ross K. Reghabi, Esq., submitted herewith, counsel for Plaintiff advised the opposing party by means of email and facsimile, of the date, time, place and nature of this Ex Parte Application.

## V.   CONCLUSION

Based on the foregoing reasons and supporting facts and authorities, it is respectfully requested that the Court issue a Temporary Restraining Order ("Proposed" Order submitted herewith), and set an Order to Show Cause hearing for Preliminary Injunction consistent with this Application ("Proposed" Order to Show Cause also submitted herewith).

Dated: December 19, 2019           SOUTHERN CALIFORNIA LAW GROUP

By: _____
Ross K. Reghabi, Esq.
Attorney for Plaintiffs

- 27 -

1    Ross K. Reghabi (SBN: 206339)
     **SOUTHERN CALIFORNIA LAW GROUP**
2    24007 Ventura Blvd., Ste. 205
     Calabasas, California 91302
3    E-mail:      reghabi@scalg.com
     Telephone:   (747) 333-5151
4    Facsimile:   (818) 584-3169

5    Attorneys for Plaintiff,
     EMPEROR ENTERTAINMENT, INC.,
6    HAMIDREZA POUSTI

7

8                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                  FOR THE COUNTY OF LOS ANGELES – NORTHWEST

10

11   EMPEROR ENTERTAINMENT, INC.,            Case No.: 19VECV01638
     a California corporation; HAMIDREZA
12   POUSTI, an individual                   **[PROPOSED] TEMPORARY**
                                             **RESTRAINING ORDER AND OSC**
13        Plaintiff,                         **RE PRELIMINARY INJUNCTION**

14   vs.                                     Assigned for all purposes to:
                                             Hon. Judge Michael Convey, Dept. U
15   DEFYNE HOLDINGS, LLC, a limited
     liability company; FRANCESCO           Hearing:
16   DISTEFANO, an individua;               Date: November 29, 2019
     DISTEFANO ENTERPRISES LLC, a           Time: 8:30 a.m.
17   limited liability company; KASH        Dept.: U
     CAPITAL, LLC, a limited liability
18   company; HSBC BANK USA,                 Action filed: November 15, 2019
     NATIONAL ASSOCIATION, a                 Trial: None set
19   business organization form unknown;
     and DOES 1 through 50, inclusive,
20
          Defendants.
21   TO DEFENDANT DEFYNE HOLDINGS, LLC,

22        Pending hearing on the Order to Show Cause issued by this Court on December __,

23   2019, you, your agents, assigns, employees, partners, ARE HEREBY RESTRAINED

24   AND ENJOINED from the following acts:

25        1.   Making, publishing, republishing, uttering, orally or in writing any false,

26             misleading, or fraudulent remarks concerning Plaintiffs business and its credit

27             card processing privileges to any person, including all third-party credit reporting

28             organizations, pending the resolution of this matter;

                                          - 28 -

2.   Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3.   Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the litigation herein.

FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, **shall**:

4.   Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5.   Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant.

This Temporary Restraining Order is effective this date, and shall expire at _____ a.m. on _____, 2019.

IT IS FURTHER ORDERED:

YOU ARE HEREBY ORDERED TO SHOW CAUSE at _____ a.m., on _____, 2019, or as soon thereafter as the matter may be heard in Department U of the above-entitled court, located at 6230 Sylmar Avenue, Van Nuys, California 91401, why you, your agents, assigns, employees, partners and all those acting in concert with you, should not be restrained and enjoined for the remainder of this litigation from the following acts

- 29 -

1. Making, publishing, republishing, uttering, orally or in writing any false, misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;

2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the pending litigation herein.

FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, **shall**:

4. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5. Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant to the TMF/MATCH list.

**IT IS FURTHER ORDERED**, the following briefing schedule shall apply:

The Complaint, Temporary Restraining Order and OSC re Preliminary Injunction shall be served on Defendants no later than _____, 2019.

Defendant's Opposition papers are due no later than _____, 2019

- 30 -

1      Plaintiff's Reply papers are due no later than _____, 2019

2  IT IS FURTHER ORDERED:

3  _____

4  _____

5  _____

6  IT IS SO ORDERED

7  Dated: December ___, 2019

8                                         _____
                                          Judge of the Superior Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 11/15/2019 01:43 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Salcedo,Deputy Clerk

19VECV01636

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Defyne Holdings, LLC., a limited liability company; (See Attachment I
for additional Defendants)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Emperor Entertainment, Inc., a California corporation; Hamidreza
Pousti, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Northwest District - Los Angeles | CASE NUMBER:<br>*(Número del Caso):* |
|---|---|

Los Angeles Superior Court, 6230 Sylmar Avenue, Van Nuys, California
91401

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ross K. Reghabi, Esq./Bar # 206339,24007 Ventura Blvd.,#205, Calabasas Ca. 91302, (747)333-5151

| DATE:<br>*(Fecha)* | 11/15/2019 | Clerk, by<br>*(Secretario)* | Sherri R. Carter Executive Officer / Clerk of Court<br>Angelica Salcedo | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Emperor Entertainment v. Defyne, et al. | |

**ATTACHMENT** *(Number):* <u>ONE</u>

*(This Attachment may be used with any Judicial Council form.)*

Additional Defendants:

Francesco DiStefano, an individual; DiStefano Enterprises, LLC., a limited liability company; Kash Capital, LLC., a limited liability company; HSBC Bank USA, National Association, a business organization form unknown; and DOES 1 through 50, inclusive.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page <u>1</u> of <u>1</u>

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT**
**to Judicial Council Form**

www.courtinfo.ca.gov

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:
Van Nuys Courthouse East
6230 Sylmar Avenue, Van Nuys, CA 91401

**NOTICE OF CASE ASSIGNMENT**

**UNLIMITED CIVIL CASE**

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

11/15/2019

Sherri R. Carter, Executive Officer / Clerk of Court
By _____ Angelica Salcedo _____ Deputy
Angelica Salcedo

Your case is assigned for all purposes to the judicial officer indicated below.

CASE NUMBER:
19VECV01638

## THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✔ | Michael J. Convey | U | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 11/19/2019
     (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By Angelica Salcedo _____ , Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

### INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007.  They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed.  Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint.  Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date.  All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference.  These matters may be heard and resolved at this conference.  At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules.  Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction.  Careful reading and compliance with the actual Chapter Rules is imperative.**

#### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

#### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status.  If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse.  If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association
Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1.  The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

    a.  Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

    b.  Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

    c.  Exchange of names and contact information of witnesses;

    d.  Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

    e.  Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

    f.  Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

    g.  Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at www.lasuperiorcourt.org under "Civil" and then under "General Information").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation.
(INSERT DATE)          (INSERT DATE)

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR PLAINTIFF)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR DEFENDANT)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

Date:

_____     >   _____
(TYPE OR PRINT NAME)              (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:                    FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| INFORMAL DISCOVERY CONFERENCE<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   ☐    Request for Informal Discovery Conference
   ☐    Answer to Request for Informal Discovery Conference
2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).
3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).
4. **For a Request for Informal Discovery Conference, _briefly_ describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, _briefly_ describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.**

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | FAX NO. (Optional): | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER |
|---|---|

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii. Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i. Also be filed on the approved form (copy attached);

      ii. Include a brief summary of why the requested relief should be denied;

**STIPULATION – DISCOVERY RESOLUTION**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

      iii.   Be filed within two (2) court days of receipt of the Request; and

      iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4. If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5. The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6. Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7. Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| | |

## The following parties stipulate:

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR PLAINTIFF)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR DEFENDANT)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

Date:
_____
(TYPE OR PRINT NAME)

➤ _____
(ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION AND ORDER – MOTIONS IN LIMINE | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least ____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER: |
|---|---|
|  |  |

**The following parties stipulate:**

Date: _____

➤ _____
_____
(TYPE OR PRINT NAME)            (ATTORNEY FOR PLAINTIFF)

Date: _____

➤ _____
_____
(TYPE OR PRINT NAME)            (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
_____
(TYPE OR PRINT NAME)            (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
_____
(TYPE OR PRINT NAME)            (ATTORNEY FOR DEFENDANT)

Date: _____

➤ _____
(TYPE OR PRINT NAME)            (ATTORNEY FOR _____)

Date: _____

➤ _____
(TYPE OR PRINT NAME)            (ATTORNEY FOR _____)

Date: _____

➤ _____
(TYPE OR PRINT NAME)            (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____                    _____
                                                                    JUDICIAL OFFICER



# Superior Court of California, County of Los Angeles

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?

ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

LASC CIV 271 NEW 03/19
For Mandatory Use
California Rules of Court, rule 3.221

---

### How to arrange mediation in Los Angeles County

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

**a.  The Civil Mediation Vendor Resource List**

Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

- JAMS, Inc.: **Case Manager (213) 253-9776** mdawson@jamsadr.com
- Mediation Center of Los Angeles: **Case Manager: (833) 476-9145** info@mediationLA.org

**These organizations cannot accept every case and they may decline cases at their discretion.**

Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.

NOTE:  This service is not available for family law, probate or small claims.

**b.  Los Angeles County Dispute Resolution Programs**

https://wdacs.lacounty.gov/programs/drp/

- Free, day- of- trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
- Free or low-cost mediations before the day of trial for these and other case types.
- For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

**c.  Mediators and ADR and Bar organizations** that provide mediation may be found on the internet.

---

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: www.lacourt.org/division/civil/settlement

**Los Angeles Superior Court ADR website:** www.lacourt.org/division/civil/settlement
**For general information and videos about ADR, visit** http://www.courts.ca.gov/programs-adr.htm

LASC CIV 271 NEW 03/19
For Mandatory Use
California Rules of Court, rule 3.221

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Ross K. Reghabi, Esq., SBN# 206339<br>SOUTHERN CALIFORNIA LAW GROUP<br>24007 Ventura Boulevard Suite 205<br>Calabasas, California 91302<br>TELEPHONE NO. (747)333-5151    FAX NO. (818)584-3169<br>ATTORNEY FOR *(Name):* Plaintiffs, Emperor Entertainment, Inc., et al. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 6230 Sylmar Avenue
MAILING ADDRESS: Same
CITY AND ZIP CODE: Van Nuys, California 91401
BRANCH NAME: Northwest District - Van Nuys

CASE NAME:
Emperor Entertainment v. Defyne, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ✓ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter    ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | |
| | | | | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
✓ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is    ✓ is not    complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ✓ monetary    b. ✓ nonmonetary; declaratory or injunctive relief    c. ✓ punitive
4. Number of causes of action *(specify):* 7
5. This case ☐ is    ✓ is not    a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: November 15, 2019
Ross K. Reghabi, Esq.
_____
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

19STCV01898

Assigned for all purposes to: Van Nuys Courthouse East, Judicial Officer: Michael Convey

Electronically FILED by Superior Court of California, County of Los Angeles on 11/15/2019 01:04 PM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Salcedo,Deputy Clerk

Ross K. Reghabi, Esq. / Bar # 206339
**SOUTHERN CALIFORNIA LAW GROUP**
24007 Ventura Boulevard, Suite 205
Calabasas, California 91302
E-mail:      reghabi@scalg.com
Telephone:   (747)333-5151
Facsimile:   (818)584-3169

Attorney for Plaintiffs, Emperor Entertainment, et al.

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| **EMPEROR ENTERTAINMENT, INC.**, a California Corporation; **HAMIDREZA POUSTI**, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>**DEFYNE HOLDINGS, LLC.**, a limited liability company; **FRANCESCO DiSTEFANO**, an individual; **DiSTEFANO ENTERPRISES, LLC.**, a limited liability company; **KASH CAPITAL, LLC.**, a limited liability company; **HSBC BANK USA, NATIONAL ASSOCIATION**, a business organization form unknown; and DOES 1 through 50, Inclusive,<br><br>Defendants. | **CASE NO:**<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>3. **INTENTIONAL MISREPRESENTAION AND FRAUD;**<br>4. **NEGLIGENCE MISREPRESENTATION;**<br>5. **RESTITUTION AND UNJUST ENRICHMENT;**<br>6. **CONVERSION.**<br>7. **VIOLATION OF BUSSINESS & PROFESSIONAL CODE, § 17200;** |

**COME NOW** Plaintiffs who complains and alleges against Defendants, and each of

them, as follows:

/  /  /  /

/  /  /  /

- 1 -

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.  At all times herein mentioned, Plaintiff, **Emperor Entertainment, Inc.,** (hereinafter "**Emperor**"), was and now is a California Corporation, formed under the laws of the State of California with its principal place of business in the County of Los Angeles, State of California.

2.  At all times herein mentioned, Plaintiff, **Hamidreza Pousti,** (hereinafter "**Pousti**"), was and now is a resident of the County of Los Angeles, State of California and an operator of Emperor.

3.  At all times herein mentioned, Defendant **Defyne Holding, LLC.,** (hereinafter "**Defyne**") was and now is a Limited liability company formed in Georgia and doing business in California and various states, through its agents, as Defyne Payments, engaged in the credit card processing services business.  At all times herein mentioned, Defyne represented it was a registered ISO of Wells Fargo Bank, N.A., in California.

4.  At all times herein mentioned, Defendant **Francesco DiStefano**, (hereinafter "**DiStefano**"), was and now an individual acting in California as agent and employee of the other named Defendant and various Defendants named herein as DOES.  At all times herein mentioned, Defendant DiStefano was also the owner and operator of DiStefano Enterprises, LLC.

5.  At all times herein mentioned, Defendant DiStefano was within the course and scope of his employment as an agent and employee of other named and un-named Defendants.

6.  At all times herein mentions, Defendant **DiStefano Enterprises, LLC.,** (hereinafter "**DiStefano, LLC.**") was and now is a Limited Liability Company, representing itself as "Payment Logistics" and doing business in California and various states, on behalf of other Defendants, herein and owned and operated by Defendant DiStefano.

7.  At all times herein mentioned, Defendant **Kash Capital, LLC.,** (hereinafter "**Kash**") was

- 2 -

1    and now is a Limited Liability Company, representing itself as credit card fund transfer service

2    and doing business in California and various states, on behalf of other Defendants herein.

3        8.   At all times herein mentioned, Defendant **HSBC Bank USA, National Association**

4    (Hereinafter **"HSBC"**) was and now is a business organization form unknown with branches in

5    every state and engaged in the banking business doing business in California.

6

7        9.   Plaintiffs are ignorant of the true names and capacities, whether individual, corporate,

8    associate, partnership, or otherwise of each of the Defendants sued herein as Does 1 through 50,

9    inclusive, and therefore sues said Defendants by such fictitious names.  Plaintiffs will seek leave

10   to amend this Complaint to reflect their true names and capacities as they are ascertained pursuant

11   to Code of Civil Procedure §474.

12

13       10. Plaintiffs are informed and believe and, based upon such information and belief, allege

14   that each of the Defendants named herein as a Doe was and is negligently, intentionally, or both

15   negligently and intentionally responsible in some manner for the occurrences herein alleged, and

16   the injuries and/or damages suffered by Plaintiffs as herein alleged were the direct and proximate

17   result of, and caused by the acts and omissions of the Defendants.

18       11. Plaintiffs are informed and believe and, based upon such information and belief, allege

19   that at all times herein mentioned, each and every one of the Defendants was and now is the

20   agent, servant, or employee of each and every other Defendant and was in doing the things herein

21   alleged, acting within the course and scope of said agency, service or employment.

22

23       12.  Plaintiffs are informed and believe and, based upon such information and belief, allege

24   that at all times herein mentioned, each of the Defendants ratified and approved the acts,

25   omissions, representations, and other activities of each and every other Defendant.

26       13. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne,

27

28

COMPLAINT

approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne. Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne. Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

14. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments. He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs by Defyne and HSBC. DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

15. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

16. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

17. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank

- 4 -

account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

18. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

19.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

20.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

21. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

22. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.

23.  Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

24. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

25. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true. Plaintiffs would not have signed the document if the true facts had been known to them.

<div align="center">

**FIRST CAUSE OF ACTION**
**FOR BREACH OF CONTRACT**
**Against All Defendants**

</div>

26. Plaintiffs alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 25 of the Complaint as though set forth at length herein.

27. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne. Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne. Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

28. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments. He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs b y Defyne and HSBC. DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

29. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

<div align="center">- 6 -</div>

30. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

31. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

32. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

33.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

34.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

- 7 -

35. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

36. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.

37. Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

38. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

39. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true. Plaintiffs would not have signed the document if the true facts had been known to them.

40. At all times herein mentioned, Plaintiffs have performed or have been excused from performing all of the acts, conditions, and covenants required to be performed by them under the contract.

41. Defendants, and each of them, have repeatedly breached the contract by reason of their actions as set forth herein above.

42. As a proximate result of Defendants' breach of contract, Plaintiffs have been damaged in an amount unknown at this time and according to proof at trial.

## SECOND CAUSE OF ACTION
### FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Against All Defendants.

43. Plaintiffs allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 42 of the Complaint as though set forth at length herein.

- 8 -

44. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne. Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne. Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

45. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments. He further represented that the loan which would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs b y Defyne and HSBC. DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

46. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

47. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

48. Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank

- 9 -

account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

49. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

50.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

51.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

52.  The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

53. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.  Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

54. These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

55. Plaintiffs relied on the representations and was induced by them to sign what it believed

- 10 -

to be true.  Plaintiffs would not have signed the document if the true facts had been known to them.

56. In or about August 2019, Defendants, and each of them, breached their implied covenant of good faith and fair dealing in the contract they entered into with Plaintiffs.

57. Defendants, and each of them, unfairly interfered with Plaintiffs' right to receive the benefit of the contract because Defendants and each of them had knowledge, or should have had knowledge but still failed to inform Plaintiffs of same.

58. As an actual and proximate result of the breach of the said covenant by Defendants and each of them as set forth above, Plaintiffs are harmed due to the fact that Plaintiffs were prevented from receiving the benefits of their agreement with Defendants.

### THIRD CAUSE OF ACTION
### FOR INTENTIONAL MISREPRESENTATION AND FRAUD
### Against All Defendants.

59. Plaintiffs allege and incorporate herein by reference each and every allegation contained in paragraphs 1 through 58 of the Complaint as though set forth at length herein.

60. In or about August 2019, Defendant DiStefano, as an agent of Defendant Defyne, approached Plaintiff Pousti, the operator of Emperor and offered to establish a merchant account for Emperor to process the credit card charges of Emperor's business through Defyne.  Defendant DiStefano clearly represented to Plaintiff Pousti that he was acting on behalf of Defendant Defyne.  Plaintiffs agreed to have a credit card processing agreement established between Emperor and Defyne.

61. Subsequent to agreeing to establish the credit card processing account, Defendant DiStefano represented to Plaintiffs that he could secure a business loan of approximately $1,000,000.00 for Plaintiff through Defyne Payments.  He further represented that the loan which

- 11 -

would be process by Defyne, would be conducted through Defendant HSBC and that when the loan was secured, the funds would be transferred to Plaintiffs b y Defyne and HSBC.  DiStefano further represented to Plaintiffs that he and Defyne work with HSBC on regular basis and obtain loans for Defyne clients.

62. The negotiations between DiStefano and Plaintiff lasted for 2 to 3 months during which DiStefano represented to Plaintiff that both he and Defyne were working with HSBC to secure the loan and that the loan would be secured "very soon."

63. During the 2 to 3 months period where, by DiStefano's representation, the loan was allegedly being processed, DiStefano stated to Plaintiff Pousti that in order to make sure the loan would be secured, various fees had to be paid in different installments so that Defyne would be able to secure the loan.

64.  Believing the representation made by DiStefano to be true and with reasonable reliance, Plaintiff Pousti paid DiStefano in excess of $55,000.00 when DiStefano presented various documents to Plaintiff showing the loan was being process and was about to be approved. Defendant presented Pousti documents showing a transfer of $985,000.00 to Plaintiff's bank account.  Pousti believed Defendant and alleges DiStefano embezzled the $55,000.00 from him by fraud.

65. At all times herein mentioned, Defendant sent various text messages to Pousti regarding the approval of the $985,000.00 business loan, along with other documents showing the funds were being wired to Plaintiff's bank account.

66.  As a direct and proximate result of DiStefano's representation, that the business loan would be forthcoming, Pousti entered into numerous contracts with its special customers and clients for events at Cabaret Tehran, Emperor's place of business.   Plaintiff Pousti further purchased new kitchen and other equipment for the business.

- 12 -

67.  When Plaintiff Pousti confronted DiStefano regarding the length of time it was taking for the loan to be approved, and after Plaintiff Pousti had invested funds in the business upon reasonable reliance on DiStefano's representation, DiStefano presented Plaintiff with a HSBC credit card which he stated had been given to him by Defyne to be used and informed Plaintiff that he could use the credit card for some of the expenses until the loan is actually secured.

68. The true facts are that any and all representations made to Plaintiff by Defendant DiStefano, as agent and/or employee of Defyne, which representation were made within the course and scope of his employment, were false.

69. In reality the representations of Defendants, and each of them, were false and the true facts were that Defendants did not intend to perform as promised.  Defendants knew the representations made to Plaintiffs to be false at all times herein mentioned.

70.  These representations of Defendants were made with the intent to induce Plaintiffs to rely on them and to induce Plaintiffs to enter into the contract as herein alleged, with the intent to defraud and deceive Plaintiffs.

71. Plaintiffs relied on the representations and was induced by them to sign what it believed to be true.  Plaintiffs would not have signed the document if the true facts had been known to them.

72. Misrepresentation or otherwise Failure to disclose material facts by Defendants, and each of them was with the intent to induce reliance on the part of Plaintiffs to enter into the agreement.  Plaintiffs relied on the representations and was induced by them to sign what it believed to be true.

73. Plaintiffs would not have entered into the agreement if the true facts had been known to them.

74.  As a direct and proximate result of Defendants', and each of them, intentional failure to

- 13 -

COMPLAINT

disclose their true intents, Plaintiffs have been harmed and suffered damages in an amount according to proof at the time of trial.

75. In doing the acts herein alleged, Defendants, and each of them, acted with oppression, fraud, and malice entitling Plaintiff to punitive damages in the sum according to proof at the time of trial.

## FOURTH CAUSE OF ACTION
## FOR NEGLIGENT MISREPRESENATION
### Against All Defendants.

76. Plaintiffs alleges and incorporate herein by reference each and every allegation as contained in paragraphs 1 through 68 of the Complaint as though set forth at length herein.

77. Defendants made the representations to Plaintiffs that Defendants, and each of them, would protect Plaintiffs' interest with no reasonable grounds for believing them to be true, in that Plaintiffs are informed and believe, and base on such information and belief, allege that Defendants did not communicate to Plaintiffs accurate information and negligently failed to fulfil their duty to Plaintiffs as grantors, to communicate to Plaintiffs knowledge they had, or should have had. They, at least, negligently failed and refused to do so.  Therefrom, Defendants were aware that without such information they could not accurately make the representations herein alleged; and at all times thereafter, Defendants concealed from Plaintiff their true intentions and did not make the alleged representations accurately. Defendants, and each of them, in failing to disclose material facts to Plaintiffs had reasonable grounds to believe that the omitted facts were in fact untrue and failed to disclose with the intent to induce reliance on the part of Plaintiffs to enter in a lease agreement.

78.  As a direct and proximate result of Defendants' conduct and failure, Plaintiffs have been harmed/suffered major loss of its property in an amount according to proof at the time of trial.

- 14 -

79.  Plaintiffs' reliance on Defendants' negligent misrepresentation was substantial factor in causing harm to Plaintiffs due to the fact that had Plaintiffs been aware of proper information, Plaintiff would have never relied and agreed to enter into the agreement.

## FIFTH CAUSE OF ACTION
### FOR RESTUTUTION AND UNJUST ENRICHMENT
#### Against All Defendants.

80. Plaintiff alleges and incorporates herein by reference each and every allegation as contained in paragraphs 1 through 72 of the Complaint as though set forth at length herein.

81. Defendants, and each of them, through their agent and employee DiStefano received approximately $55,000.00 from Plaintiff by misrepresenting material facts and disclosing their true intentions.

82.  As a direct and proximate result of Defendants' misconduct, they have been unjustly enriched at the expense of Plaintiffs in an amount according to proof at the time of trial.

83.  As a further direct and proximate result of Defendants' misconduct, to prevent them from being unjustly enriched at the expense of Plaintiffs, Plaintiffs also seek as order of this Court requiring Defendants to disgorge and turn over to Plaintiff the $55,000.00

## SIXTH CAUSE OF ACTION
### FOR CONVERSION
#### Against All Defendants.

84. Plaintiffs allege and incorporate herein by reference each and every allegation as contained in paragraphs 1 through 83 of the Complaint as though set forth at length herein.

85. At all times herein mentioned, Defendants, and each of them, had a legal duty to maintain all funds received from Plaintiffs, including but not limited to the $55,000.00 in cash towards securing the promised business loan.

86.  Plaintiffs are informed and believe and, based on such information and belief, allege that Defendants named in this cause of action, have converted said funds for their own use and benefit

- 15 -

by refusing to repay the $55,000.00

87.  Commencing August 2019 through present, Defendants, and each of them, have converted the funds provided to them which acts constituted an actual and substantial interference with plaintiffs' right of ownership and possessory interests in the funds.

88. Between the time of Defendants' conversion and the filing of this action, Plaintiffs properly expended in pursuit of the property exclusive of attorney's fees and costs associated with preparation for litigation in an amount according to proof at trial.

89. Plaintiffs have duly demanded that Defendants, named in this cause of action, return said funds, but Defendants have failed and refused, and continue to fail and refuse, to make such payments and return such assets.

## SEVENTH CAUSE OF ACTION
## FOR UNFAIR BUSINESS PRACTICES UNDER BUSINESS AND PROFESSION CODE 17200, ET SEQ.
### Against All Defendants.

87. Plaintiffs allege and incorporates herein by reference each and every allegation contained in paragraphs 1 through 87 of the Complaint as though set forth at length herein.

88. Defendants and Does 1-50 committed unlawful, unfair, and fraudulent business practices or acts, as defined by *Business and Professions Code Section 17200*, and as set forth herein.

89.  Defendants' conduct in holding themselves out as competent and duly licensed credit card processing company and a business loan broker was an unfair business practice in that they unlawfully rendered professional services and received monies to which they were not entitled as a matter of law.

90.  Defendants received the benefit of the agreement with Plaintiffs while engaging in the unfair business practice of receiving unlawful monies while failing to disclose to Plaintiff the unlawful activity.

91.  Plaintiffs entered into the agreement with Defendants in reliance on the mistaken belief

- 16 -

1   that it was represented by a qualified and duly licensed business opportunities broker.

2       92.  Plaintiffs allege that Defendants, and each of them, in doing the acts alleged herein

3   Above have engaged in unfair and or unlawful business practices by engaging in such unfair

4   business practices, thereby inducing and causing Plaintiffs to suffer "injury in fact" and to lose

5   money or property rights as a result of such unfair acts, in violation of the Act, including but not

6   necessarily limited to, *Business & Professions Code* section 17200 which provides "as used in this

7   chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business

8   practice..."

9

10      93.  As a direct and proximate result of the above-referenced acts of Defendants and Does

11   1-50, and each of them, Plaintiffs sustained "injury in fact" and lost money or property as a result

12   of such unfair acts [*Business & Professions Code* section 17204], and are therefore entitled to

13   restitution of money lost as a result of Defendants' unfair business practices as well as equitable

14   relief in the form of an order requiring defendants, and each of them, to show cause, if any they

15   have, why they should not be enjoined from continuing their unlawful business practices during the

16   pendency of this action, and for a temporary restraining order, a preliminary injunction, and a

17   permanent injunction, all enjoining Defendants and Does 1-50, and each of them from engaging in

18   the unlawful business practices described herein.

19

20      94.  Plaintiffs also seek exemplary damages by this Honorable Court in order to deter

21   Defendants' and each of them future conduct in the amount to be determined at the time of trial.

22   **WHEREFORE**, Plaintiffs demand judgment against defendants, and each of them, for the

23   following:

24   **Damages as to First and Second Causes of Action:**

25      1.  Compensatory Damages;

26      2.  Interest according to legal rate of 10% per annum or as provided by law;

27

28

- 17 -

COMPLAINT

3. Reasonable Attorney's fees;

4. Injunctive Relief;

5. Punitive and exemplary Damages;

6. Restitution damages;

7. Cost of lawsuit; and

8. Such further relief as court deemed appropriate.

Dated: November 15, 2019

SOUTHERN CALIFORNIA LAW GROUP

_____
Ross K. Reghabi, Esq. / Plaintiffs' Attorney

- 18 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

<u>Via US Mail and e-mail:info@defynepay.com</u>
Duayne Haskett
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

<u>In Ref: EMPEROR ENTERTAINMENT INC.</u>
Case #:192870001,192800010,192770001,192770002, 192760044

Dear Mr. Haskett:

Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

2

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

Via US Mail and e-mail:lchazan@defynepay.com
Liad Chazan
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

    *In Ref:  EMPEROR ENTERTAINMENT INC.*
    Case #:192870001,192800010,192770001,192770002, 192760044
Dear Mrs. Chazan:

    Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

    Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

    As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

    At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

<u>Via US Mail and Fascimilie: 602-643-1818</u>
Stephen Palazzo
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

<u>*In Ref:  EMPEROR ENTERTAINMENT INC.*</u>
Case #:192870001,192800010,192770001,192770002, 192760044

Dear Mr. Palazzo:

Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.


Yours truly,
SOUTHERN CALIFORNIA LAW GROUP


Ross K. Reghabi, Esq.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION



STANLEY
ESREY &
BUCKLEY

Direct Dial: (404) 835-6208
gmichell@seblaw.com

October 30, 2019

**BY E-MAIL – DREGHABI@SCALG.COM**
**AND FEDERAL EXPRESS**

Ross K. Reghabi, Esq.
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434

Re:   Emperor Entertainment, Inc.

Dear Mr. Reghabi:

This firm represents Defyne Holdings, LLC ("Defyne"). I write in response to your letters to Defyne, Duayne Haskett, Stephen Palazzo, and Liad Chazan on behalf of Emperor Entertainment, Inc. ("Emperor") dated October 22, 2019, and October 24, 2019. Please direct all future correspondence regarding this matter to me.

First, Francesco DiStefano is not an employee of Defyne. He is an independent contractor that refers merchants to Defyne. Neither Defyne nor any of its employees has ever misinformed or misguided your client for monetary gain or embezzled money from your client or been "in conspiracy" with Mr. DiStefano to do so. Further, Defyne is not a lender and has never offered to lend money to your client. Defyne is not aware of Mr. DiStefano or anyone else making any representations to the contrary. If there is any evidence that you or Emperor contend supports any of the accusations in your letter to the contrary (e.g. the documents referenced in your letter), please provide it immediately.

Second, Defyne is certainly willing to investigate the claims and allegations in your letter regarding Mr. DiStefano. To assist with that investigation, please provide any and all evidence that you or your client contend supports those claims and allegations.

Third and finally, per the terms of its Merchant Application and Agreement, your client is "responsible for reimbursing [Defyne] for any and all Chargebacks and Disputes by the Issuer and/or the Cardholder with respect to [its] Card Transactions and for related fees, for any reason, whether or not [it has] the right to contest the Chargeback under applicable Operating Rules."

Ross K. Reghabi, Esq.
October 30, 2019
Page 2

_____

      If you have any questions regarding this response, please feel free to contact me.

                         Sincerely,

                         STANLEY, ESREY & BUCKLEY, LLP

                         Greg Michell

cc:    Duayne Haskett (by email)
       Steve Palazzo (by email)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 4

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Defyne Payments
P O Box 778
Alpharetta, GA 30009

Nov 07, 2019

CABERNET TEHRAN
 Attn: HAMIDREZA   POUSTI
17530 Ventura Blvd #102
Encino, CA 91310

Dear HAMIDREZA   POUSTI

Merchant account number:  769020632860

Please be advised Defyne Payments closed your merchant account and was
terminated effective October  31 , 2019 due to excessive chargebacks.

As of the date hereof, Merchant owes Defyne Payments the aggregate amount of
$139996.78 and reject fees pursuant to the Agreement. Pursuant to its rights under
the Agreement, Defyne Payments has attempted to collect this amount by electronic
debit to one or more of Merchant's accounts via the automated clearing house
system, but all such attempted debits have been rejected.

Accordingly, Defyne Payments hereby demands full payment of the aforementioned
amount within Ten (10) days of the date of this letter.  To avoid forcing Defyne Payments
to take further action, this may include but not be limited to any or all of the following:

    (i)     referring this matter to a collection agency; including all costs including
            attorney fees, etc pursuant to the Agreement

    (ii)    reporting Merchant's non-payment to all applicable commercial reporting
            agencies ("credit bureaus"), which may affect Merchant's credit and credit
            rating and which may involve identifying the names and identification of
            Merchant's principals; [and]

    (iii)   adding Merchant to the Visa U.S.A./MasterCard International "Terminated
            Merchant File," commonly known as TMF and "MATCH". Due to the
            Nature of the transactions this may be reported to Federal authorities.

Call 800-711-5769 if you wish to resolve this matter and to prevent further action.

Sincerely,

Loss Prevention
Defyne Payments

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 5

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (818)584-3169

November 11, 2019

**VIA U.S. MAIL & E-MAIL:  gmichell@seblaw.com**

Mr. Greg Michell, Esq.
**STANLEY, ESREY & BUCKLEY, LLP.**
1230 Peachtree Street, N.E., Suite 2400
Atlanta, Georgia 30309

## Re: EMPEROR ENTERTAINMENT INC.

Dear Mr. Michell:

As you are well aware, the undersigned represent Emperor Entertainment, Inc., in reference to any and all matters pertaining to the various action conducted by your client, Defyne, its agents, employees and ones acting on its behalf.  Please direct any and all communications directly to this office and please instruct your client and its agent, employees and different department to immediately cease contacting our client.

This office wrote letters to your client by addressing its various agents on October 22, 2019 and October 24, 2019.  I believe you are in possession of said letters, but for ease of communication with you, I am enclosing copies of those letter.  In return, your client, more specifically its "loss prevention" communicated with our client on November 7, 2019.  Please direct them to immediately cease contacting our client in writing "or" by their continuous threatening telephone calls over the past two weeks.

First, We strongly disagree with your contentions in your letter that 'Frencesco DiStefano' is not "employed by Defyne and is an independent contractor who "refers" merchants to Defyne.  He can be an independent contractor and not listed as an 'employee' of Defyne but can be an 'agent' of Defyne.  Hence, your representation and attempt to create a distance between DiStefano and Defyne is fruitless.  The issue of whether DiStefano was, or continuously is, in conspiracy with your client's agents and employees, including Ms. Chazen, is a question of fact in a lawsuit and eventually for the jury.  Mr. DiStefano clearly and unequivocally stated to our client that he was an agent of Defyne and supervised directly by Ms. Chazen.  Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business.  This is also a question of fact, along with his claim that he had secured loans of over $1,000,000.00 from "Defyne Payments" and HSBC.

Page Two
**Emperor Entertainment**

Second, you may go ahead and proceed with any investigation you deem fit to ascertain the actual facts and business dealing between your client and others including our client.

Third, what "Merchant Application" are you referring to. Your client's agent did not present our client with such application or agreement. Please provide this office with the agreement so that we may be able to investigate to basis of your claim and assertions. Based on the representation that DiStefano specifically made on behalf of Defyne, our client expended large sums of money to remodel his business by purchasing various equipment believing your client's agent, DiStefano, that a loan of approximately $985,000.00 was coming to our client.

In conclusion, we are investigating the activities of your client and its agent, including but not limited to Francesco DiStefano, and have advised our client regarding any and all actions that may be taken against any and all individuals and entities involved herein and will be in contact with your office. Should there be any questions, please do not hesitate to contact this office.

Your courtesy is appreciated.

Very truly your
**SOUTHERN CALIFORNIA LAW GROUP**

**Ross K. Reghabi, Esq.**

RR/mn

2

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

Via US Mail and e-mail:lchazan@defynepay.com
Liad Chazan
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

*In Ref:  EMPEROR ENTERTAINMENT INC.*
Case #:192870001,192800010,192770001,192770002, 192760044
Dear Mrs. Chazan:

Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

2

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

Via US Mail and e-mail:info@defynepay.com
Duayne Haskett
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

         *In Ref: EMPEROR ENTERTAINMENT INC.*
         Case #:192870001,192800010,192770001,192770002, 192760044
Dear Mr. Haskett:

      Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

      Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

      As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

      At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

2

# Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 22, 2019

<u>Via US Mail and Fascimilie: 602-643-1818</u>
Stephen Palazzo
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA 30009

<u>In Ref:</u> *EMPEROR ENTERTAINMENT INC.*
Case #:192870001,192800010,192770001,192770002, 192760044
Dear Mr. Palazzo:

Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

2

## Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434
Phone: (747) 333-5151 * Facsimile: (888)987-4445

October 24, 2019

Via US Mail and Fascimile: 602-643-1818
Retrieval & Chargeback Department
Defyne Holding, LLC.
P.O. Box 788
Alpharetta, GA  30009

*In Ref: EMPEROR ENTERTAINMENT INC.*
Case #:192870001,192800010,192770001,192770002, 192760044

To Whom It May Concern:

Please be advised the undersigned represent Emperor Entertainment, Inc., in reference to series of illegal actions by a number of your employees/agents, fraudulent financial misrepresentation and gaining monetary benefits from my client.

Based on documents I reviewed it is my understanding that your employee Francesco Distefano in conspiracy with other employee(s) of your company has intentionally misinformed, misguided my client and others for monetary gain in embezzling more than $55,000.00 cash from my client and causing him to endure financial and reputational damages to the business. Mr. Distefano fraudulently made a series of misrepresentations to my client including that he had secured loans of over $1,000,000.00 from Defyne payment company and HSBC to Emperor Entertainment. During more than 2-3 months process and negotiation Mr. Distefano embezzled more than $55,000.00 cash from my client by showing fraudulent and manipulated documents which showed final approval of the above loans.

As a result of Mr. Distefano's action and in reliance on his misrepresentation Emperor Entertainment entered into a number of contracts for events for its special customers which required substantial investment. However, when my client finally found out about Distefano's embezzlement and fraudulent conduct it was unable to meet requirements for contracted events and as a result Emperor lost substantial number of its long-term customers, money and reputation in the community. Also, as a result of Distefano's fraudulent misrepresentation my client now facing multiple legal actions, including more than $250,000.00 charge back by its customers including Case number 192870001, 192800010, 192770001, 192770002, 192760044.

At this point we are waiting to see your company's course of action against Mr. Distefano and his other co- conspirator(s). We are willing to cooperate with you in this process

however, due to past experience we are not to deal with individuals who are associating with Mr. Distefano.

Furthermore, we demand that while our investigation regarding the above activities is on-going there should be no collection action or any kind of derogatory reports against my client to any financial institution. I look forward to hearing from you regarding your position in this matter.

If you have any question, please do not hesitate to contact me. I thank you for your anticipated cooperation.

Yours truly,
SOUTHERN CALIFORNIA LAW GROUP

Ross K. Reghabi, Esq.

## Successful transmission to 16026431818. Re: EMPEROR ENTERTAINMENT INC.

October 24, 2019 at 3:46 PM

From MetroFax

To Ross Reghabi, Esq., LLM

📎 ☐ 2019102×_1_W_G0366260.gif 33.06 KB

**metro**fax

Your fax was successfully sent to 16026431818 by MetroFax.

**Fax Details**
**Date:** 2019-10-24 22:46:55 (GMT)
**Number of Pages:** 3
**Length of Transmission:** 199 seconds
**Receiving Machine Fax ID:** Fax Server

If you have any questions, please visit our online help center.

Thank you for choosing MetroFax.

Sincerely,
The MetroFax Team

**Tip:** Switch to an annual plan and save! Call (888) 321-3121.

# FAX COVER SHEET

| TO | Retrieval & Chargeback Defyne Holdir |
|---|---|
| COMPANY | |
| FAX NUMBER | 16026431818 |
| FROM | Ross Reghabi |
| DATE | 2019-10-24 22:40:07 GMT |
| RE | EMPERORENTERTAINMENTINC. |

## COVER MESSAGE

CaseNos:192870001,192800010,192770001, 19277000

## Successful transmission to 16026431818. Re: EMPEROR ENTERTAINMENT INC.

October 24, 2019 at 3:40 PM

From MetroFax

To Ross Reghabi, Esq., LLM

20191024_1_W_60365430.gif 32.25 KB



Your fax was successfully sent to 16026431818 by MetroFax.

**Fax Details**
**Date:** 2019-10-24 22:41:01 (GMT)
**Number of Pages:** 3
**Length of Transmission:** 197 seconds
**Receiving Machine Fax ID:** Fax Server

If you have any questions, please visit our online help center.

Thank you for choosing MetroFax.

Sincerely,
The MetroFax Team

**Tip:** Switch to an annual plan and save! Call (888) 321-3121.

# FAX COVER SHEET

| TO | Stephen Palazzo |
| COMPANY | Defyne Holding, LLC. |
| FAX NUMBER | 16026431818 |
| FROM | Ross Reghabi |
| DATE | 2019-10-24 22:36:42 GMT |
| RE | EMPEROR ENTERTAINMENT INC. |

## COVER MESSAGE

PLEASE SEE ATTACHED REPRESENTATION LETTER

WWW.METROFAX.COM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 6

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION



**STANLEY
ESREY &
BUCKLEY**

Direct Dial: (404) 835-6208
gmichell@seblaw.com

November 15, 2019

**By E-Mail – dreghabi@scalg.com**
**And Federal Express**

Ross K. Reghabi, Esq.
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard, Suite 205
Calabasas, California 91302-1434

Re:    Emperor Entertainment, Inc. ("Emperor")

Dear Mr. Reghabi:

I write in response to your letter dated November 11, 2019.

As set forth in my prior letter, under the terms of its Merchant Agreement, Emperor and Mr. Hamidreza Pousti are required to reimburse Defyne Holdings, LLC ("Defyne") for any and all customer chargebacks and related fees. Despite receiving repeated notice regarding a significant amount of chargebacks, they have failed and refused to fulfill that contractual responsibility. A copy of the Merchant Agreement is enclosed for your convenience. Defyne will continue to communicate with Emperor regarding these and any other chargebacks.

As also set forth in my prior letter, Defyne denies your characterization of its relationship with Mr. DiStefano and any accusation of wrongdoing by Defyne. I note that you did not provide a single piece of evidence in response to my letter. Therefore, if you or your client has any evidence that supports any of the accusations in your letter, I again request that you provide it. Defyne is willing to investigate your client's claims and allegations regarding Mr. DiStefano. In order to do so, however, it needs all evidence that you or your client has that supports those claims and allegations.

Ross K. Reghabi, Esq.
November 15, 2019
Page 2

---

If you have any questions regarding this response, please feel free to contact me.

Sincerely,

STANLEY, ESREY & BUCKLEY, LLP

Greg Michell

Enclosure

cc:    Duayne Haskett (by email)
       Steve Palazzo (by email)



MERCHANT APPLICATION AND AGREEMENT

## BUSINESS INFORMATION

| CORPORATE/LEGAL NAME EMPEROR ENTERTAINMENT INC. | | | MERCHANT NAME (DBA OR TRADE NAME) CABERNET TEHRAN | | |
|---|---|---|---|---|---|
| CORPORATE ADDRESS 16101 Ventura Boulevard | | | LOCATION ADDRESS 16101 VENTURA BLVD #160 | | |
| CITY Los Angeles | STATE CA | ZIP CODE 91436 | CITY ENCINO | STATE CA | ZIP CODE 91436 |
| CUSTOMER SERVICE # (818) 988-5800 | EMAIL ADDRESS NOEMAIL@NOEMAIL.COM | | LOCATION PHONE # (818) 988-5800 | | FEDERAL TAX # XX-XXXX101 |
| YEARS IN BUSINESS 10 | DATE BUSINESS OPENED | # OF LOCATIONS | MAILING ADDRESS  • DBA   LEGAL | | WEBSITE http://www.cabarettehran.com/ |

PAYMENT CARD INDUSTRY SECURITY STANDARD: MUST PROVIDE COPY OF SELF ASSESSMENT QUESTIONNAIRE. IF APPLICABLE, MUST PROVIDE CERTIFICATE OF COMPLIANCE

## OWNER INFORMATION

The following information for each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of the legal entity listed above: (please provide copy of Driver's License for each signing principal)

| PRINCIPAL/OWNER (First, Middle and Last) 1 HAMIDREZA POUSTI | | | EMAIL ADDRESS NOEMAIL@NOEMAIL.COM | | SSN # #####–3460 | | DATE OF BIRTH 07/15/1979 |
|---|---|---|---|---|---|---|---|
| TITLE CEO | % OWNERSHIP 100 | PRIOR BANKRUPTCIES?  NO   IF YES, | | BUSINESS | | PERSONAL | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS 17530 VENTURA BLVD #102 | | | CITY ENCINO | STATE CA | ZIP CODE 91310 | HOME PHONE # (818) 699-9000 | |
| PRINCIPAL/OWNER (First, Middle and Last) 2 | | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES?  NO   IF YES, | | BUSINESS | | PERSONAL | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | | CITY | STATE | ZIP CODE | HOME PHONE # | |
| PRINCIPAL/OWNER (First, Middle and Last) 3 | | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES?  NO   IF YES, | | BUSINESS | | PERSONAL | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | | CITY | STATE | ZIP CODE | HOME PHONE # | |
| PRINCIPAL/OWNER (First, Middle and Last) 4 | | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES?  NO   IF YES, | | BUSINESS | | PERSONAL | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | | CITY | STATE | ZIP CODE | HOME PHONE # | |

## CONTROLLING OFFICER

Complete the following information for one individual with significant responsibility for managing the legal entity listed above, such as: An Executive Officer or senior manager )e.g., Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Managing Member, General partner, President, Vice President, Treasurer); or any other individual who regularly performs similar functions. If appropriate, an individual listed under section (a) above may also be listed in this section (b)

| FIRST NAME 1 | MIDDLE | | LAST | | TITLE | Is this individual already listed in Owner Info Section If No, please complete next section  • YES   NO | |
|---|---|---|---|---|---|---|---|
| HOME ADDRESS | | | CITY | STATE | ZIP CODE | HOME PHONE # | |
| SSN | DRIVER'S LICENSE #/PASSPORT NUMBER & EXP DATE | | EMAIL ADDRESS | | | DATE OF BIRTH | |

## SALES PROFILE

| DOES THIS LOCATION CURRENTLY TAKE VISA/MASTERCARD/DISCOVER NETWORK?  • YES   NO | | | | RETAIL CHIP SWIPE | 100 | % |
|---|---|---|---|---|---|---|
| CURRENT PROCESSOR | | | | MAIL/PHONE | 0 | % |
| AVERAGE TICKET $ 150 | MAXIMUM TICKET $ 2000 | | MONTHLY VOLUME $ 100000 | INTERNET | 0 | % |
| NEXT DAY FUNDING   • YES   NO | | BILLING TYPE :  • MONTHLY   DAILY | | IMPRINT (CARD PRESENT) 0 | | % |
| Is any third party used to store, process or transmit cardholder data? (shopping cart, gateway, etc.)   NO   If YES, please provide: | | | | B2B% | B2C% | B2G% |
| NAME: | ADDRESS: | | CITY,STATE, ZIP | 0 | 100 | 0 |
| Do you utilize a fulfillment house for storage/shipping of product?  No   If YES, please provide: | | | | DAYS TO DELIVERY: | | |
| NAME: | ADDRESS: | | CITY,STATE, ZIP | 0-7 | 7-14 | 15 + |

## BUSINESS PROFILE

**OWNERSHIP: MUST PROVIDE DOCUMENTATION**

| | | | |
|---|---|---|---|
| INDIVIDUAL/SOLE PROPRIETOR | ● CORPORATION | PARTNERSHIP | LLC/LLP · OTHER |
| GOVERNMENT | PUBLICLY TRADED | PA/PC | NON-PROFIT (MUST PROVIDE 501 C3 LETTER) |

**BUSINESS TYPE** · RETAIL · ● RESTAURANT · INTERNET · SERVICE · LODGING · OTHER

**MCC/SIC CODE** 5812    **GOODS AND SERVICES** RESTAURANT

**BANK NAME** BANK OF THE WEST    **BUSINESS CHECKING ROUTING #** XXXXXX843    **BUSINESS CHECKING ACCOUNT #** XXXXXX863

**PLEASE DESCRIBE YOUR REFUND/RETURN POLICY:**

## SITE INSPECTION SURVEY

**MERCHANT:** OWNS · ● RENTS    **NAME & ADDRESS LANDLORD/MGT CO:**

**AREA ZONED:** ● COMMERCIAL · INDUSTRIAL · RESIDENTAL    **SQUARE FOOTAGE:** 0-500 · 501-1000 · ●1001-2000 · 2001-4000 · 2ST SQ FT.

**INVENTORY MAINTAINED:** ● ON SITE · WAREHOUSE OFF SITE · FULFILLMENT CENTER, PROVIDE NAME & ADDRESS:

**WAS THE OFF-SITE LOCATION VISITED?** YES   NO   IF NO, PLEASE EXPLAIN:

**DOES THE AMOUNT OF INVENTORY ON SHELVES, FLOOR AND IN WAREHOUSE CONSISTENT WITH THIS TYPE OF BUSINESS AND CREDIT CARD VOLUME?**

    YES   NO   IF NO, PLEASE EXPLAIN:

**DOES LOCATION HAVE SUFFICIENT STAFF, TELEPHONE LINES AND OTHER EQUIPMENT TO MEET ANTICPATED SALES VOLUME?** YES   NO   IF NO, PLEASE EXPLAIN:

**DOES THE SIGNAGE INSIDE AND OUTSIDE MATCH THE GOODS OR SERVICES SOLD LISTED ON THE APPLICATION?** YES   NO   IF NO, PLEASE EXPLAIN:

I hereby verify that I have inspected the business premises of the merchant at this address and the information stated above is correct to the best of my knowldege and belief.

**Inspected By (Print Name):**     **Signature:**     **Date:**

## SERVICE ACCEPTANCE AND FEE SCHEDULE

**DISCOUNT RATES**   TIERED   ● INTERCHANGE PLUS   FLAT RATE / CD

| INTERCHANGE PLUS | MARK -UP | PER TRANSACTION | TIERED PRICING | RATE | PER TRANSACTION |
|---|---|---|---|---|---|
| VISA/MASTERCARD/DISCOVER | 0.20 % | $ 0.00 | CREDIT QUALIFIED | NA % | $ NA |
| SIGNATURE DEBIT | 0.20 % | $ 0.00 | DEBIT QUALIFIED | NA % | $ NA |
| PIN DEBIT / EBT | 0.00 % | $ | PIN DEBIT/ EBT | NA % | $ NA |
| AMERICAN EXPRESS OPTBLUE | 0.40 % | $ 0.00 | AMERICAN EXPRESS OPTBLUE | NA % | $ NA |
| CARD ASSOCIATION ASSESSMENT & FEES | PASS - THRU | | DOWNGRADES | MID QUAL DOWNGRADE | NON QUAL DOWNGRADE |
| | | | MID QUALIFIED/NON QUALIFIED | NA % | NA % |

| FLAT RATE / CASH DISCOUNT | RATE | PER TRANSACTION | | RATE | PER TRANSACTION |
|---|---|---|---|---|---|
| VISA/MASTERCARD/DISCOVER | NA % | $ NA | PIN DEBIT / EBT | NA % | $ NA |
| SIGNATURE DEBIT | NA % | $ NA | AMERICAN EXPRESS OPTBLUE | NA % | $ NA |

## AUTHORIZATION, MONTHLY & SPECIAL PROGRAM FEES

| | | | | | |
|---|---|---|---|---|---|
| AUTHORIZATION - VS/MC/DS/DEBIT | PER AUTHORIZATION | $ 0.1 | INACTIVITY FEE | PER MONTH | $ |
| AUTHORIZATION - AMERICAN EXPRESS | PER AUTHORIZATION | $ 0.1 | ELECTRONIC AVS | PER ITEM | $ 0.1 |
| AUTHORIZATION - PIN DEBIT/EBT | PER AUTHORIZATION | $ | SERVICE BUNDLE FEE | PER MONTH | $ |
| BATCH FEE | PER OCCURRENCE | $ 0.06 | CHARGEBACKS | PER ITEM | $ 25 |
| MONTHLY MINIMUM DISCOUNT | PER MERCHANT, PER MONTH | $ | ACH REJECTS & RETURNS | PER ITEM | $ 25 |
| WIRELESS SETUP FEE | ONE-TIME | $ | RETRIVALS | PER ITEM | $ 25 |
| WIRELESS AUTHORIZATION | PER AUTHORIZATION | $ | PIN DEBIT ACCESS FEE | PER MONTH | $ |
| WIRELESS SERVICE FEE | PER MONTH | $ | PCI COMPLIANCE FEE | PER MONTH | $ |
| VOICE AUTHORIZATION | PER ITEM | $ 1.75 | PCI COMPLIANCE FEE | ANNUALLY | $ 75 |
| MONTHLY SUPPORT | PER MONTH | $ 5 | PCI NON-COMPLIANCE FEE | PER MONTH | $ |

Version 1.3.0 122018     Defyne Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

## AUTHORIZATION, MONTHLY & SPECIAL PROGRAM FEES - CONTINUED

| NEXT DAY FUNDING | PER MONTH | $ NA | ANNUAL FEE | | ANNUALLY | $ |
| MERCHANT 1099K TAX REPORTING | PER MONTH | $ | EARLY SERVICE TERMINATION FEE | | ONE-TIME | $ |
| TIN MISMATCH - IRS DATA INTEGRITY FEE | PER MONTH UNTIL VALIDATED | $ 24.95 | | | | |

### EQUIPMENT SETUP

| TYPE OF EQUIPMENT | | | MANUFACTURER | MODEL | QTY | | DEPLOYMENT | |
|---|---|---|---|---|---|---|---|---|
| Terminal | Pin Pad | /AR | | | | Existing | Agent | New Order (attach Equipment Order Form) |
| Terminal | Pin Pad | '/AR | | | | Existing | Agent | New Order (attach Equipment Order Form) |

FEATURES:   AUTO CLOSE (Time) _____   TIP LINE _____   CASH BACK _____   CD % _____   EBT FNSB _____

PIN DEBIT   GIFT CARD   CHECK SERVICE   DIAL   ETHERNET S/N _____   WIRELESS S/N _____

SHIPPING INSTRUCTIONS

SHIP TO MERCHANT:

SHIP TO SALES REP:

### MERCHANT ACCEPTANCE AND AGREEMENT

By signing below, each of the undersigned Owner/Officer(s) certifies that he/she has the authority, as described below, to represent the Merchant named above and, on behalf of the Merchant, (1) represents that the information provided above is true and correct, (2) agrees to use the Services pursuant to terms and conditions of the Merchant Agreement, (3) authorizes the financial institution where your agent, to obtain information concerning the Merchant's financial condition from any credit reporting agency, creditor or financial institution, and (4) authorize the financial institution where your Settlement Account is maintained to make all such debits and credits to your account. Facsimile signatures on the Application shall be binding in the same manner as original signatures. The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of the Transaction Receipt or other evidence of a Transaction to us, shall be the Merchant's acceptance of an agreement to the Terms and Conditions, incorporated herein and located at our website, http://www.fisglobal.com/Solutions/Banking-and-Wealth/Consumer-Banking/-/media/FISGlobal/Files/Documents/FIS-Merchant-Terms-and-Conditions.pdf, including, without limitation, this Merchant Application, and the Cardholder Information Security Agreement incorporated herein by this reference and located at our website, http://fisglobal.com/Solutions/Banking-and-Wealth/Consumer-Banking/-/media/FISGlobal/Files/Documents/FIS-Merchant-Cardholder-Information-Security-Agreement.pdf. Merchant acknowledges that it has read and understands the Terms and Conditions and the Cardholder Information Security Agreement as may be amended from time to time. If we approve your Merchant Application, you will be provided with instructions on how you can access and obtain a copy of the Operating Rules and with such other requirements and directives we may require relating to your acceptance of Card Transactions. You agree that if you process Card Transactions, you will comply with the Operating Rules for all Card Transactions you accept and process. You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time. **This Merchant Application and Agreement shall not take effect until you have been approved and the Agreement has be accepted by Provider and Wells Fargo Bank, N.A. (Acquirer) for Visa and MasterCard.**

Merchant: EMPEROR ENTERTAINMENT INC.   Date: 4/13/19, 11:12 PM   Signature of Principal/Owr   IP Address: _____   Date: 4/13/19, 11:12 PM

Print Legal Name of Merchant Business

Signature of Principal/Owner 2 : _____   Date: _____

### PERSONAL GUARANTEE

The undersigned guarantees to Provider and Acquirer the performance of the Agreement, and any addendum thereto by Client, including payment of all sums due and owing and costs associated with the enforcements of the terms thereof. Provider and Acquirer shall not be required to first proceed against the Client or enforce any other remedy before proceeding against the undersigned individual. This is the continuing guarantee and shall not be discharged or affected by the death of the undersigned and shall bind the heirs, administrators, representatives and assigns and be enforced by or for the benefit of any successor of Provider or Acquirer. The term of this guarantee shall be for the duration of the Merchant Processing Application and Agreement and any addendum thereto and shall guarantee all obligations which may arise in connection with my activities during the term thereof thereon enforcement shall be sought subsequent to any termination.

Guarantor 1 _____   Date: 4/13/19, 11:12 P   Guarantor 2 _____   Date: _____

**BANK DISCLOSURE**

| MERCHANT SERVICES PROVIDER CONTACT INFORMATION | | MEMBER BANK (ACQUIRER) INFORMATION | |
|---|---|---|---|
| PROVIDER NAME | Fidelity Information Services, INC | ACQUIRER NAME | Wells Fargo Bank, N.A. |
| PROVIDER ADDRESS | Attn: Merchant services 11601<br>Rosevelt Blvd.,TA-22 St<br>Petersburg, FL 33716 | ACQUIRER ADDRESS | P.O. Box 6079<br>Concord, CA 94524 |
| APPLICATION INQUIRY # 800-552-5828 | SALES OFFICE # 800-552-5828 | ACQUIRER PHONE # 844-284-6834 | |
| CUSTOMER SERVICE # 800-552-5828 | | | |

**IMPORTANT MEMBER BANK (ACQUIRER) RESPONSIBILITIES**

- The Bank is the only entity approved to extend acceptance of Payment Network products directly to a merchant
- The Bank must be a principal (signer) to the Merchant Agreement
- The Bank is responsible for education Merchants on pertinent Visa and MasterCard Rules with which Merchant must comply; but this information may be provided to you by Provider/Processor
- The Bank is responsible for and must provide settlement funds to the Merchant
- The Bank is responsible for all funds held in reserve that are derived from settlement

**IMPORTANT MERCHANT RESPONSIBILITIES**

- Ensure compliance with cardholder data security and storage requirements.
- Maintain fraud and chargebacks below Payment Network thresholds.
- Review and understand the terms of the Merchant Agreement.
- Comply with Payment Network Rules.
- Retain a copy of these Disclosures.
- Operating Rules may be obtained from:

  Visa: https://usa.visa.com/support/small-business/regulations-fees-html

  MasterCard: https://www.mastercard.com/us/merchant/support/rules.html

The responsibilities above do not replace the terms of the Merchant Agreement and are provided to ensure you, understand important obligations of each party and that the Member Bank is the ultimate authority should you experience any problems.

**MERCHANT INFORMATION**

| | | | |
|---|---|---|---|
| LEGAL NAME | EMPEROR ENTERTAINMENT INC. | | |
| DBA NAME | CABERNET TEHRAN | | |
| LOCATION ADDRESS | 16101 VENTURA BLVD #160 | | |
| LOCATION PHONE | (818) 988-5800 | | |
| OWNER/PRINCIPAL NAME | HAMIDREZA POUSTI | TITLE: | CEO |

**SIGNATURES**

SIGNATURE PRINCIPAL/OWNER 1: ________ SIGNATURE PRINCIPAL/OWNER 2: ________

PRINT NAME: HAMIDREZA POUSTI TITLE: CEO DATE: 4/13/19, 11:12 P PRINT NAME: ________ TITLE: ________ DATE: ________

Defyne Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

Version 1.3.1 012219

FIS

## TERMS AND CONDITIONS

RETAIN THIS COPY FOR YOUR RECORDS

In these Terms and Conditions ("Terms and Conditions"), "we", "us," and "our" means Fidelity Information Services, LLC for Discover Card Transactions, and Wells Fargo Bank, N.A. and Fidelity Information Services, LLC for all other Card Transactions. "You" and "your" means Merchant. "Cards" means the credit cards and debit cards enabled to process through a Payment Network as set forth in your Merchant Application. These Terms and Conditions, together with the Merchant Application, Cardholder Information Security Agreement and all schedules and attachment hereto (collectively, the "Merchant Agreement") establishes the terms and conditions on which you may accept Cards as payment for goods and services and we will provide transaction processing and settlement services. If we approve your Merchant Application, you will be provided with instructions on how you can access and obtain a copy of the Operating Rules and with such other requirements and directives we may require relating to your acceptance of Card Transactions. You agree that if you accept and process Card Transactions, you will comply with the Operating Rules for all Card Transactions you accept and process.

**1. Card Transactions.**

1.1 You and your authorized representatives or employees are responsible to ensure that the Cardholder understands that you are responsible for the Card Transaction, including the goods or services that are the subject of the Card Transaction, dispute resolution, and performance of the terms and conditions. You must honor all Cards presented for payment except as otherwise provided under the Merchant Agreement and Operating Rules. The following requirements apply to all Card Transactions: (a) you cannot establish minimum or maximum amounts as a condition for accepting a Card, except as permitted by Applicable Law and/or the Operating Rules; (b) you cannot impose a surcharge or fee for accepting a Card, except as permitted by Applicable Law and/or the Operating Rules; (c) you cannot establish any special conditions for accepting a Card; (d) you cannot discourage, favor or discriminate against the use of a Card in relation to other credit cards or debit cards, except with respect to your own proprietary private label, loyalty, or gift cards; however, you may choose not to accept either U.S. issued debit Cards or U.S. issued credit Cards under the terms described in Section 1.3 of these Terms and Conditions; (d) you cannot discourage, favor or discriminate against the use of a Card issued by any particular Card issuer in relation to a Card issued by any other Card issuer; (f) you cannot require the Cardholder to supply any personal information (e.g., home or business phone number; home or business address; or driver's license number) unless instructed by us, except for a mail order/telephone order or delivery required transaction, and ZIP code for a Card-present key-entered transaction in order to obtain an Address Verification (AVS); (g) any tax required to be collected must be included in the total transaction amount and not collected in cash; (h) you cannot submit any Card Transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectible; (i) you cannot submit a Card Transaction or sale that has been previously charged back; (j) you must deliver at least one copy of the Sales Draft or credit draft to the Cardholder; (k) you cannot submit a Card Transaction or sale to cover a dishonored check. Failure to comply with any of the applicable Operating Rules may result in fines or penalties.

1.2 Prohibited Transactions. You may not accept Cards in payment for any Card Transaction that is illegal, not authorized by the Cardholder, fraudulent, or that may damage the goodwill of us or any Payment Network. "Factoring" which is the submission of Authorization Requests and/or Sales Data by a Merchant for Card Sales or Cash Advances transacted by another Person, is expressly prohibited. Factoring is considered Merchant fraud. If you submit Sales Data on behalf of another Person you will suffer any losses associated with any Dispute of the Card Sales. Also, if any fraud is involved, you could face criminal prosecution. You are prohibited from depositing Card Transactions originating from Cards of owners, partners, officers or employees of your business establishment except for Card Transactions that are routine in type, size and frequency for your business and that represent actual sales of goods or services. Submission of sales transactions on Cards in order to obtain a cash advance is strictly prohibited and may result in immediate cancellation of your merchant account. Cash disbursements to Cardholders are also prohibited. You must not accept any direct payments from Cardholders for charges of merchandise or services which have been included on a Sales Draft; it is the exclusive right of the Card Issuer to receive such payments. You may not make any cash disbursements to a Cardholder as part of a Card transaction except to the extent expressly authorized by this Agreement or the applicable Payment Network Rules. You may not accept Cards at Terminals that dispense scrip.

1.3 Card Acceptance Requirements. You must check or obtain the "valid from" and expiration date on the Card and confirm that the Card is valid and not expired prior to completing a Card sale. The Card is valid through the last day of the month embossed on the Card, if present. If the Card has expired, you cannot accept that Card for a sale. If you are suspicious that the Card presenter is not an authorized user of the Card, you should call us at the telephone number we provide for such purpose. You have the right to limit card acceptance to credit or debit cards with the appropriately executed contract addendum in place.

1.4 CID/CVV/CVC Requirements and Limitations. You must submit CID/CVV/CVC to us under the following circumstances: (a) the first installment of an Automatic Payment Plan, where the first installment is a Card Not Present sale; and (b) where we notify you that we require you to submit CID in all or a certain portion of your Authorization Requests. Your failure to include the CID/CVV/CVC in an Authorization Request where required by us, as described above, may result in a negative Authorization response and may increase the Interchange or Fees you are obligated to pay. If you do not submit CID/CVV/CVC with an Authorization Request for a Card Not Present sale, even where not required above, you may lose a Dispute of the Card Sale (and, in the case of an Automatic Payment Plan where the first installment is a Card Not Present sale, all installments under the plan may be subject to Dispute if you fail to submit CID/CVV/CVC with the Authorization request for the first installment). You are strictly prohibited from retaining, archiving or otherwise storing the CID/CVV/CVC in any form or format for any reason, including the recording of the CID/CVV/CVC on Transaction Documentation or the making of photocopies of the front or back of Cards. Records demonstrating that the CID/CVV/CVC was included in an Authorization Request will be maintained only by the applicable Payment Network.

1.5 Transaction Documentation. You must prepare Transaction Documentation for each Card Transaction and provide a copy of the Transaction Documentation to the Card presenter at the time of completion of the Card Transaction, in each case in accordance with the Operating Rules. The form and format of the Transaction Documentation you prepare must be acceptable to us. You shall ensure that the Transaction Documentation for each Card Transaction, whether electronically generated or manually printed on paper, is legible and contains all of the information required under these Terms and Conditions and the Operating Rules. You may not require a Cardholder to sign Transaction Documentation until the final Transaction amount is entered on the Transaction Documentation.

1.6 Cardholder Signature. Except in Card Not Present sales and other special circumstances described in the Merchant Agreement or the Operating Rules, Transaction Documentation must be signed by the Card presenter in the presence of your authorized representative or employee at the time of the Card Sale. The signature on the Transaction Documentation must reasonably match the signature appearing on the signature panel of the Card (unless the valid Card does not have a signature panel on the back of the Card) and the Cardholder's name as embossed on the front of the Card (except where the valid Card does not bear a Cardholder name on the front of the Card).

1.7 Verification of Signature on Card. In Card Present sales involving valid Cards bearing a signature panel on the back of the Card, you must verify that there is a signature on the signature panel on the back of the Card and verify that the name on the back of the Card is reasonably similar to the name embossed on the front of the Card (except where the valid Card does not bear a Cardholder name on the front of the Card). If the Card includes a photograph of the Cardholder, you must verify that the Cardholder resembles the photograph.

FIS

1.8 Unsigned Cards. If a Card bearing an unsigned signature panel is presented to you, you must request two pieces of identification, one of which must be government-issued picture identification. When you have confirmed that the person presenting the Card is the Cardholder, you must require the Cardholder to sign the back of the Card. If you are unable to positively identify the Card presenter as the Cardholder, or if you have reason to suspect fraud, you must call us.

1.9 Your Submission of Sales Data. You may submit Sales Data only for valid Card Transactions between you and a bona fide Cardholder. You must submit Sales Data to us no later than three (3) business days after the date of the Card Transaction except that (i) Sales Data may not be presented until goods are shipped, (ii) if you have received Authorization for delayed presentment, (iii) if you are required by Applicable Law to retain the Transaction Documentation or return it to the Cardholder upon timely cancellation, in which case you must present the Sales Data within ten (10) days of the Card Transaction date, and (iv) when you have multiple locations and use a central facility to accumulate and present Sales Data to us, in which case we must receive the related Sales Data within thirty (30) calendar days of the Card Transaction date. For Card Sales and Credits, the Card Transaction date is the date that you conduct the Card Sale or promise the Credit to the Cardholder. Except for Cardholder deposits for purchases, you may not send Sales Data for goods or services ordered by a Cardholder in a Card Sale until the goods or services have been delivered or furnished to the Cardholder. Sales Data for Card Sales submitted for Settlement more than thirty (30) calendar days after the Card Transaction date may be rejected, subject to higher Interchange and/or other Fees or subject to Dispute. The applicable Payment Network may withhold Settlement and/or assess higher Interchange and other Fees for any Sales Data sent to us that does not include all of the information required to be included.

1.10 Preparation and Transmission of Sales Data. You must prepare Sales Data for all Card Transactions as described in this Section 1.10, and transmit the Sales Data to us as described in this Section 1.10 and the Operating Rules. Additional requirements for the preparation and transmission of Sales Data apply for Card Not Present transactions and you must comply with these requirements. You must include all goods and/or services purchased or returned/refunded at one time and at one cash register on one Transaction Receipt or Transaction Slip, or in a single transmission of electronic Card Transaction data, and you must transmit the Sales Data relating to goods and/or services purchased or returned/refunded at one time and at a single cash register in a single electronic transmission of Sales Data unless otherwise approved by us in writing. Notwithstanding the foregoing, you may use separate Transaction Receipts or Transaction Slips or use multiple transmissions to submit electronic Card Transaction data, and you may submit Sales Data in multiple transmissions, for bona fide deposits, partial payments and Automatic Payment Plans that comply with any applicable requirements.

1.11 Unusable Sales Data. We will notify you if all or a portion of the Sales Data submitted by you cannot be processed due to invalid, missing or unreadable data. In the event that all or a portion of the Sales Data you submit is invalid, missing or unreadable, you are responsible for: (i) retrieving and resubmitting valid, readable Sales Data in proper form immediately; and (ii) the risk of any loss with respect to the Card Transactions described in the Sales Data, including for damage to or destruction of Sales Data, whether or not held by the applicable Payment Network, until complete, usable Sales Data is successfully received by the applicable Payment Network.

1.12 Submitting Electronic Sales Data. You are required to transmit Sales Data by electronic means in the form and format specified by us from time to time in the Operating Rules and to the location that we specify. All Sales Data transmitted by you must conform to these Terms and Conditions and the Operating Rules.

1.13 Record Retention. You must keep original copies of all mail/telephone order forms and other documentation relating to Card Transactions (including copies of Transaction Documentation) until the later to occur of (i) three hundred sixty five (365) calendar days following the Card Transaction date, or (ii) the resolution of any pending or threatened Disputes, claims, disagreements or litigation involving or relating to the Card Transaction. You must keep a microfilm or other copy of Sales Data for no less than three (3) years from the date of the Card Transaction. You must provide us with a copy of any Transaction Documentation, Sales Data or any other documentation retained by you within fifteen (15) calendar days of our request for such information. In addition, you are responsible for retaining copies of documentation for a period sufficient to enable you to respond to any Disputes that may be initiated with respect to Card Transactions. If you do not provide on your own behalf a copy of any Transaction Documentation, Sales Data or other documentation requested by us, the Card Transaction may be subject to Dispute, including Chargeback, or other Fees.

1.14 Special Rules for Particular Transactions. Additional terms, conditions, and requirements apply with respect to Card Not Present transactions, telecommunication Card Sales, Cash Over Transactions, Mail-Order and Telephone Order Sales, Automatic Payment Plans, delayed delivery sales, Automobile Rental Transactions, Airline and Cruise Line transactions, Hotel and Lodging Industry Transactions, Cash Advance Transactions, Card Sales in connection with store closings or liquidations, Electronic Commerce transactions, and other special categories (as such terms are defined in Section 28 of these Terms and Conditions or the Operating Rules). You are responsible to obtain from us the special rules pertaining to these transactions and any special rules that apply to other Card Sales that are not in-person Card Present transactions in full payment for same day delivery of retail goods and/or services. By submitting Sales Data in connection with any such Card Transactions, you agree that you have received and agree to the special terms, conditions, and requirements relating to these transactions.

1.15 Returns. If you provide proper disclosure to a Cardholder at the time of the Card Transaction, you may establish a return policy under which you will: (a) not accept merchandise in return or exchange and issue no refunds; (b) only accept merchandise in immediate exchange for similar merchandise of a price equal to the amount of the original Card Transaction; or (c) accept merchandise in return for in-store credit only; or (d) stipulate special circumstances agreed to by the Cardholder. Proper disclosure shall be deemed to have been given if the words "NO REFUND", "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" appear on all copies of the Transaction Documentation in letters approximately ¼ inch high and in close proximity to the space provided for the Cardholder's signature.

**2. Authorization**

2.1 You must obtain an Authorization for all Card Sales that you submit to us. You must request Authorization of the entire amount of the Card Transaction before completing the Card Transaction. The Authorization code must be displayed on the transaction receipt or noted in the appropriate place on the Sales Draft. You may pay higher Interchange if you complete a Card Sale without receiving a positive Authorization, if you submit Sales Data to us regarding Card sales for which you did not receive a positive Authorization or if the Authorization code is not properly designated in the Sales Data. In addition, the Card Sale may be subject to Dispute and/or you may lose a Dispute of the Card Sale, as described in the Dispute Rules.

2.2 An Authorization only indicates the availability of credit on an account at the time the Authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that you will not be subject to a Chargeback. If you fail to obtain an Authorization or if you submit a Card Transaction after receiving a decline (even if a subsequent Authorization attempt provides an approval), your transaction may be assessed fines or fees by the applicable Payment Network for which you will be responsible.

2.3 If you receive a Referral Code in response to an Authorization Request, you should contact us for additional information. A Referral Code is not a positive Authorization. If you subsequently complete a Card Sale where you received a Referral Code without subsequently receiving a positive Authorization and corresponding Authorization code, you may be obligated to pay higher Interchange for failure to receive a positive Authorization response. The Card Sale may be subject to Dispute and/or you may lose a Dispute of the Card Sale, as described in the Dispute Rules.

Merchant T&C v17-1-1 Fidelity Information Services, LLC is a registered ISO of Wells Fargo Bank, N.A., Concord, CA Initials/Date ________/________



2.4 You may not attempt to obtain multiple Authorizations for a single Card Transaction. If a Card Sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other Authorization sources. Instead, request another form of payment. If you accept and process a Card Transaction that was declined, or attempt to submit multiple Card Transactions and/or multiple Authorizations, you are subject to a Chargeback, fines and/or cancellation of the Merchant Agreement.

2.5 If you conduct a Card sale using a POS Device to electronically capture data from the Card, the Authorization request you send to us must include all of the data specified in our Operating Rules, including the unaltered contents of track 1 or track 2 of the track data contained on the Card (which includes the Card Verification Value (CVV) data). In addition, the POS Device you use to conduct the Card Sale must be capable of receiving the full, unaltered Authorization response when sent. If a Card Sale is conducted using a POS Device but the Card cannot be read electronically, you must manually input the required Card Transaction information into the POS Device prior to submitting the Authorization request to us. In addition, you must imprint the Card on the Transaction Receipt. If your POS Device is unable to receive an electronic Authorization response, or if the online Authorization system is down, you should call the number we provide you to submit a voice Authorization request. When a positive voice Authorization response is granted, we will provide you with an Authorization code. You must manually enter this Authorization code in the POS Device in such a manner that the Authorization code is printed on the Transaction Receipt. If the Card Sale is not conducted using a POS Device, you shall to record the Authorization code in the appropriate box on the Sales Draft. We will notify you of any negative (or declined) Authorization response provided to us. In the event of a negative Authorization response, you may not comment to the Card presenter on the reason for the decline of the Authorization request. If the Card presenter requests information about the reason for the decline of the Authorization request, you should inform the Card presenter to contact the Card Issuer.

2.6 Occasionally in response to an Authorization request, we may, on behalf of an Issuer, direct you obtain certain information from the Card presenter to verify the Card presenter's identity. Also, in response to an Authorization request, we may, on behalf of an Issuer, occasionally direct you to take and retain a Card from the Card presenter. In each such case, you will use reasonable and lawful attempts to comply with our request.

2.7 If a Card Sale is cancelled or the amount of the Card Sale changes following your receipt of Authorization for the Card Sale, you must cancel the Authorization by (i) processing a return using your POS Device (if the Authorization was obtained using a POS Device), or (ii) call us to request a cancellation of the Authorization (if the Authorization was a voice Authorization). An Authorization may be cancelled at any time within fifteen (15) calendar days of your receipt of the Authorization but must be cancelled before Sales Data relating to the Card Sale has been submitted to us. Once Sales Data relating to the Card Sale has been submitted to us, the Authorization cannot be changed. You may not contact the applicable Payment Network in an attempt to cancel an Authorization. You must contact us to cancel an Authorization, and we will contact the applicable Payment Network.

2.8 You must submit all Authorization requests in U.S. dollars.

**3. Settlement of Card Transactions.**
3.1    Subject to your compliance with all the terms and provisions of the Merchant Agreement and the Operating Rules, we will accept valid Transaction Documentation from you during the term of the Merchant Agreement and to promptly pay you the total amount represented by the Transaction Documentation. At our sole discretion, we may credit your account for the total amount of Card Sales less any applicable fees or, in a separate transaction, subsequently debit you or your account for applicable fees. The payments by us to you shall be deposited in the account designated in your Merchant Application or as you subsequently designate in writing.

3.2 In addition to any other remedies available to us under the Merchant Agreement, we may, without prior notice, suspend payment of any funds if we have reason to believe that you are in default of any obligation under the Merchant Agreement or there is any fraudulent activity related to the transactions that you submit to us.

3.3 To the extent the Automated Clearing House (ACH) settlement process is used to debit or credit your Settlement Account, you agree to be bound by the terms of the operating rules of the National Automated Clearing House Association (NACHA). You hereby authorize us to initiate credit and debit entries and adjustments to your account through the ACH settlement process and/or through direct instructions to (or such other arrangements as we deem appropriate) the financial institution where your Settlement Account is maintained for amounts due under the Merchant Agreement and under any agreements with us or our affiliates for any related services, as well as for any credit entries in error. You hereby authorize the financial institution where your Settlement Account is maintained to make all such debits and credits to your account. This authority will remain in full force and effect until all monies due under the Merchant Agreement and under any other agreements with us or our affiliates for any related services have been paid in full.

3.4 After you submit Sales Drafts and Credits, you will receive settlement funds through ACH credit. We will initiate a transfer of such applicable settlement funds through ACH to your Settlement Account. Settlement by ACH credit generally will take place the second banking day after we process the applicable Card Transactions.

3.5 If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is or should have been affected.

3.6 If after your Settlement Account has terminated, you fail to instruct us as to where to transmit funds that we are holding and that are due to you, we may deduct from those funds our reasonable costs associated with the maintenance of such funds on a monthly basis.

3.7 The following is a partial list of reasons for other debits to your Settlement Account. We may add to this list as required: (a) the applicable Payment Network fees, charges and fines assessed as a result of your transactions; (b) currency conversion errors; (c) fees and Chargebacks not previously charged; and (d) deposits posted in error. For additional reasons, refer to your Operating Rules.

**4. Chargebacks.**
4.1 You are responsible for reimbursing us for any and all Chargebacks and Disputes by the Issuer and/or the Cardholder with respect to your Card Transactions and for related fees, for any reason, whether or not you have the right to contest the Chargeback under applicable Operating Rules.
4.2 Reasons that a Card Transaction may be Disputed or a Chargeback include, but are not limited to:
(a) a Cardholder disputes the validity of a Card Transaction; (b)  a Cardholder disputes the quality or receipt of goods or services;  (c) a copy of the Sales Draft was not provided when requested, or the copy provided was improperly completed or illegible in whole or in part; (d) a Credit was not provided to the Cardholder; (e) the Card Transaction was not authorized by the Issuer at the time of Card Sale, or efforts were made to avoid a decline of the Authorization (such as, but not limited to, attempts to obtain an Authorization after receiving either a decline or a referral to a call center or splitting a sale across multiple transactions of the same Card); (f) the Sales Draft was not imprinted using an imprinting machine (an electronic swipe of the magnetic stripe on the Card may only substitute for a manual imprint if the transaction is electronically authorized by the terminal after the swipe. In situations where the account number is keyed into the terminal or where the



terminal provides a referral response, a physical imprint of the Card on the Sales Draft is mandatory); and (g) all mail order/telephone order and Internet sales are at your risk and are subject to Chargeback.

4.3   You must maintain sufficient funds in your designated Settlement Account to cover all Chargebacks and related fees. For each Card Transaction accepted and processed by you, we have a contingent and unmatured claim against you for any amount we must pay as a result of your acceptance and processing of Card transactions, including, but not limited to, any Chargebacks, fees, discounts, customer credits and adjustments, charges, fines, assessments and penalties. All settlements or credits given or payment made by us to you in connection with your Card Transactions are provisional, and subject to revocation, Chargeback or refund, subject to the terms and conditions of the Merchant Agreement and the applicable Operating Rules. Your right to receive any amounts due from us is expressly subject and subordinate to our Chargeback, set-off, lien and security interest rights without regard to whether such Chargeback, set-off, lien and security interest rights are applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured. WE MAY, WITHOUT FURTHER NOTICE, ELECTRONICALLY DEBIT YOUR SETTLEMENT ACCOUNT TO COVER ALL SUMS OWING TO US PURSUANT TO THE MERCHANT AGREEMENT, INCLUDING, BUT NOT LIMITED TO, AMOUNTS OWING FOR CHARGEBACKS, RELATED FEES AND FINES IMPOSED BY THE APPLICABLE PAYMENT NETWORK.

## 5.  Operation of Business.

5.1 Change in Business.  You must notify us immediately of any change to the information included in your Merchant Application, including if you engage in, or in the future elects to engage in, any new lines or types of business activities not disclosed in your Merchant Application or if you change your business activities in any of the following ways:  (i) change of ownership; (ii) change in type or kind of business; (iii) change in identity, including corporate/legal name or address; (iv) closing or liquidating business entirely or any locations; (v) change in processing method (i.e., Transaction Slips to POS Device);  (vi) voluntary or involuntary party in a bankruptcy case; (vii) entry into a loan or other agreement with a third party that seeks to affect the Merchant Agreement; (viii) change to any entity that is a party to or guarantor of the Merchant Agreement, including by merger or acquisition; and (ix) change to or from a business that conducts exclusively retail sales to one that accepts Card Sales by mail, telephone order or Internet transactions.

You agree to notify us of any changes specified above, including any changes to the information in your Merchant Application. We may terminate Card acceptance by you and your sublicense to use the Program Marks if you fail to notify us of any such change. In addition, Card Sales by you relating to a new business activity of which we have not been notified may be rejected or subject to reversal or Chargeback, at any time at our sole discretion.

5.2 Compliance with Laws.  You are responsible for operating your business and performing your obligations hereunder in compliance with Applicable Law.

5.3 Audits. We may, at our discretion, conduct or engage a third party to conduct examinations and audits of such your compliance with the applicable provisions of the Merchant Agreement or the Operating Rules. All such examinations and audits will be at your sole cost and expense. We may report the results of each such examination and audit to the applicable Payment Network. In addition to the foregoing, you agree that the applicable Payment Network shall have the right to visit you and review your retail locations, corporate offices and websites to verify your compliance with the terms of the Merchant Agreement and the Operating Rules, including the License, the display of the Program Marks, adherence to point-of-sale procedures and compliance with the Security Requirements. If an audit identifies a regular or repeated failure by you to comply with the obligations applicable to you, you agree to promptly notify us of your plan to cure such deficiency along with the implementation date of such cure.

## 6.  Card Account Information.

6.1  You may not request or use Card account information for any purpose that you know or should have known to be fraudulent or in violation of the Operating Rules.  You must not ask a Cardholder to record a Card account number or other account information on the exterior of any order form or other similar device designed to be mailed. You may not disclose Card Transaction information except to us or our agent for the purpose of processing a Card Transaction or Chargeback, or to your loyalty program or fraud control service provider, or as required by Applicable Law.

6.2 You must comply with the requirements of the Payment Card Industry Data Security Standards  ("PCI DSS").  FIS requires all merchants to validate PCI DSS compliance on an annual basis.  Initial validation to should occur no later than thirty (30) days after account approval.  You will be charged the monthly PCI Fee listed in the Pricing Schedule provided in the application.

6.3 If Third Party providers are used to handle Card account information, they must also comply with the requirements of the PCI DSS.

6.4  If you fail to provide validation of PCI DSS compliance within thirty (30) days of account approval, or in subsequent years on or before the anniversary date of account approval, you will be charged a monthly non-compliance surcharge fee(s) until FIS is provided with validation of compliance.  The surcharge fee(s) will increase after more than 6 months of non-compliance and again at more than 12 months of non-compliance.

**7.  Exclusivity.** During the term of the Merchant Agreement, you shall use us as your exclusive provider of all Services unless we have otherwise specifically agreed in writing.

## 8.  Program Marks.

8.1 You are prohibited from using the Program Marks, as defined below, other than as expressly authorized in writing by us or as provided in this Section 8. Additionally, you shall not use the Program Marks other than to display decals, signage, advertising and other forms depicting the Program Marks that are provided to you by us pursuant to the Merchant Agreement or otherwise approved in advance in writing by us. You may use the Program Marks only to promote the services covered by the Program Marks by using them on decals, indoor and outdoor signs, websites, advertising materials and marketing materials; provided that all such uses must be approved in advance by us in writing  You shall not use the Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Program Marks. You recognize that you have no ownership rights in the Program Marks. You shall not assign to any third party any of the rights to use the Program Marks.

8.2 You must prominently display the Program Marks at the point of interaction to indicate that the merchant accept the applicable Payment Network's cards.  If you are a remote services merchant, you must display the Program Marks wherever payment options are presented. We will provide you with the appropriate artwork in a format authorized by the applicable Payment Network. The Program Marks must be clearly visible to the public. The preferred location to post the Program Marks at a physical point of interaction is the entrance, nearby window or door of your business location, and on the first screen of an electronic point of interaction. Where it is not possible to post signage at the entrance of your location, posting the Program Marks so that they can easily and readily be seen within the location will satisfy the above requirement. Where it is not possible to post the Program Marks on the first screen of an electronic point of interaction, posting the Program Marks on the payment screen will satisfy this requirement. You must display each Program Mark in such manner and with such frequency as accorded any other Payment Network's Program Marks. You must limit your use or display of the Program Marks in accordance with the terms of the license granted under Section 8.1 and this Agreement or in accordance with any other specifications provided by us. We will provide you with signage displaying representations of the Program Marks that are consistent with the applicable Payment Network standards. We will provide approved displays to you for your use to inform the public that



credit and debit cards are accepted. You shall prominently display the Program Marks that we provide. You may not indicate that any Payment Network endorses any of your products or services.

8.3 Your license to use the Program Marks shall terminate upon the earlier of (i) the termination of the Merchant Agreement, or (ii) delivery of notice by us to you of the termination of the license hereunder.

## 9.  Confidentiality.

9.1 <u>Confidential Information</u>. We, the applicable Payment Network, or the applicable Payment Network's or our agents on behalf of the applicable Payment Network, ourselves, the applicable Payment Network's and our affiliates and prospective and current Issuers, including the applicable Payment Network Issuers, and each of their and our respective officers, directors, subcontractors and employees, agents and affiliates (in each case, a "<u>Disclosing Party</u>") may disclose or communicate, directly or indirectly, to you or your agents ("<u>Receiving Party</u>") information and data that the Disclosing Party deems as confidential or proprietary ("<u>Confidential Information</u>"). The term "Confidential Information" includes all information and materials pertaining to technology, trade secrets, know-how, products, facilities, processes, operations, suppliers, current and prospective customers, marketing objectives and plans, pricing and other information pertaining to the Disclosing Party's business affairs, and includes all information pertaining to us and the applicable Payment Network, our and their respective marketing and other business plans, profitability, market share and position, Card Transaction volumes, BINs, prospective and current Issuers, other acquirers of Card Transactions and/or merchants, and any information disclosed by a Disclosing Party to a Receiving Party prior to the execution of the Agreement in contemplation or anticipation of the entry into the Agreement, regardless of whether such disclosure was protected by a confidentiality agreement. The term "Confidential Information" also includes the terms of the Merchant Agreement and the Operating Rules, including documents incorporated by reference, each of the schedules, exhibits, appendices and amendments thereto and any material that is distributed or disclosed by the Disclosing Party in connection with exercising its rights or performing its obligations under the Merchant Agreement, regardless of whether such information is marked as "Confidential." The term "Confidential Information" includes information or data that is in oral, written or other visual form, or recorded on tape, electronic or other media. The terms of this Section 9 shall supersede any oral or written agreements between you and us governing confidentiality entered into prior to the execution of the Merchant Agreement and the terms of this Section 9 shall apply retroactively to the date of the first disclosure by the Disclosing Party of Confidential Information in contemplation of the entry into the Merchant Agreement. In the event of a conflict between the terms of this Section 9 and the terms of any confidentiality agreement between you and us entered into prior to entry into the Merchant Agreement, the terms of this Section 9 shall govern. The term "Confidential Information" will exclude (i) information in the public domain or information that becomes available to the general public without restriction through no wrongful act or omission of the Receiving Party; (ii) information that is independently developed by the Receiving Party without reference to Confidential Information of the other party; or (iii) information that is known by the Receiving Party prior to disclosure by the Disclosing Party.

9.2 <u>Limited Use</u>.
You agree that Confidential Information will be used by you for the sole and exclusive purpose of performing the obligations and exercising the rights as granted or permitted under the Merchant Agreement. You must ensure that Confidential Information is kept confidential and is not disclosed, directly or indirectly, to any third party unless the Disclosing Party consents in writing to such disclosure, and then only upon the prior execution of a confidentiality agreement containing terms substantially similar to those in this Section 9 by the third party to whom the Receiving Party desires to disclose such information. Notwithstanding the foregoing, the Receiving Party may disclose strictly limited and necessary types of Confidential Information to its affiliates and/or agents that require access to such Confidential Information in order for the Receiving Party to perform its obligations under this Agreement, subject to the terms of Section 9.2 and provided that such Persons are bound to confidentiality terms substantially similar to those in this Section 9.

9.3 <u>Permitted Disclosures</u>.
Notwithstanding the above restrictions, the Receiving Party may disclose Confidential Information in response to a subpoena or order of a court or an agency or government authority of competent jurisdiction that is binding on the Receiving Party, and which compels the disclosure of Confidential Information, provided that the Receiving Party will, to the extent permitted by Applicable Law, immediately notify the Disclosing Party of the receipt of a subpoena or order so as to permit the Disclosing Party to contest any such subpoena or order or to seek an appropriate protective order at the Disclosing Party's expense. To the extent required by specific circumstances, you may disclose certain limited and necessary terms of the Merchant Agreement and the Operating Rules, to (i) your regulators, examiners, auditors and counsel, or (ii) to proposed investors and financing sources and their advisors in connection with a merger or acquisition or proposed merger or acquisition or the like, provided such proposed recipients agree in writing to be bound by the obligations of confidentiality required by the Operating Rules and provided that you provide prompt written notice to the applicable Payment Network in advance of such disclosure.

9.4 <u>Return or Destruction of Confidential Information</u>.
Upon the termination or expiration of the Merchant Agreement, all Receiving Parties will comply with the Disclosing Party's reasonable instructions regarding the disposition of Confidential Information, which may include the return or destruction of any and all Confidential Information (including any electronic or paper copies, reproductions, extracts or summaries thereof); provided that the Receiving Parties may retain a reasonable number of copies of any tangible property containing Confidential Information, subject to the terms of these Operating Rules, which may be used solely for regulatory and record-keeping purposes and may not be used for any other purpose.

## 10.  Advertising and Publicity.

Except as otherwise explicitly permitted by these Terms and Conditions, you may not use the registered trademarks, service marks, logos or any proprietary information of the applicable Payment Network, us or the applicable Payment Network's or our affiliates without the prior written consent of the owner of such intellectual property and the prior review, by such owner, of the materials in which such marks, logos or proprietary information is proposed to be used, including in any press release. In your case, such materials shall include the types of media referred to in Section 7.2 in which the Program Marks or logos are displayed. Such consent shall not be unreasonably withheld or delayed. Neither party shall make any public statement or press release regarding the Program or the Merchant Agreement, without the prior written approval of the other party.

## 11.  Fees; Adjustments.
You agree to pay charges and fees in the amount and in the frequency specified from time to time by us.  You also agree to pay any fines imposed on us by the applicable Payment Network resulting from Chargebacks and any other fees or fines imposed by the applicable Payment Network with respect to your acts or omissions. We have the right to revise our fees and charges upon written notice to you and you shall pay such revised charges and fees. You agree that any objections to any such charges or fees that are not made and timely received by us as provided herein, shall be deemed waived by you.

## 12.  Representations; Warranties.
12.1 For each Card Transaction submitted to us, you represent and warrant the following: (a) it is a lawful sale/rental not previously submitted and is only for the items sold or rented (including taxes, but without any surcharge); (b) it represents an obligation of the Cardholder for the Card Transaction amount; (c) it is not an amount charged subject to any dispute, set-off or counterclaim; (d) it is for merchandise or service actually delivered or performed at the same time you accepted and submitted the Card Transaction for processing (except for any delayed delivery or advance deposit transactions expressly authorized by this Agreement); (e) it is not the refinancing of an existing obligation of the Cardholder or arising from the dishonor of a personal check; (f) that you have no knowledge or notice that



the transaction is improper, fraudulent or unauthorized; (g) that the Card Transaction is between you and the Cardholder; and (h) the Card Transaction is made in accordance with the Merchant Agreement, the Operating Rules.

12.2 THIS IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OR ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THE MERCHANT AGREEMENT.

**13. Term and Termination.** Merchant's ability to participate in our card processing program ("Program") shall begin as of the Effective Date and continue for an initial term ("Initial Term") of thirty-six (36) months from service installation and shall automatically renew thereafter for additional terms of one (1) year each unless Merchant provides us with written notice at least ninety (90) days prior to the expiration of the Initial Term or any renewal term. Merchant may also terminate the Merchant Agreement prior to expiration of the Initial Term or any renewal term upon providing us with thirty (30) days' notice prior to the first of any month. If Merchant terminates within the Initial Term, Merchant will immediately pay FIS, as liquidated damages, an early termination fee equal to $295. In addition to all other amounts owed. If Merchant terminates at any time during the second or third year of the Initial Term, the Merchant will pay, as liquidated damages, a termination fee equal to $195, in addition to all other amounts owed. Merchant agrees that the early termination fee is not a penalty, but rather is reasonable in light of the financial harm caused by Merchant's early termination. FIS will use best efforts to debit the Merchant's account in the amount of the applicable termination fee within sixty (60) days of receipt of Merchant's written notice of termination. Any partial month of processing is considered post termination and will be included in the number of months remaining in the term for purposes of determining the termination fee. FIS may terminate Merchant's participation in the Program at any time by giving written or telephonic notice to Merchant. Written notice shall be deemed given on the date mailed by certified mail, return receipt requested. Telephonic notice shall be deemed given on the date the call is completed. In no event shall Merchant be required to deposit, or are we required to accept for deposit, any charge forms or credit forms after the termination date.

All obligations incurred or existing under the Merchant Agreement as of the date of termination shall survive such termination until such obligations are fully satisfied. Merchant expressly acknowledges that VISA and MasterCard maintain records containing information on Merchants terminated for one or more reasons specified in the Operating Rules. Such reasons generally include, but are not limited to, fraud, counterfeit paper, unauthorized transactions, breach of contract, excessive Chargebacks or highly suspect activity. Merchant acknowledges that we are required to report the Merchant business name and the name of its principals to VISA and MasterCard when Merchant is terminated due to one or more of the foregoing reasons. Merchant expressly agrees and consents to such reporting by Service Provider in the event of the termination of the Merchant Agreement due to one or more of such reasons.

**14. Security Interest.** You hereby grant us a security interest and lien on any deposit account that you now or hereafter have with any financial institution, in all funds in any such account, all writings evidencing any such account, and all proceeds of the foregoing, to secure your existing and future obligations to us under the Merchant Agreement. You agree to take such actions as may be required, from time to time, to establish and maintain such security interest as a perfected first lien security interest. For purposes of this Section, any failure by you to pay us, upon demand, the amount of any transaction that we have charged back to you or any other amount owed by you to us under the Merchant Agreement shall constitute a default by you. Upon any such default, we shall have all rights and remedies provided by law, including the right to enforce our security interest by applying all funds in any account held by us to any and all of your indebtedness to us.

**15. Limitation of Liability.** OUR LIABILITY TO YOU WITH RESPECT TO ANY CARD TRANSACTION SHALL NOT EXCEED THE AMOUNT REPRESENTED BY THE TRANSACTION DOCUMENTATION IN CONNECTION WITH THAT CARD TRANSACTION LESS ANY APPLICABLE DISCOUNT RATE, PROVIDED THAT OUR TOTAL, AGGREGATE LIABILITY FOR ALL CLAIMS SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY YOU DURING THE THREE (3) MONTHS PRIOR TO THE MOST RECENT CLAIM. IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES WHATSOEVER.

**16. Entire Agreement; Compliance.** The parties intend that the Merchant Agreement shall constitute the entire agreement of the parties and may not be contradicted by evidence of any prior or contemporaneous agreement. You shall comply with Applicable Law as applicable to you and any Card Transaction, including, without limitation, all state and federal consumer credit and consumer protection statutes and regulations. You shall also comply with all operating instructions, rules and regulations as we or the applicable Payment Network may issue or amend from time to time. You shall pay, or reimburse us for our payments of, any fines or assessments imposed by the applicable Payment Network that arise out of your Card acceptance activities. The applicable Payment Network(s) Operating Rules are incorporated herein by reference and you agree to be bound by and comply with the same.

**17. Waiver.** No failure to exercise and no delay in exercising any right, remedy, or power under the Merchant Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity. The waiver by any party of the time for performance of any act or condition hereunder does not constitute a waiver of the act or condition itself.

**18. Severability, Amendment, and Construction.** If any provision of the Merchant Agreement is declared illegal or void, it shall not affect the validity or enforceability of the remainder of this Agreement. The Merchant Agreement may be amended at any time by us upon written notice to you. Your continued use of the Services hereunder subsequent to any such change constitutes your acceptance of the change. The Merchant Agreement shall be construed and interpreted in accordance with the laws of the state of Wisconsin and applicable federal law. All headings are for convenience only and do not control substantive provisions of the Merchant Agreement.

**19. Successors and Assigns.** This Agreement shall bind and inure to the benefit of the parties hereto, their successors, and assigns. Notwithstanding the foregoing, you may not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by other operation of law, any right or obligation under the Merchant Agreement without our written consent. Any purported assignment, transfer, or delegation in violation of this Section shall be null and void. We may subcontract or delegate our obligations hereunder to subcontractors or third parties at our sole discretion.

**20. Fines or Assessments.** If we are fined or assessed any sum by the applicable Payment Network, for your violations of such Payment Network's Operating Rules, you will immediately reimburse us for said amounts.

**21. Lawsuits, Venue, and Attorneys' Fee.** You and we agree to and hereby waive the right to trial by jury in any lawsuit arising out of the Merchant Agreement and the documents referenced in the Merchant Agreement, whether such claims are based on contract, unjust enrichment, tort or any other theory of law. Each party represents to the other that this waiver is knowingly, willingly and voluntarily given. The parties further agree that all such lawsuits shall only be venued in the county in which our principal place of business is located. You will reimburse us for reasonable attorney's fees and other costs and expenses incurred by us in enforcing any rights we may have with regard to the Merchant Agreement and the documents referenced herein.



**22. Reserve Account**. In our sole discretion, we may establish a Reserve Account in your name to protect our interests based upon our estimate of the amount necessary to cover anticipated chargebacks, fees and other liabilities you owe us. To establish the Reserve Account, you authorize us to deduct funds from amounts due you by us, or charge any deposit account of yours with any other financial institution by Automated Clearing House or otherwise and place such funds in a Reserve Account. You hereby grant us a security interest in the funds in the Reserve Account as security for any existing or future obligation you owe us hereunder. The funds in the Reserve Account shall not be subject to the claims of any other party. You may not grant any lien or security interest in the Reserve Account. We may deduct a portion from each credit transaction deposited or transmitted by you to us or any other financial institution and place such funds into the Reserve Account. The Reserve Account shall be maintained for as long as we, in our sole discretion, deem necessary. You hereby expressly authorize any financial institution at which you maintain an account to transfer funds from such account to us upon our request to maintain funds in the Reserve Account of a level deemed appropriate by us. In our sole discretion, we may withdraw funds from the Reserve Account to satisfy your obligations to us hereunder. If your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from you, or if the funds in the Reserve Account have been released, you agree to promptly pay us such sums upon request. You shall not receive any accrued interest on any funds held by us as a result of your processing of Card Transactions, including, but not limited to, funds held by us in a Reserve Account. Notwithstanding the foregoing, we shall be entitled to accrued interest on any such held funds.

**23. Financial and Other Information**.
23.1 Upon our request, you shall furnish to us copies of your financial statements, and /or such other financial information and reports reasonably requested by us. You authorize us to obtain, from time to time, credit, financial, and other information regarding you from other persons or entities, such as credit reporting agencies. You also authorize us to respond to requests from others for information regarding you. We have the right at any reasonable time to verify all sales and to audit your books, accounts, records, and other papers relative to credit transactions tendered to us hereunder.

23.2 From time to time, we may determine that an inspection of your business location is necessary. In such event, you shall pay the costs incurred by us for such inspection, including, but not limited to, costs incurred for airfare and hotel accommodations. Prior to the imposition of such costs, we shall notify you in writing of our intention to impose such costs and provide you with an estimate as to the amount of such costs. Your written consent to pay such costs shall not be unreasonably withheld.

**24. Indemnification**. You agree to indemnify and hold us, our vendors and affiliates, as well as the applicable Payment Network and any Issuer, harmless from and against all losses, liabilities, damages and expenses (including reasonable attorneys' fees) resulting from your actions, including, but not limited to, any breach of any warranty, covenant or agreement or any misrepresentation by you under the Merchant Agreement, or arising out of you or your employees' acts or omissions, including as a result of your processing of Card Transactions or use of the Services.

**25. Processing Related Equipment**.
25.1 YOU WARRANT THAT ANY PROCESSING EQUIPMENT AND/OR SOFTWARE YOU OBTAIN IS FOR A COMMERCIAL PURPOSE AND IS NOT FOR PERSONAL USE. Unless otherwise provided for in a separate sales agreement, the sale of all processing equipment is between you and third parties, including, but not limited to, our independent sales agents and representatives.

25.2 YOU ACKNOWLEDGE THAT ANY EQUIPMENT AND/OR SOFTWARE YOU OBTAIN MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS. WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH EQUIPMENT AND/OR SOFTWARE COMPATIBLE WITH ANY OTHER PROCESSING SYSTEMS. IN THE EVENT THAT YOU ELECT TO USE ANOTHER PROCESSING SERVICE PROVIDER UPON THE TERMINATION OF THE MERCHANT AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE THAT YOU HAVE OBTAINED.

25.3 We may upgrade or otherwise modify our computer system at any time without prior notice. You agree to provide us access to your processing equipment in the event that we deem it necessary as part of our upgrade or system modification.

**26. Other Provisions**.
26.1 No party shall be liable for any default or delay in the performance of its obligations under the Merchant Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a third party for any similar cause beyond the reasonable control of such party, including, without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the nonperforming party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this Section, your failure to receive payment or funds from a third party shall not excuse the performance of your obligations to us under the Merchant Agreement.

26.2 The headings contained in the Merchant Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of the Merchant Agreement.

26.3 If there are any inconsistencies between the Merchant Agreement and the Operating Rules, the Merchant Agreement will govern. If any part of the Merchant Agreement is not enforceable, the remaining provisions shall remain valid and enforceable.

26.4 The Merchant Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof, supersedes any previous agreements and understandings and, except as expressly provided in the Merchant Agreement, can be changed only by a written agreement signed by all parties. A party's waiver of a breach of any term or condition of the Merchant Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

26.5 The parties acknowledge that the applicable Payment Network's Operating Rules give such Payment Network certain rights to require termination or modification of the Merchant Agreement with respect to transactions involving Cards and the Payment Network and to investigate you. The parties also acknowledge that issuers of other Cards, for which we perform services on your behalf, may have similar rights under their applicable the applicable Payment Network Rules with respect to the Merchant Agreement's applicability to transactions involving such other Cards.

26.6 You may designate a third party as your agent for the purpose of delivering credit card transactions data-captured at POS Device by such agent for clearing and settlement. In such event, you agree that: (a) you must provide satisfactory notice to us if exercising use of third-party agent; (b) you understand and agree that the obligation of us to you to reimburse you for credit card transactions is limited to the amount (less fees) delivered by that agent to us; and (c) you is responsible for any failure by your agent to comply with your responsibilities under the Merchant Agreement and the Operating Rules including but not limited to any violation which results in a Chargeback.



**27. Merchant Chargeback Notification.** As a merchant participating in the Program for Card acceptance, you must be aware of the Cardholder's right to chargeback a transaction. A chargeback occurs when a Cardholder disputes purchase for any number of reasons. Please be aware of the following:

- A chargeback is initiated by the Cardholder's issuing bank, not by us.
- The chargeback process is one which ordinarily favors the Cardholder rather than the merchant.
- A chargeback does not mean that you, as a merchant, are without recourse. What it may mean, however, is that you may have to pursue a private collection action against your customer.
- A Cardholder's right to charge back is very broad. The Cardholder simply has to file a written dispute with his/her issuing bank. The issuing bank must then charge the item back to the acquiring bank.
- An Authorization does not guarantee your Card Sale, should the Cardholder dispute the Card Sale.
- A Cardholder has significant rights to return merchandise. Please note the applicable provisions of the Operating Rules with respect to returns and disclosure of Merchant's return policy(ies). Should the cardholder claim he/she was not made aware of the disclosure (the merchant's return policy), a Chargeback will likely be initiated.
- The acquiring bank is simply the messenger when a chargeback is initiated by a cardholder. The acquiring bank must process the chargeback to the merchant's account per the applicable Payment Network Operating Rules.

**28. Definitions.** As used in the Merchant Agreement, the terms below will have the following meanings:

"Applicable Law" means any law, ordinance, statute, treaty, rule, judgment, decree, regulation, official directive, consent, approval, authorization, order or other determination or finding of any governmental authority applicable to or binding upon you or to which you are subject, whether federal, state, county, local, foreign or otherwise, including state usury laws, the Truth-In-Lending Act, the Fair Debt Collection Practices Act, the Federal Equal Credit Opportunity Act, the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act, the National Bank Act, the Bank Secrecy Act as amended by the USA PATRIOT Act together with implementing federal regulations, the Trading With the Enemy Act, the International Emergency Economic Powers Act and the United Nations Participation Act and related Executive Orders and implementing U.S. Department of the Treasury regulations, the Electronic Funds Transfer Act, the Telephone Consumer Protection Act, the Gramm-Leach-Bliley Act, the Foreign Corrupt Practices Act, the Anti-Boycott provisions of the Export Administration Act and implementing U.S. Department of Commerce regulations, the Federal Trade Commission Act, the Sarbanes-Oxley Act and implementing federal regulations, and Regulations B, E, P and Z of the Board of Governors of the Federal Reserve System.

"Authorization" means approval by, or on behalf of, the Issuer to validate a Card Transaction. An Authorization indicates only the availability of the Cardholder's credit limit at the time the Authorization is requested.

"Automatic Payment Plan" means an obligation, either of a fixed or variable amount, that is paid by a Cardholder with a series of charges to a Card account over a period time pursuant to an agreement between the Cardholder and the merchant.

"Card Not Present" means a Card Sale or Credit that occurs when neither the Card nor the Cardholder is present at the point-of-sale to conduct the Card Sale or Credit, including Internet, mail-order and telephone-order Card Sales and Credits.

"Card Present" means a Card Sale, Cash Advance or Credit that occurs where the Card and the Cardholder are present at the point-of-sale and the Card is used to conduct the Card Sale, Cash Advance or Credit, as evidenced by our receipt of Track Data in the Authorization request (except with respect to Biometric Card Transactions, which constitute Card Present sale but will not include CVV with the Authorization request).

"Card Sale" means a sale of goods or services to a Cardholder by a merchant, either in a Card Present environment or as a Card Not Present transaction, either of which is conducted pursuant to a merchant agreement where the amount of such sale is applied to a Card account and considered an obligation of the Cardholder.

"Card Transaction" means a transaction involving a Card, including any Card Sale, Cash Advance, Credit, Chargeback, Reversal or Correction.

"Cardholder" means the individual whose name is embossed on a Card (credit card or debit card, as applicable) and any authorized user of such Card.

"Chargeback" means the procedure by which a Sales Draft or other indicator of a Card transaction (or disputed portion thereof) is returned to Bank or the Issuing Bank, the liability for which is the Merchant's responsibility.

"Chargeback Fee" means a fee incurred each time a transaction is charged back to you.

"CID" or "Card Identification Data" means the three digit number that follows the complete or truncated Card Number in the signature panel or in a separate box directly to the right of the signature panel on the back of each Card.

"Credit" means a refund or price adjustment given for a previous purchase transaction.

"CVV" or "Card Verification Value" means the three digit number that follows the complete or truncated Card account number in the signature panel or in a separate box directly to the the right of the signature panel on the back of each Card.

"Dial-Up Terminal" means an Authorization device which, like a telephone, dials an Authorization center for validation of transactions.

"Discount Rate" means an amount charged for processing credit Card transactions or signature debit Card Sales. Discount Rates are charged on all sales and refunds.

"Dispute" means a ticket retrieval request, request for a Chargeback, request for representment of a Card Transaction, or representment of a Card Transaction, as the context may require, by an Issuer, us or the applicable Payment Network, including supporting information and documentation provided by the Issuer or us in connection with any of the foregoing, and the applicable Payment Network's process of resolving or effecting any of the foregoing, including Dispute arbitration, as more fully described in the Dispute Rules.



"Dispute Rules" means the document that contains instructions and requirements relating to the resolution of Disputes relating to Card Transactions, including Chargebacks, Credits and corrections, as such document may be amended from time to time by the applicable Payment Network.

"Fees" means the fees and charges we or the applicable Payment Network assess for or related to the Services.

"Interchange" means a charge assessed by the applicable Payment Network and paid to the Issuer.

"Imprinter" means a manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on a Sales Draft.

"Issuer" means the bank or other party that has issued a Card.

"Magnetic Stripe" means a stripe of magnetic information affixed to the back of a plastic credit or Debit Card. The magnetic stripe contains essential Cardholder and account information.

"Operating Rules" means the rules, regulations, bylaws, releases, interpretations and other requirements (whether contractual or otherwise) now or hereafter imposed, adopted or communicated by the applicable Payment Network, as such may be amended, modified or supplemented from time to time.

"Payment Network(s)" means Visa U.S.A. Inc. ("VISA"), MasterCard International, Inc. ("MasterCard") and Discover Financial Services ("Discover") payment card networks, and other payment card networks or systems

"Person" means an individual, partnership, joint venture, corporation, association, or other legal entity, however organized.

"POS Device" means an electronic point-of-sale device, cash register, or terminal and any necessary software, including a CAT and a self-service terminal, located at the physical premises of a merchant that is capable of electronically capturing data from Cards and receiving electronic evidence of Authorization responses and which may also be capable of transmitting electronic evidence of Sales Data.

"Program Marks" means any and all trademarks and service marks of a Payment Network which are provided to you or approved by us for your use in connection with the Services.

"Referral Code" means the message received from an Issuing Bank when an attempt for Authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

"Reserve Account" means a fund established and managed by us in a depository selected by us to protect against actual or contingent liability arising from Chargebacks, adjustments, fees and other charges.

"Retrieval Request/Transaction Documentation Request" means a request for documentation related to a Card Transaction such as a copy of a Sales Draft or other Card Transaction source documents.

"Sales Data" means evidence of Card Sales and Credits in electronic format that is captured, prepared and/or transmitted by you for a Card Sale or Credit.

"Sales Draft" means evidence of a purchase of goods or services by a Cardholder from Merchant using a Card, regardless of whether the form of such evidence is in paper, electronic or otherwise, all of which must conform to the applicable Payment Network Rules.

"Security Requirements" means (i) the VISA's Cardholder Information Security Program ("CISP"), MasterCard's Site Data Protection Program ("SDP"), the Payment Card Industry ("PCI") PIN Security Requirements, the Payment Card Industry Data Security Standard ("PCI-DSS") located at www.pcisecuritystandards.org, in each case, as interpreted and communicated to Merchant by us and/or the Payment Network, and as may be amended and supplemented from time to time, which is incorporated herein by reference and all related compliance requirements, and (ii) any additional security requirements and all related compliance requirements promulgated by the applicable Payment Network from time to time.

"Services" means the activities undertaken by us to authorize, process and settle all United States Dollar-denominated Card Transactions undertaken by Cardholders at Merchant's location(s) in the United States, and all other activities necessary for us to perform the functions required by the Merchant Agreement for all Cards covered by the Merchant Agreement.

"Settlement Account" means an account at a financial institution designated by Merchant as the account to be debited and credited by us for Card transactions, fees, Chargebacks and other amounts due under the Merchant Agreement or in connection with the Merchant Agreement.

"Transaction Documentation" means, collectively, Transaction Receipts and Transaction Slips.

"Transaction Receipt" means a paper or electronic copy of Card Transaction data generated at the point -of -sale when the Card Transaction is conducted using a POS Device, a copy of which is provided to the Cardholder.

"Transaction Slip" means a form used by you to capture Card Transaction data in transactions where a POS Device is not used, one copy of which is provided to the Cardholder and one copy of which is provided to us for settlement of the Card Transaction, including a Sales Slip or a Credit Slip, as applicable or appropriate under the circumstances.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 7

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION



MERCHANT APPLICATION AND AGREEMENT

## BUSINESS INFORMATION

| | | |
|---|---|---|
| CORPORATE/LEGAL NAME  EMPEROR ENTERTAINMENT INC. | | MERCHANT NAME (DBA OR TRADE NAME)  CABERNET TEHRAN |

| | | |
|---|---|---|
| CORPORATE ADDRESS  16101 Ventura Boulevard | | LOCATION ADDRESS  16101 VENTURA BLVD #160 |

| CITY Los Angeles | STATE CA | ZIP CODE 91436 | CITY ENCINO | STATE CA | ZIP CODE 91436 |
|---|---|---|---|---|---|

| CUSTOMER SERVICE # (818) 988-5800 | EMAIL ADDRESS NOEMAIL@NOEMAIL.COM | LOCATION PHONE # (818) 988-5800 | FEDERAL TAX # XX-XXXX101 |
|---|---|---|---|

| YEARS IN BUSINESS 10 | DATE BUSINESS OPENED | # OF LOCATIONS | MAILING ADDRESS ● DBA ○ LEGAL | WEBSITE http://www.cabarettehran.com/ |
|---|---|---|---|---|

PAYMENT CARD INDUSTRY SECURITY STANDARD: MUST PROVIDE COPY OF SELF ASSESSMENT QUESTIONNAIRE. IF APPLICABLE, MUST PROVIDE CERTIFICATE OF COMPLIANCE

## OWNER INFORMATION

The following information for each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of the legal entity listed above: (please provide copy of Driver's License for each signing principal)

| PRINCIPAL/OWNER (First, Middle and Last) 1  HAMIDREZA  POUSTI | | EMAIL ADDRESS NOEMAIL@NOEMAIL.COM | | SSN # #####-3460 | | DATE OF BIRTH 07/15/1979 |
|---|---|---|---|---|---|---|
| TITLE CEO | % OWNERSHIP 100 | PRIOR BANKRUPTCIES? ○ NO   IF YES, | ○ BUSINESS | ○ PERSONAL | | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS 17530 VENTURA BLVD #102 | | CITY ENCINO | STATE CA | ZIP CODE 91310 | HOME PHONE # (818) 699-9000 | |

| PRINCIPAL/OWNER (First, Middle and Last) 2 | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES? ○ NO   IF YES, | ○ BUSINESS | ○ PERSONAL | | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | CITY | STATE | ZIP CODE | HOME PHONE # | |

| PRINCIPAL/OWNER (First, Middle and Last) 3 | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES? ○ NO   IF YES, | ○ BUSINESS | ○ PERSONAL | | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | CITY | STATE | ZIP CODE | HOME PHONE # | |

| PRINCIPAL/OWNER (First, Middle and Last) 4 | | EMAIL ADDRESS | | SSN # #####- | | DATE OF BIRTH |
|---|---|---|---|---|---|---|
| TITLE | % OWNERSHIP | PRIOR BANKRUPTCIES? ○ NO   IF YES, | ○ BUSINESS | ○ PERSONAL | | DATE DISCHARGED MM/YYYY |
| HOME ADDRESS | | CITY | STATE | ZIP CODE | HOME PHONE # | |

## CONTROLLING OFFICER

Complete the following information for one individual with significant responsibility for managing the legal entity listed above, such as: An Executive Officer or senior manager )e.g., Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Managing Member, General partner, President, Vice President, Treasurer); or any other individual who regularly performs similar functions. If appropriate, an individual listed under section (a) above may also be listed in this section (b)

| FIRST NAME 1 | MIDDLE | LAST | | TITLE | Is this individual already listed In Owner Info Section If No, please complete next section ●YES   ○NO |
|---|---|---|---|---|---|
| HOME ADDRESS | | CITY | STATE | ZIP CODE | HOME PHONE # |
| SSN | DRIVER'S LICENSE #/PASSPORT NUMBER & EXP DATE | | EMAIL ADDRESS | | DATE OF BIRTH |

## SALES PROFILE

| DOES THIS LOCATION CURRENTLY TAKE VISA/MASTERCARD/DISCOVER NETWORK? ● YES   ○ NO | | | RETAIL CHIP SWIPE | 100 | % |
|---|---|---|---|---|---|
| CURRENT PROCESSOR | | | MAIL/PHONE | 0 | % |
| AVERAGE TICKET $ 150 | MAXIMUM TICKET $ 2000 | MONTHLY VOLUME $ 100000 | INTERNET | 0 | % |
| NEXT DAY FUNDING ● YES   ○ NO | BILLING TYPE : ● MONTHLY   ○ DAILY | | IMPRINT (CARD PRESENT) 0 | | % |

| Is any third party used to store, process or transmit cardholder data? (shopping cart, gateway, etc.)   ○ NO   IF YES, please provide: | | | B2B% | B2C% | B2G% |
|---|---|---|---|---|---|
| NAME: | ADDRESS: | CITY,STATE, ZIP | 0 | 100 | 0 |

| Do you utilize a fulfillment house for storage/shipping of product?  ○No   If YES, please provide: | | | DAYS TO DELIVERY: | | |
|---|---|---|---|---|---|
| NAME: | ADDRESS: | CITY,STATE, ZIP | ○ 0-7 | ○ 7-14 | ○ 15 + |

Version 1.1.1 012219

Defyne Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

## BUSINESS PROFILE

OWNERSHIP: MUST PROVIDE DOCUMENTATION

| | | | |
|---|---|---|---|
| INDIVIDUAL/SOLE PROPRIETOR | ● CORPORATION | PARTNERSHIP | LLC/LLP  ☐ OTHER |
| GOVERNMENT | PUBLICLY TRADED | PA/PC | NON-PROFIT (MUST PROVIDE 501 C3 LETTER) |

BUSINESS TYPE  RETAIL  ● RESTAURANT  INTERNET  SERVICE  LODGING  OTHER

| MCC/SIC CODE 5812 | GOODS AND SERVICES RESTAURANT | |
|---|---|---|
| BANK NAME BANK OF THE WEST | BUSINESS CHECKING ROUTING # XXXXXX843 | BUSINESS CHECKING ACCOUNT # XXXXXX863 |

PLEASE DESCRIBE YOUR REFUND/RETURN POLICY:

## SITE INSPECTION SURVEY

MERCHANT:  OWNS  ● RENTS  NAME & ADDRESS LANDLORD/MGT CO:

AREA ZONED: ● COMMERCIAL  INDUSTRIAL  RESIDENTAL  SQUARE FOOTAGE: 0-500  501-1000  ●1001-2000  2001-4000  2ST SQ FT.

INVENTORY MAINTAINED: ●ON SITE  WAREHOUSE OFF SITE  FULFILLMENT CENTER, PROVIDE NAME & ADDRESS:

WAS THE OFF-SITE LOCATION VISITED?  YES  NO  IF NO, PLEASE EXPLAIN:

DOES THE AMOUNT OF INVENTORY ON SHELVES, FLOOR AND IN WAREHOUSE CONSISTENT WITH THIS TYPE OF BUSINESS AND CREDIT CARD VOLUME?

YES  NO  IF NO, PLEASE EXPLAIN:

DOES LOCATION HAVE SUFFICIENT STAFF, TELEPHONE LINES AND OTHER EQUIPMENT TO MEET ANTICPATED SALES VOLUME?  YES  NO  IF NO, PLEASE EXPLAIN:

DOES THE SIGNAGE INSIDE AND OUTSIDE MATCH THE GOODS OR SERVICES SOLD LISTED ON THE APPLICATION?  YES  NO  IF NO, PLEASE EXPLAIN:

I hereby verify that I have inspected the business premises of the merchant at this address and the information stated above is correct to the best of my knowldege and belief.

Inspected By (Print Name):                    Signature:                    Date:

## SERVICE ACCEPTANCE AND FEE SCHEDULE

DISCOUNT RATES  TIERED  ● INTERCHANGE PLUS  FLAT RATE / CD

| INTERCHANGE PLUS | | | TIERED PRICING | | |
|---|---|---|---|---|---|
| | MARK -UP | PER TRANSACTION | | RATE | PER TRANSACTION |
| VISA/MASTERCARD/DISCOVER | 0.20 % | $ 0.00 | CREDIT QUALIFIED | NA % | $ NA |
| SIGNATURE DEBIT | 0.20 % | $ 0.00 | DEBIT QUALIFIED | NA % | $ NA |
| PIN DEBIT / EBT | 0.00 % | $ | PIN DEBIT/ EBT | NA % | $ NA |
| AMERICAN EXPRESS OPTBLUE | 0.40 % | $ 0.00 | AMERICAN EXPRESS OPTBLUE | NA % | $ NA |
| CARD ASSOCIATION ASSESSMENT & FEES | PASS - THRU | | DOWNGRADES | MID QUAL DOWNGRADE | NON QUAL DOWNGRADE |
| | | | MID QUALIFIED/NON QUALIFIED | NA % | NA % |

| FLAT RATE / CASH DISCOUNT | | | | | |
|---|---|---|---|---|---|
| | RATE | PER TRANSACTION | | RATE | PER TRANSACTION |
| VISA/MASTERCARD/DISCOVER | NA % | $ NA | PIN DEBIT / EBT | NA % | $ NA |
| SIGNATURE DEBIT | NA % | $ NA | AMERICAN EXPRESS OPTBLUE | NA % | $ NA |

## AUTHORIZATION, MONTHLY & SPECIAL PROGRAM FEES

| | | | | | |
|---|---|---|---|---|---|
| AUTHORIZATION - VS/MC/DS/DEBIT | PER AUTHORIZATION | $ 0.1 | INACTIVITY FEE | PER MONTH | $ |
| AUTHORIZATION - AMERICAN EXPRESS | PER AUTHORIZATION | $ 0.1 | ELECTRONIC AVS | PER ITEM | $ 0.1 |
| AUTHORIZATION - PIN DEBIT/EBT | PER AUTHORIZATION | $ | SERVICE BUNDLE FEE | PER MONTH | $ |
| BATCH FEE | PER OCCURRENCE | $ 0.06 | CHARGEBACKS | PER ITEM | $ 25 |
| MONTHLY MINIMUM DISCOUNT | PER MERCHANT, PER MONTH | $ | ACH REJECTS & RETURNS | PER ITEM | $ 25 |
| WIRELESS SETUP FEE | ONE-TIME | $ | RETRIVALS | PER ITEM | $ 25 |
| WIRELESS AUTHORIZATION | PER AUTHORIZATION | $ | PIN DEBIT ACCESS FEE | PER MONTH | $ |
| WIRELESS SERVICE FEE | PER MONTH | $ | PCI COMPLIANCE FEE | PER MONTH | $ |
| VOICE AUTHORIZATION | PER ITEM | $ 1.75 | PCI COMPLIANCE FEE | ANNUALLY | $ 75 |
| MONTHLY SUPPORT | PER MONTH | $ 5 | PCI NON-COMPLIANCE FEE | PER MONTH | $ |

Defyne Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

Version 1.3.0 122018

**AUTHORIZATION, MONTHLY & SPECIAL PROGRAM FEES - CONTINUED**

| NEXT DAY FUNDING | PER MONTH | $ NA | ANNUAL FEE | | ANNUALLY | $ |
| MERCHANT 1099K TAX REPORTING | PER MONTH | $ | EARLY SERVICE TERMINATION FEE | | ONE-TIME | $ |
| TIN MISMATCH - IRS DATA INTEGRITY FEE | PER MONTH UNTIL VALIDATED | $ 24.95 | | | | |

**EQUIPMENT SETUP**

| TYPE OF EQUIPMENT | | | MANUFACTURER | MODEL | QTY | | | DEPLOYMENT |
|---|---|---|---|---|---|---|---|---|
| Terminal | Pin Pad | /AR | | | | Existing | Agent | New Order (attach Equipment Order Form) |
| Terminal | Pin Pad | /AR | | | | Existing | Agent | New Order (attach Equipment Order Form) |

FEATURES:   AUTO CLOSE (Time) _____   TIP LINE _____   CASH BACK _____   CD % _____   EBT FNSB _____

   PIN DEBIT _____   GIFT CARD _____   CHECK SERVICE _____   DIAL _____   ETHERNET S/N _____   WIRELESS S/N _____

SHIPPING INSTRUCTIONS

SHIP TO MERCHANT:

SHIP TO SALES REP:

**MERCHANT ACCEPTANCE AND AGREEMENT**

By signing below, each of the undersigned Owner/Officer(s) certifies that he/she has the authority, as described below, to represent the Merchant named above and, on behalf of the Merchant, (1) represents that the information provided above is true and correct, (2) agrees to use the Services pursuant to terms and conditions of the Merchant Agreement, (3) authorizes the financial institution where your agent, to obtain information concerning the Merchant's financial condition from any credit reporting agency, creditor or financial institution, and (4) authorize the financial institution where your Settlement Account is maintained to make all such debits and credits to your account. Facsimile signatures on the Application shall be binding in the same manner as original signatures. The signature by an authorized representative of Merchant on the Merchant Application, or the transmission of the Transaction Receipt or other evidence of a Transaction to us, shall be the Merchant's acceptance of an agreement to the Terms and Conditions, incorporated herein and located at our website, http://www.fisglobal.com/Solutions/Banking-and-Wealth/Consumer-Banking/-/media/FISGlobal/Files/Documents/FIS-Merchant-Terms-and-Conditions.pdf, including, without limitation, this Merchant Application, and the Cardholder Information Security Agreement incorporated herein by this reference and located at our website, http://fisglobal.com/Solutions/Banking-and-Wealth/Consumer-Banking/-/media/FISGlobal/Files/Documents/FIS-Merchant-Cardholder-Information-Security-Agreement.pdf. Merchant acknowledges that it has read and understands the Terms and Conditions and the Cardholder Information Security Agreement as may be amended from time to time. If we approve your Merchant Application, you will be provided with instructions on how you can access and obtain a copy of the Operating Rules and with such other requirements and directives we may require relating to your acceptance of Card Transactions. You agree that if you process Card Transactions, you will comply with the Operating Rules for all Card Transactions you accept and process. You further acknowledge and agree that you will not use your merchant account and/or the Services for illegal transactions, for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq, as may be amended from time to time. **This Merchant Application and Agreement shall not take effect until you have been approved and the Agreement has been accepted by Provider and Wells Fargo Bank, N.A. (Acquirer) for Visa and MasterCard.**

| | | | IP Address: |
|---|---|---|---|
| Merchant: EMPEROR ENTERTAINMENT INC. | Date: 4/13/19, 11:12 PM | Signature of Principal/Own | Date: 4/13/19, 11:12 PM |
| Print Legal Name of Merchant Business | | | |

Signature of Principal/Owner 2 : _____   Date: _____

**PERSONAL GUARANTEE**

The undersigned guarantees to Provider and Acquirer the performance of the Agreement, and any addendum thereto by Client, including payment of all sums due and owing and costs associated with the enforcements of the terms thereof. Provider and Acquirer shall not be required to first proceed against the Client or enforce any other remedy before proceeding against the undersigned individual. This is the continuing guarantee and shall not be discharged or affected by the death of the undersigned and shall bind the heirs, administrators, representatives and assigns and be enforced by or for the benefit of any successor of Provider or Acquirer. The term of this guarantee shall be for the duration of the Merchant Processing Application and Agreement and any addendum thereto and shall guarantee all obligations which may arise in connection with my activities during the term thereof through enforcement shall be sought subsequent to any termination.

Guarantor 1 _____   Date: 4/13/19, 11:12 F   Guarantor 2 _____   Date: _____

Version 1.3.1 012219

Defye Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

**BANK DISCLOSURE**

| MERCHANT SERVICES PROVIDER CONTACT INFORMATION | | MEMBER BANK (ACQUIRER) INFORMATION | |
|---|---|---|---|
| PROVIDER NAME | Fidelity Information Services, INC | ACQUIRER NAME | Wells Fargo Bank, N.A. |
| PROVIDER ADDRESS | Attn: Merchant services 11601 Roosevelt Blvd.,TA-22 St Petersburg, FL 33716 | ACQUIRER ADDRESS | P.O. Box 6079 Concord, CA 94524 |
| APPLICATION INQUIRY # 800-552-5828 | SALES OFFICE # 800-552-5828 | ACQUIRER PHONE # 844-284-6834 | |
| CUSTOMER SERVICE # 800-552-5828 | | | |

**IMPORTANT MEMBER BANK (ACQUIRER) RESPONSIBILITIES**

- The Bank is the only entity approved to extend acceptance of Payment Network products directly to a merchant
- The Bank must be a principal (signer) to the Merchant Agreement
- The Bank is responsible for education Merchants on pertinent Visa and MasterCard Rules with which Merchant must comply; but this information may be provided to you by Provider/Processor
- The Bank is responsible for and must provide settlement funds to the Merchant
- The Bank is responsible for all funds held in reserve that are derived from settlement

**IMPORTANT MERCHANT RESPONSIBILITIES**

- Ensure compliance with cardholder data security and storage requirements.
- Maintain fraud and chargebacks below Payment Network thresholds.
- Review and understand the terms of the Merchant Agreement.
- Comply with Payment Network Rules.
- Retain a copy of these Disclosures.
- Operating Rules may be obtained from:

  Visa: https://usa.visa.com/support/small-business/regulations-fees-html

  MasterCard: https://www.mastercard.com/us/merchant/support/rules.html

The responsibilities above do not replace the terms of the Merchant Agreement and are provided to ensure you, understand important obligations of each party and that the Member Bank is the ultimate authority should you experience any problems.

**MERCHANT INFORMATION**

| LEGAL NAME | EMPEROR ENTERTAINMENT INC. | | |
|---|---|---|---|
| DBA NAME | CABERNET TEHRAN | | |
| LOCATION ADDRESS | 16101 VENTURA BLVD #160 | | |
| LOCATION PHONE | (818) 988-5800 | | |
| OWNER/PRINCIPAL NAME | HAMIDREZA POUSTI | | TITLE: CEO |

**SIGNATURES**

| SIGNATURE PRINCIPAL/OWNER 1: | | SIGNATURE PRINCIPAL/OWNER 2: | |
|---|---|---|---|
| PRINT NAME: HAMIDREZA POUSTI | TITLE: CEO DATE: 4/13/19, 11:12 P | PRINT NAME: | TITLE: DATE: |

Version 1.3.1 012219

Defyne Payments is a registered ISO of Wells Fargo Bank, N.A., Concord, CA

Page 4

https://www.privacyoffice.com/underwriting/print_app/4317

4/4



**TERMS AND CONDITIONS**
RETAIN THIS COPY FOR YOUR RECORDS

In these Terms and Conditions ("Terms and Conditions"), "we", "us," and "our" means Fidelity Information Services, LLC for Discover Card Transactions, and Wells Fargo Bank, N.A. and Fidelity Information Services, LLC for all other Card Transactions. "You" and "your" means Merchant. "Cards" means the credit cards and debit cards enabled to process through a Payment Network as set forth in your Merchant Application. These Terms and Conditions, together with the Merchant Application, Cardholder Information Security Agreement and all schedules and attachment hereto (collectively, the "Merchant Agreement") establishes the terms and conditions on which you may accept Cards as payment for goods and services and we will provide transaction processing and settlement services. If we approve your Merchant Application, you will be provided with instructions on how you can access and obtain a copy of the Operating Rules and with such other requirements and directives we may require relating to your acceptance of Card Transactions. You agree that if you accept and process Card Transactions, you will comply with the Operating Rules for all Card Transactions you accept and process.

**1. Card Transactions.**

1.1 You and your authorized representatives or employees are responsible to ensure that the Cardholder understands that you are responsible for the Card Transaction, including the goods or services that are the subject of the Card Transaction, dispute resolution, and performance of the terms and conditions. You must honor all Cards presented for payment except as otherwise provided under the Merchant Agreement and Operating Rules. The following requirements apply to all Card Transactions: (a) you cannot establish minimum or maximum amounts as a condition for accepting a Card, except as permitted by Applicable Law and/or the Operating Rules; (b) you cannot impose a surcharge or fee for accepting a Card, except as permitted by Applicable Law and/or the Operating Rules; (c) you cannot establish any special conditions for accepting a Card; (d) you cannot discourage, favor or discriminate against the use of a Card in relation to other credit cards or debit cards, except with respect to your own proprietary private label, loyalty, or gift cards; however, you may choose not to accept either U.S. issued debit Cards or U.S. issued credit Cards under the terms described in Section 1.3 of these Terms and Conditions; (d) you cannot discourage, favor or discriminate against the use of a Card issued by any particular Card issuer in relation to a Card issued by any other Card issuer; (f) you cannot require the Cardholder to supply any personal information (e.g., home or business phone number; home or business address; or driver's license number) unless instructed by us, except for a mail order/telephone order or delivery required transaction, and ZIP code for a Card-present key-entered transaction in order to obtain an Address Verification (AVS); (g) any tax required to be collected must be included in the total transaction amount and not collected in cash; (h) you cannot submit any Card Transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectible; (i) you cannot submit a Card Transaction or sale that has been previously charged back; (j) you must deliver at least one copy of the Sales Draft or credit draft to the Cardholder; (k) you cannot submit a Card Transaction or sale to cover a dishonored check. Failure to comply with any of the applicable Operating Rules may result in fines or penalties.

1.2 Prohibited Transactions. You may not accept Cards in payment for any Card Transaction that is illegal, not authorized by the Cardholder, fraudulent, or that may damage the goodwill of us or any Payment Network. "Factoring" which is the submission of Authorization Requests and/or Sales Data by a Merchant for Card Sales or Cash Advances transacted by another Person, is expressly prohibited. Factoring is considered Merchant fraud. If you submit Sales Data on behalf of another Person you will suffer any losses associated with any Dispute of the Card Sales. Also, if any fraud is involved, you could face criminal prosecution. You are prohibited from depositing Card Transactions originating from Cards of owners, partners, officers or employees of your business establishment except for Card Transactions that are routine in type, size and frequency for your business and that represent actual sales of goods or services. Submission of sales transactions on Cards in order to obtain a cash advance is strictly prohibited and may result in immediate cancellation of your merchant account. Cash disbursements to Cardholders are also prohibited. You must not accept any direct payments from Cardholders for charges of merchandise or services which have been included on a Sales Draft; it is the exclusive right of the Card Issuer to receive such payments. You may not make any cash disbursements to a Cardholder as part of a Card transaction except to the extent expressly authorized by this Agreement or the applicable Payment Network Rules. You may not accept Cards at Terminals that dispense scrip.

1.3 Card Acceptance Requirements. You must check or obtain the "valid from" and expiration date on the Card and confirm that the Card is valid and not expired prior to completing a Card sale. The Card is valid through the last day of the month embossed on the Card, if present. If the Card has expired, you cannot accept that Card for a sale. If you are suspicious that the Card presenter is not an authorized user of the Card, you should call us at the telephone number we provide for such purpose. You have the right to limit card acceptance to credit or debit cards with the appropriately executed contract addendum in place.

1.4 CID/CVV/CVC Requirements and Limitations. You must submit CID/CVV/CVC to us under the following circumstances: (a) the first installment of an Automatic Payment Plan, where the first installment is a Card Not Present sale; and (b) where we notify you that we require you to submit CID in all or a certain portion of your Authorization Requests. Your failure to include the CID/CVV/CVC in an Authorization Request where required by us, as described above, may result in a negative Authorization response and may increase the Interchange or Fees you are obligated to pay. If you do not submit CID/CVV/CVC with an Authorization Request for a Card Not Present sale, even where not required above, you may lose a Dispute of the Card Sale (and, in the case of an Automatic Payment Plan where the first installment is a Card Not Present sale, all installments under the plan may be subject to Dispute if you fail to submit CID/CVV/CVC with the Authorization request for the first installment). You are strictly prohibited from retaining, archiving or otherwise storing the CID/CVV/CVC in any form or format for any reason, including the recording of the CID/CVV/CVC on Transaction Documentation or the making of photocopies of the front or back of Cards. Records demonstrating that the CID/CVV/CVC was included in an Authorization Request will be maintained only by the applicable Payment Network.

1.5 Transaction Documentation. You must prepare Transaction Documentation for each Card Transaction and provide a copy of the Transaction Documentation to the Card presenter at the time of completion of the Card Transaction, in each case in accordance with the Operating Rules. The form and format of the Transaction Documentation you prepare must be acceptable to us. You shall ensure that the Transaction Documentation for each Card Transaction, whether electronically generated or manually printed on paper, is legible and contains all of the information required under these Terms and Conditions and the Operating Rules. You may not require a Cardholder to sign Transaction Documentation until the final Transaction amount is entered on the Transaction Documentation.

1.6 Cardholder Signature. Except in Card Not Present sales and other special circumstances described in the Merchant Agreement or the Operating Rules, Transaction Documentation must be signed by the Card presenter in the presence of your authorized representative or employee at the time of the Card Sale. The signature on the Transaction Documentation must reasonably match the signature appearing on the signature panel of the Card (unless the valid Card does not have a signature panel on the back of the Card) and the Cardholder's name as embossed on the front of the Card (except where the valid Card does not bear a Cardholder name on the front of the Card).

1.7 Verification of Signature on Card. In Card Present sales involving valid Cards bearing a signature panel on the back of the Card, you must verify that there is a signature on the signature panel on the back of the Card and verify that the name on the back of the Card is reasonably similar to the name embossed on the front of the Card (except where the valid Card does not bear a Cardholder name on the front of the Card). If the Card includes a photograph of the Cardholder, you must verify that the Cardholder resembles the photograph.



1.8 Unsigned Cards. If a Card bearing an unsigned signature panel is presented to you, you must request two pieces of identification, one of which must be government-issued picture identification. When you have confirmed that the person presenting the Card is the Cardholder, you must require the Cardholder to sign the back of the Card. If you are unable to positively identify the Card presenter as the Cardholder, or if you have reason to suspect fraud, you must call us.

1.9 Your Submission of Sales Data.  You may submit Sales Data only for valid Card Transactions between you and a bona fide Cardholder.  You must submit Sales Data to us no later than three (3) business days after the date of the Card Transaction except that (i) Sales Data may not be presented until goods are shipped, (ii) if you have received Authorization for delayed presentment, (iii) if you are required by Applicable Law to retain the Transaction Documentation or return it to the Cardholder upon timely cancellation, in which case you must present the Sales Data within ten (10) days of the Card Transaction date, and (iv) when you have multiple locations and use a central facility to accumulate and present Sales Data to us, in which case we must receive the related Sales Data within thirty (30) calendar days of the Card Transaction date. For Card Sales and Credits, the Card Transaction date is the date that you conduct the Card Sale or promise the Credit to the Cardholder. Except for Cardholder deposits for purchases, you may not send Sales Data for goods or services ordered by a Cardholder in a Card Sale until the goods or services have been delivered or furnished to the Cardholder. Sales Data for Card Sales submitted for Settlement more than thirty (30) calendar days after the Card Transaction date may be rejected, subject to higher Interchange and/or other Fees or subject to Dispute. The applicable Payment Network may withhold Settlement and/or assess higher Interchange and other Fees for any Sales Data sent to us that does not include all of the information required to be included.

1.10 Preparation and Transmission of Sales Data. You must prepare Sales Data for all Card Transactions as described in this Section 1.10, and transmit the Sales Data to us as described in this Section 1.10 and the Operating Rules. Additional requirements for the preparation and transmission of Sales Data apply for Card Not Present transactions and you must comply with these requirements. You must include all goods and/or services purchased or returned/refunded at one time and at one cash register on one Transaction Receipt or Transaction Slip, or in a single transmission of electronic Card Transaction data, and you must transmit the Sales Data relating to goods and/or services purchased or returned/refunded at one time and at a single cash register in a single electronic transmission of Sales Data unless otherwise approved by us in writing. Notwithstanding the foregoing, you may use separate Transaction Receipts or Transaction Slips or use multiple transmissions to submit electronic Card Transaction data, and you may submit Sales Data in multiple transmissions, for bona fide deposits, partial payments and Automatic Payment Plans that comply with any applicable requirements.

1.11 Unusable Sales Data.  We will notify you if all or a portion of the Sales Data submitted by you cannot be processed due to invalid, missing or unreadable data. In the event that all or a portion of the Sales Data you submit is invalid, missing or unreadable, you are responsible for: (i) retrieving and resubmitting  valid, readable Sales Data in proper form immediately; and (ii) the risk of any loss with respect to the Card Transactions described in the Sales Data, including for damage to or destruction of Sales Data, whether or not held by the applicable Payment Network, until complete, usable Sales Data is successfully received by the applicable Payment Network.

1.12 Submitting Electronic Sales Data.  You are required to transmit Sales Data by electronic means in the form and format specified by us from time to time in the Operating Rules and to the location that we specify. All Sales Data transmitted by you must conform to these Terms and Conditions and the Operating Rules.

1.13 Record Retention.  You must keep original copies of all mail/telephone order forms and other documentation relating to Card Transactions (including copies of Transaction Documentation) until the later to occur of (i) three hundred sixty five (365) calendar days following the Card Transaction date, or (ii) the resolution of any pending or threatened Disputes, claims, disagreements or litigation involving or relating to the Card Transaction. You must keep a microfilm or other copy of Sales Data for no less than three (3) years from the date of the Card Transaction. You must provide us with a copy of any Transaction Documentation, Sales Data or any other documentation retained by you within fifteen (15) calendar days of our request for such information. In addition, you are responsible for retaining copies of documentation for a period sufficient to enable you to respond to any Disputes that may be initiated with respect to Card Transactions. If you do not provide on your own behalf a copy of any Transaction Documentation, Sales Data or other documentation requested by us, the Card Transaction may be subject to Dispute, including Chargeback, or other Fees.

1.14 Special Rules for Particular Transactions.  Additional terms, conditions, and requirements apply with respect to Card Not Present transactions, telecommunication Card Sales, Cash Over Transactions, Mail-Order and Telephone Order Sales, Automatic Payment Plans, delayed delivery sales, Automobile Rental Transactions, Airline and Cruise Line transactions, Hotel and Lodging Industry Transactions, Cash Advance Transactions, Card Sales in connection with store closings or liquidations, Electronic Commerce transactions, and other special categories (as such terms are defined in Section 28 of these Terms and Conditions or the Operating Rules).  You are responsible to obtain from us the special rules pertaining to these transactions and any special rules that apply to other Card Sales that are not in-person Card Present transactions in full payment for same day delivery of retail goods and/or services.  By submitting Sales Data in connection with any such Card Transactions, you agree that you have received and agree to the special terms, conditions, and requirements relating to these transactions.

1.15 Returns.  If you provide proper disclosure to a Cardholder at the time of the Card Transaction, you may establish a return policy under which you will: (a) not accept merchandise in return or exchange and issue no refunds; (b) only accept merchandise in immediate exchange for similar merchandise of a price equal to the amount of the original Card Transaction; or (c) accept merchandise in return for in-store credit only; or (d) stipulate special circumstances agreed to by the Cardholder. Proper disclosure shall be deemed to have been given if the words "NO REFUND", "EXCHANGE ONLY" or "IN STORE CREDIT ONLY" appear on all copies of the Transaction Documentation in letters approximately ¼ inch high and in close proximity to the space provided for the Cardholder's signature.

## 2.  Authorization

2.1 You must obtain an Authorization for all Card Sales that you submit to us. You must request Authorization of the entire amount of the Card Transaction before completing the Card Transaction. The Authorization code must be displayed on the transaction receipt or noted in the appropriate place on the Sales Draft. You may pay higher Interchange if you complete a Card Sale without receiving a positive Authorization, if you submit Sales Data to us regarding Card sales for which you did not receive a positive Authorization or if the Authorization code is not properly designated in the Sales Data. In addition, the Card Sale may be subject to Dispute and/or you may lose a Dispute of the Card Sale, as described in the Dispute Rules.

2.2 An Authorization only indicates the availability of credit on an account at the time the Authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that you will not be subject to a Chargeback. If you fail to obtain an Authorization or if you submit a Card Transaction after receiving a decline (even if a subsequent Authorization attempt provides an approval), your transaction may be assessed fines or fees by the applicable Payment Network for which you will be responsible.

2.3 If you receive a Referral Code in response to an Authorization Request, you should contact us for additional information. A Referral Code is not a positive Authorization. If you subsequently complete a Card Sale where you received a Referral Code without subsequently receiving a positive Authorization and corresponding Authorization code, you may be obligated to pay higher Interchange for failure to receive a positive Authorization response. The Card Sale may be subject to Dispute and/or you may lose a Dispute of the Card Sale, as described in the Dispute Rules.



2.4 You may not attempt to obtain multiple Authorizations for a single Card Transaction. If a Card Sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other Authorization sources. Instead, request another form of payment. If you accept and process a Card Transaction that was declined, or attempt to submit multiple Card Transactions and/or multiple Authorizations, you are subject to a Chargeback, fines and/or cancellation of the Merchant Agreement.

2.5 If you conduct a Card sale using a POS Device to electronically capture data from the Card, the Authorization request you send to us must include all of the data specified in our Operating Rules, including the unaltered contents of track 1 or track 2 of the track data contained on the Card (which includes the Card Verification Value (CVV) data). In addition, the POS Device you use to conduct the Card Sale must be capable of receiving the full, unaltered Authorization response when sent. If a Card Sale is conducted using a POS Device but the Card cannot be read electronically, you must manually input the required Card Transaction information into the POS Device prior to submitting the Authorization request to us. In addition, you must imprint the Card on the Transaction Receipt. If your POS Device is unable to receive an electronic Authorization response, or if the online Authorization system is down, you should call the number we provide you to submit a voice Authorization request. When a positive voice Authorization response is granted, we will provide you with an Authorization code. You must manually enter this Authorization code in the POS Device in such a manner that the Authorization code is printed on the Transaction Receipt. If the Card Sale is not conducted using a POS Device, you shall to record the Authorization code in the appropriate box on the Sales Draft. We will notify you of any negative (or declined) Authorization response provided to us. In the event of a negative Authorization response, you may not comment to the Card presenter on the reason for the decline of the Authorization request. If the Card presenter requests information about the reason for the decline of the Authorization request, you should inform the Card presenter to contact the Card Issuer.

2.6 Occasionally in response to an Authorization request, we may, on behalf of an Issuer, direct you obtain certain information from the Card presenter to verify the Card presenter's identity. Also, in response to an Authorization request, we may, on behalf of an Issuer, occasionally direct you to take and retain a Card from the Card presenter. In each such case, you will use reasonable and lawful attempts to comply with our request.

2.7 If a Card Sale is cancelled or the amount of the Card Sale changes following your receipt of Authorization for the Card Sale, you must cancel the Authorization by (i) processing a return using your POS Device (if the Authorization was obtained using a POS Device), or (ii) call us to request a cancellation of the Authorization (if the Authorization was a voice Authorization). An Authorization may be cancelled at any time within fifteen (15) calendar days of your receipt of the Authorization but must be cancelled before Sales Data relating to the Card Sale has been submitted to us. Once Sales Data relating to the Card Sale has been submitted to us, the Authorization cannot be changed. You may not contact the applicable Payment Network in an attempt to cancel an Authorization. You must contact us to cancel an Authorization, and we will contact the applicable Payment Network.

2.8 You must submit all Authorization requests in U.S. dollars.

**3.  Settlement of Card Transactions**.
3.1    Subject to your compliance with all the terms and provisions of the Merchant Agreement and the Operating Rules, we will accept valid Transaction Documentation from you during the term of the Merchant Agreement and to promptly pay you the total amount represented by the Transaction Documentation. At our sole discretion, we may credit your account for the total amount of Card Sales less any applicable fees or, in a separate transaction, subsequently debit you or your account for applicable fees. The payments by us to you shall be deposited in the account designated in your Merchant Application or as you subsequently designate in writing.

3.2 In addition to any other remedies available to us under the Merchant Agreement, we may, without prior notice, suspend payment of any funds if we have reason to believe that you are in default of any obligation under the Merchant Agreement or there is any fraudulent activity related to the transactions that you submit to us.

3.3 To the extent the Automated Clearing House (ACH) settlement process is used to debit or credit your Settlement Account, you agree to be bound by the terms of the operating rules of the National Automated Clearing House Association (NACHA). You hereby authorize us to initiate credit and debit entries and adjustments to your account through the ACH settlement process and/or through direct instructions to (or such other arrangements as we deem appropriate) the financial institution where your Settlement Account is maintained for amounts due under the Merchant Agreement and under any agreements with us or our affiliates for any related services, as well as for any credit entries in error. You hereby authorize the financial institution where your Settlement Account is maintained to make all such debits and credits to your account. This authority will remain in full force and effect until all monies due under the Merchant Agreement and under any other agreements with us or our affiliates for any related services have been paid in full.

3.4 After you submit Sales Drafts and Credits, you will receive settlement funds through ACH credit. We will initiate a transfer of such applicable settlement funds through ACH to your Settlement Account. Settlement by ACH credit generally will take place the second banking day after we process the applicable Card Transactions.

3.5 If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within sixty (60) days after any debit or credit is or should have been affected.

3.6 If after your Settlement Account has terminated, you fail to instruct us as to where to transmit funds that we are holding and that are due to you, we may deduct from those funds our reasonable costs associated with the maintenance of such funds on a monthly basis.

3.7 The following is a partial list of reasons for other debits to your Settlement Account. We may add to this list as required: (a) the applicable Payment Network fees, charges and fines assessed as a result of your transactions; (b) currency conversion errors; (c) fees and Chargebacks not previously charged; and (d) deposits posted in error. For additional reasons, refer to your Operating Rules.

**4.  Chargebacks**.
4.1 You are responsible for reimbursing us for any and all Chargebacks and Disputes by the Issuer and/or the Cardholder with respect to your Card Transactions and for related fees, for any reason, whether or not you have the right to contest the Chargeback under applicable Operating Rules.
4.2 Reasons that a Card Transaction may be Disputed or a Chargeback include, but are not limited to:
(a) a Cardholder disputes the validity of a Card Transaction; (b)  a Cardholder disputes the quality or receipt of goods or services;  (c) a copy of the Sales Draft was not provided when requested, or the copy provided was improperly completed or illegible in whole or in part; (d) a Credit was not provided to the Cardholder; (e) the Card Transaction was not authorized by the Issuer at the time of Card Sale, or efforts were made to avoid a decline of the Authorization (such as, but not limited to, attempts to obtain an Authorization after receiving either a decline or a referral to a call center or splitting a sale across multiple transactions of the same Card); (f) the Sales Draft was not imprinted using an imprinting machine (an electronic swipe of the magnetic stripe on the Card may only substitute for a manual imprint if the transaction is electronically authorized by the terminal after the swipe. In situations where the account number is keyed into the terminal or where the



terminal provides a referral response, a physical imprint of the Card on the Sales Draft is mandatory); and (g) all mail order/telephone order and Internet sales are at your risk and are subject to Chargeback.

4.3  You must maintain sufficient funds in your designated Settlement Account to cover all Chargebacks and related fees. For each Card Transaction accepted and processed by you, we have a contingent and unmatured claim against you for any amount we must pay as a result of your acceptance and processing of Card transactions, including, but not limited to, any Chargebacks, fees, discounts, customer credits and adjustments, charges, fines, assessments and penalties. All settlements or credits given or payment made by us to you in connection with your Card Transactions are provisional, and subject to revocation, Chargeback or refund, subject to the terms and conditions of the Merchant Agreement and the applicable Operating Rules. Your right to receive any amounts due from us is expressly subject and subordinate to our Chargeback, set-off, lien and security interest rights without regard to whether such Chargeback, set-off, lien and security interest rights are applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured. WE MAY, WITHOUT FURTHER NOTICE, ELECTRONICALLY DEBIT YOUR SETTLEMENT ACCOUNT TO COVER ALL SUMS OWING TO US PURSUANT TO THE MERCHANT AGREEMENT, INCLUDING, BUT NOT LIMITED TO, AMOUNTS OWING FOR CHARGEBACKS, RELATED FEES AND FINES IMPOSED BY THE APPLICABLE PAYMENT NETWORK.

**5.  Operation of Business.**
5.1 Change in Business.  You must notify us immediately of any change to the information included in your Merchant Application, including if you engage in, or in the future elects to engage in, any new lines or types of business activities not disclosed in your Merchant Application or if you change your business activities in any of the following ways: (i) change of ownership; (ii) change in type or kind of business; (iii) change in identity, including corporate/legal name or address; (iv) closing or liquidating business entirely or any locations; (v) change in processing method (i.e., Transaction Slips to POS Device); (vi) voluntary or involuntary party in a bankruptcy case; (vii) entry into a loan or other agreement with a third party that seeks to affect the Merchant Agreement; (viii) change to any entity that is a party to or guarantor of the Merchant Agreement, including by merger or acquisition; and (ix) change to or from a business that conducts exclusively retail sales to one that accepts Card Sales by mail, telephone order or Internet transactions.

You agree to notify us of any changes specified above, including any changes to the information in your Merchant Application. We may terminate Card acceptance by you and your sublicense to use the Program Marks if you fail to notify us of any such change. In addition, Card Sales by you relating to a new business activity of which we have not been notified may be rejected or subject to reversal or Chargeback, at any time at our sole discretion.

5.2 Compliance with Laws.  You are responsible for operating your business and performing your obligations hereunder in compliance with Applicable Law.

5.3 Audits. We may, at our discretion, conduct or engage a third party to conduct examinations and audits of such your compliance with the applicable provisions of the Merchant Agreement or the Operating Rules. All such examinations and audits will be at your sole cost and expense. We may report the results of each such examination and audit to the applicable Payment Network. In addition to the foregoing, you agree that the applicable Payment Network shall have the right to visit you and review your retail locations, corporate offices and websites to verify your compliance with the terms of the Merchant Agreement and the Operating Rules, including the License, the display of the Program Marks, adherence to point-of-sale procedures and compliance with the Security Requirements. If an audit identifies a regular or repeated failure by you to comply with the obligations applicable to you, you agree to promptly notify us of your plan to cure such deficiency along with the implementation date of such cure.

**6.  Card Account Information.**
6.1  You may not request or use Card account information for any purpose that you know or should have known to be fraudulent or in violation of the Operating Rules.  You must not ask a Cardholder to record a Card account number or other account information on the exterior of any order form or other similar device designed to be mailed. You may not disclose Card Transaction information except to us or our agent for the purpose of processing a Card Transaction or Chargeback, or to your loyalty program or fraud control service provider, or as required by Applicable Law.

6.2 You must comply with the requirements of the Payment Card Industry Data Security Standards ("PCI DSS"). FIS requires all merchants to validate PCI DSS compliance on an annual basis.  Initial validation to should occur no later than thirty (30) days after account approval.  You will be charged the monthly PCI Fee listed in the Pricing Schedule provided in the application.

6.3 If Third Party providers are used to handle Card account information, they must also comply with the requirements of the PCI DSS.

6.4  If you fail to provide validation of PCI DSS compliance within thirty (30) days of account approval, or in subsequent years on or before the anniversary date of account approval, you will be charged a monthly non-compliance surcharge fee(s) until FIS is provided with validation of compliance.  The surcharge fee(s) will increase after more than 6 months of non-compliance and again at more than 12 months of non-compliance.

**7.  Exclusivity.** During the term of the Merchant Agreement, you shall use us as your exclusive provider of all Services unless we have otherwise specifically agreed in writing.

**8.  Program Marks.**
8.1 You are prohibited from using the Program Marks, as defined below, other than as expressly authorized in writing by us or as provided in this Section 8. Additionally, you shall not use the Program Marks other than to display decals, signage, advertising and other forms depicting the Program Marks that are provided to you by us pursuant to the Merchant Agreement or otherwise approved in advance in writing by us. You may use the Program Marks only to promote the services covered by the Program Marks by using them on decals, indoor and outdoor signs, websites, advertising materials and marketing materials; provided that all such uses must be approved in advance by us in writing. You shall not use the Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Program Marks. You recognize that you have no ownership rights in the Program Marks. You shall not assign to any third party any of the rights to use the Program Marks.

8.2 You must prominently display the Program Marks at the point of interaction to indicate that the merchant accept the applicable Payment Network's cards.  If you are a remote services merchant, you must display the Program Marks wherever payment options are presented. We will provide you with the appropriate artwork in a format authorized by the applicable Payment Network. The Program Marks must be clearly visible to the public. The preferred location to post the Program Marks at a physical point of interaction is the entrance, nearby window or door of your business location, and on the first screen of an electronic point of interaction. Where it is not possible to post signage at the entrance of your location, posting the Program Marks so that they can easily and readily be seen within the location will satisfy the above requirement. Where it is not possible to post the Program Marks on the first screen of an electronic point of interaction, posting the Program Marks on the payment screen will satisfy this requirement. You must display each Program Mark in such manner and with such frequency as accorded any other Payment Network's Program Marks. You must limit your use or display of the Program Marks in accordance with the terms of the license granted under Section 8.1 and this Agreement or in accordance with any other specifications provided by us. We will provide you with signage displaying representations of the Program Marks that are consistent with the applicable Payment Network standards. We will provide approved displays to you for your use to inform the public that



credit and debit cards are accepted. You shall prominently display the Program Marks that we provide. You may not indicate that any Payment Network endorses any of your products or services.

8.3 Your license to use the Program Marks shall terminate upon the earlier of (i) the termination of the Merchant Agreement, or (ii) delivery of notice by us to you of the termination of the license hereunder.

## 9. Confidentiality.

9.1 Confidential Information. We, the applicable Payment Network, or the applicable Payment Network's or our agents on behalf of the applicable Payment Network, ourselves, the applicable Payment Network's and our affiliates and prospective and current Issuers, including the applicable Payment Network Issuers, and each of their and our respective officers, directors, subcontractors and employees, agents and affiliates (in each case, a "Disclosing Party") may disclose or communicate, directly or indirectly, to you or your agents ("Receiving Party") information and data that the Disclosing Party deems as confidential or proprietary ("Confidential Information"). The term "Confidential Information" includes all information and materials pertaining to technology, trade secrets, know-how, products, facilities, processes, operations, suppliers, current and prospective customers, marketing objectives and plans, pricing and other information pertaining to the Disclosing Party's business affairs, and includes all information pertaining to us and the applicable Payment Network, our and their respective marketing and other business plans, profitability, market share and position, Card Transaction volumes, BINs, prospective and current Issuers, other acquirers of Card Transactions and/or merchants, and any information disclosed by a Disclosing Party to a Receiving Party prior to the execution of the Agreement in contemplation or anticipation of the entry into the Agreement, regardless of whether such disclosure was protected by a confidentiality agreement. The term "Confidential Information" also includes the terms of the Merchant Agreement and the Operating Rules, including documents incorporated by reference, each of the schedules, exhibits, appendices and amendments thereto and any material that is distributed or disclosed by the Disclosing Party in connection with exercising its rights or performing its obligations under the Merchant Agreement, regardless of whether such information is marked as "Confidential." The term "Confidential Information" includes information or data that is in oral, written or other visual form, or recorded on tape, electronic or other media. The terms of this Section 9 shall supersede any oral or written agreements between you and us governing confidentiality entered into prior to the execution of the Merchant Agreement and the terms of this Section 9 shall apply retroactively to the date of the first disclosure by the Disclosing Party of Confidential Information in contemplation of the entry into the Merchant Agreement. In the event of a conflict between the terms of this Section 9 and the terms of any confidentiality agreement between you and us entered into prior to entry into the Merchant Agreement, the terms of this Section 9 shall govern. The term "Confidential Information" will exclude (i) information in the public domain or information that becomes available to the general public without restriction through no wrongful act or omission of the Receiving Party; (ii) information that is independently developed by the Receiving Party without reference to Confidential Information of the other party; or (iii) information that is known by the Receiving Party prior to disclosure by the Disclosing Party.

9.2 Limited Use.
You agree that Confidential Information will be used by you for the sole and exclusive purpose of performing the obligations and exercising the rights as granted or permitted under the Merchant Agreement. You must ensure that Confidential Information is kept confidential and is not disclosed, directly or indirectly, to any third party unless the Disclosing Party consents in writing to such disclosure, and then only upon the prior execution of a confidentiality agreement containing terms substantially similar to those in this Section 9 by the third party to whom the Receiving Party desires to disclose such information. Notwithstanding the foregoing, the Receiving Party may disclose strictly limited and necessary types of Confidential Information to its affiliates and/or agents that require access to such Confidential Information in order for the Receiving Party to perform its obligations under this Agreement, subject to the terms of Section 9.2 and provided that such Persons are bound to confidentiality terms substantially similar to those in this Section 9.

9.3 Permitted Disclosures.
Notwithstanding the above restrictions, the Receiving Party may disclose Confidential Information in response to a subpoena or order of a court or an agency or government authority of competent jurisdiction that is binding on the Receiving Party, and which compels the disclosure of Confidential Information, provided that the Receiving Party will, to the extent permitted by Applicable Law, immediately notify the Disclosing Party of the receipt of a subpoena or order so as to permit the Disclosing Party to contest any such subpoena or order or to seek an appropriate protective order at the Disclosing Party's expense. To the extent required by specific circumstances, you may disclose certain limited and necessary terms of the Merchant Agreement and the Operating Rules, to (i) your regulators, examiners, auditors and counsel, or (ii) to proposed investors and financing sources and their advisors in connection with a merger or acquisition or proposed merger or acquisition or the like, provided such proposed recipients agree in writing to be bound by the obligations of confidentiality required by the Operating Rules and provided that you provide prompt written notice to the applicable Payment Network in advance of such disclosure.

9.4 Return or Destruction of Confidential Information.
Upon the termination or expiration of the Merchant Agreement, all Receiving Parties will comply with the Disclosing Party's reasonable instructions regarding the disposition of Confidential Information, which may include the return or destruction of any and all Confidential Information (including any electronic or paper copies, reproductions, extracts or summaries thereof); provided that the Receiving Parties may retain a reasonable number of copies of any tangible property containing Confidential Information, subject to the terms of these Operating Rules, which may be used solely for regulatory and record-keeping purposes and may not be used for any other purpose.

## 10. Advertising and Publicity.
Except as otherwise explicitly permitted by these Terms and Conditions, you may not use the registered trademarks, service marks, logos or any proprietary information of the applicable Payment Network, us or the applicable Payment Network's or our affiliates without the prior written consent of the owner of such intellectual property and the prior review, by such owner, of the materials in which such marks, logos or proprietary information is proposed to be used, including in any press release. In your case, such materials shall include the types of media referred to in Section 7.2 in which the Program Marks or logos are displayed. Such consent shall not be unreasonably withheld or delayed. Neither party shall make any public statement or press release regarding the Program or the Merchant Agreement, without the prior written approval of the other party.

**11. Fees; Adjustments.** You agree to pay charges and fees in the amount and in the frequency specified from time to time by us. You also agree to pay any fines imposed on us by the applicable Payment Network resulting from Chargebacks and any other fees or fines imposed by the applicable Payment Network with respect to your acts or omissions. We have the right to revise our fees and charges upon written notice to you and you shall pay such revised charges and fees. You agree that any objections to any such charges or fees that are not made and timely received by us as provided herein, shall be deemed waived by you.

## 12. Representations; Warranties.
12.1 For each Card Transaction submitted to us, you represent and warrant the following: (a) it is a lawful sale/rental not previously submitted and is only for the items sold or rented (including taxes, but without any surcharge); (b) it represents an obligation of the Cardholder for the Card Transaction amount; (c) it is not an amount charged subject to any dispute, set-off or counterclaim; (d) it is for merchandise or service actually delivered or performed at the same time you accepted and submitted the Card Transaction for processing (except for any delayed delivery or advance deposit transactions expressly authorized by this Agreement); (e) it is not the refinancing of an existing obligation of the Cardholder or arising from the dishonor of a personal check; (f) that you have no knowledge or notice that



the transaction is improper, fraudulent or unauthorized; (g) that the Card Transaction is between you and the Cardholder; and (h) the Card Transaction is made in accordance with the Merchant Agreement, the Operating Rules.

12.2 THIS IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THOSE REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OR ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THE MERCHANT AGREEMENT.

13. Term and Termination. Merchant's ability to participate in our card processing program ("Program") shall begin as of the Effective Date and continue for an initial term ("Initial Term") of thirty-six (36) months from service installation and shall automatically renew thereafter for additional terms of one (1) year each unless Merchant provides us with written notice at least ninety (90) days prior to the expiration of the Initial Term or any renewal term. Merchant may also terminate the Merchant Agreement prior to expiration of the Initial Term or any renewal term upon providing us with thirty (30) days' notice prior to the first of any month. If Merchant terminates within the Initial Term, Merchant will immediately pay FIS, as liquidated damages, an early termination fee equal to $295. In addition to all other amounts owed. If Merchant terminates at any time during the second or third year of the Initial Term, the Merchant will pay, as liquidated damages, a termination fee equal to $195, in addition to all other amounts owed. Merchant agrees that the early termination fee is not a penalty, but rather is reasonable in light of the financial harm caused by Merchant's early termination. FIS will use best efforts to debit the Merchant's account in the amount of the applicable termination fee within sixty (60) days of receipt of Merchant's written notice of termination. Any partial month of processing is considered post termination and will be included in the number of months remaining in the term for purposes of determining the termination fee. FIS may terminate Merchant's participation in the Program at any time by giving written or telephonic notice to Merchant. Written notice shall be deemed given on the date mailed by certified mail, return receipt requested. Telephonic notice shall be deemed given on the date the call is completed. In no event shall Merchant be required to deposit, or are we required to accept for deposit, any charge forms or credit forms after the termination date.

All obligations incurred or existing under the Merchant Agreement as of the date of termination shall survive such termination until such obligations are fully satisfied. Merchant expressly acknowledges that VISA and MasterCard maintain records containing information on Merchants terminated for one or more reasons specified in the Operating Rules. Such reasons generally include, but are not limited to, fraud, counterfeit paper, unauthorized transactions, breach of contract, excessive Chargebacks or highly suspect activity. Merchant acknowledges that we are required to report the Merchant business name and the name of its principals to VISA and MasterCard when Merchant is terminated due to one or more of the foregoing reasons. Merchant expressly agrees and consents to such reporting by Service Provider in the event of the termination of the Merchant Agreement due to one or more of such reasons.

14. Security Interest. You hereby grant us a security interest and lien on any deposit account that you now or hereafter have with any financial institution, in all funds in any such account, all writings evidencing any such account, and all proceeds of the foregoing, to secure your existing and future obligations to us under the Merchant Agreement. You agree to take such actions as may be required, from time to time, to establish and maintain such security interest as a perfected first lien security interest. For purposes of this Section, any failure by you to pay us, upon demand, the amount of any transaction that we have charged back to you or any other amount owed by you to us under the Merchant Agreement shall constitute a default by you. Upon any such default, we shall have all rights and remedies provided by law, including the right to enforce our security interest by applying all funds in any account held by us to any and all of your indebtedness to us.

15. Limitation of Liability. OUR LIABILITY TO YOU WITH RESPECT TO ANY CARD TRANSACTION SHALL NOT EXCEED THE AMOUNT REPRESENTED BY THE TRANSACTION DOCUMENTATION IN CONNECTION WITH THAT CARD TRANSACTION LESS ANY APPLICABLE DISCOUNT RATE, PROVIDED THAT OUR TOTAL, AGGREGATE LIABILITY FOR ALL CLAIMS SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY YOU DURING THE THREE (3) MONTHS PRIOR TO THE MOST RECENT CLAIM. IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES WHATSOEVER.

16. Entire Agreement; Compliance.    The parties intend that the Merchant Agreement shall constitute the entire agreement of the parties and may not be contradicted by evidence of any prior or contemporaneous agreement. You shall comply with Applicable Law as applicable to you and any Card Transaction, including, without limitation, all state and federal consumer credit and consumer protection statutes and regulations. You shall also comply with all operating instructions, rules and regulations as we or the applicable Payment Network may issue or amend from time to time. You shall pay, or reimburse us for our payments of, any fines or assessments imposed by the applicable Payment Network that arise out of your Card acceptance activities. The applicable Payment Network(s) Operating Rules are incorporated herein by reference and you agree to be bound by and comply with the same.

17. Waiver. No failure to exercise and no delay in exercising any right, remedy, or power under the Merchant Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, or power hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, or power provided herein or by law or in equity. The waiver by any party of the time for performance of any act or condition hereunder does not constitute a waiver of the act or condition itself.

18. Severability, Amendment, and Construction. If any provision of the Merchant Agreement is declared illegal or void, it shall not affect the validity or enforceability of the remainder of this Agreement. The Merchant Agreement may be amended at any time by us upon written notice to you. Your continued use of the Services hereunder subsequent to any such change constitutes your acceptance of the change. The Merchant Agreement shall be construed and interpreted in accordance with the laws of the state of Wisconsin and applicable federal law. All headings are for convenience only and do not control substantive provisions of the Merchant Agreement.

19. Successors and Assigns. This Agreement shall bind and inure to the benefit of the parties hereto, their successors, and assigns. Notwithstanding the foregoing, you may not assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, or by other operation of law, any right or obligation under the Merchant Agreement without our written consent. Any purported assignment, transfer, or delegation in violation of this Section shall be null and void. We may subcontract or delegate our obligations hereunder to subcontractors or third parties at our sole discretion.

20. Fines or Assessments. If we are fined or assessed any sum by the applicable Payment Network, for your violations of such Payment Network's Operating Rules, you will immediately reimburse us for said amounts.

21. Lawsuits, Venue, and Attorneys' Fee. You and we agree to and hereby waive the right to trial by jury in any lawsuit arising out of the Merchant Agreement and the documents referenced in the Merchant Agreement, whether such claims are based on contract, unjust enrichment, tort or any other theory of law. Each party represents to the other that this waiver is knowingly, willingly and voluntarily given. The parties further agree that all such lawsuits shall only be venued in the county in which our principal place of business is located. You will reimburse us for reasonable attorney's fees and other costs and expenses incurred by us in enforcing any rights we may have with regard to the Merchant Agreement and the documents referenced herein.



**22. Reserve Account.** In our sole discretion, we may establish a Reserve Account in your name to protect our interests based upon our estimate of the amount necessary to cover anticipated chargebacks, fees and other liabilities you owe us. To establish the Reserve Account, you authorize us to deduct funds from amounts due you by us, or charge any deposit account of yours with any other financial institution by Automated Clearing House or otherwise and place such funds in a Reserve Account. You hereby grant us a security interest in the funds in the Reserve Account as security for any existing or future obligation you owe us hereunder. The funds in the Reserve Account shall not be subject to the claims of any other party. You may not grant any lien or security interest in the Reserve Account. We may deduct a portion from each credit transaction deposited or transmitted by you to us or any other financial institution and place such funds into the Reserve Account. The Reserve Account shall be maintained for as long as we, in our sole discretion, deem necessary. You hereby expressly authorize any financial institution at which you maintain an account to transfer funds from such account to us upon our request to maintain funds in the Reserve Account of a level deemed appropriate by us. In our sole discretion, we may withdraw funds from the Reserve Account to satisfy your obligations to us hereunder. If your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from you, or if the funds in the Reserve Account have been released, you agree to promptly pay us such sums upon request. You shall not receive any accrued interest on any funds held by us as a result of your processing of Card Transactions, including, but not limited to, funds held by us in a Reserve Account. Notwithstanding the foregoing, we shall be entitled to accrued interest on any such held funds.

**23. Financial and Other Information.**

23.1 Upon our request, you shall furnish to us copies of your financial statements, and /or such other financial information and reports reasonably requested by us. You authorize us to obtain, from time to time, credit, financial, and other information regarding you from other persons or entities, such as credit reporting agencies. You also authorize us to respond to requests from others for information regarding you. We have the right at any reasonable time to verify all sales and to audit your books, accounts, records, and other papers relative to credit transactions tendered to us hereunder.

23.2 From time to time, we may determine that an inspection of your business location is necessary. In such event, you shall pay the costs incurred by us for such inspection, including, but not limited to, costs incurred for airfare and hotel accommodations. Prior to the imposition of such costs, we shall notify you in writing of our intention to impose such costs and provide you with an estimate as to the amount of such costs. Your written consent to pay such costs shall not be unreasonably withheld.

**24. Indemnification.** You agree to indemnify and hold us, our vendors and affiliates, as well as the applicable Payment Network and any Issuer, harmless from and against all losses, liabilities, damages and expenses (including reasonable attorneys' fees) resulting from your actions, including, but not limited to, any breach of any warranty, covenant or agreement or any misrepresentation by you under the Merchant Agreement, or arising out of you or your employees' acts or omissions, including as a result of your processing of Card Transactions or use of the Services.

**25. Processing Related Equipment.**
25.1 YOU WARRANT THAT ANY PROCESSING EQUIPMENT AND/OR SOFTWARE YOU OBTAIN IS FOR A COMMERCIAL PURPOSE AND IS NOT FOR PERSONAL USE. Unless otherwise provided for in a separate sales agreement, the sale of all processing equipment is between you and third parties, including, but not limited to, our independent sales agents and representatives.

25.2 YOU ACKNOWLEDGE THAT ANY EQUIPMENT AND/OR SOFTWARE YOU OBTAIN MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS. WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH EQUIPMENT AND/OR SOFTWARE COMPATIBLE WITH ANY OTHER PROCESSING SYSTEMS. IN THE EVENT THAT YOU ELECT TO USE ANOTHER PROCESSING SERVICE PROVIDER UPON THE TERMINATION OF THE MERCHANT AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE THAT YOU HAVE OBTAINED.

25.3 We may upgrade or otherwise modify our computer system at any time without prior notice. You agree to provide us access to your processing equipment in the event that we deem it necessary as part of our upgrade or system modification.

**26. Other Provisions.**
26.1 No party shall be liable for any default or delay in the performance of its obligations under the Merchant Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a third party for any similar cause beyond the reasonable control of such party, including, without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the nonperforming party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this Section, your failure to receive payment or funds from a third party shall not excuse the performance of your obligations to us under the Merchant Agreement.

26.2 The headings contained in the Merchant Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of the Merchant Agreement.

26.3 If there are any inconsistencies between the Merchant Agreement and the Operating Rules, the Merchant Agreement will govern. If any part of the Merchant Agreement is not enforceable, the remaining provisions shall remain valid and enforceable.

26.4 The Merchant Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof, supersedes any previous agreements and understandings and, except as expressly provided in the Merchant Agreement, can be changed only by a written agreement signed by all parties. A party's waiver of a breach of any term or condition of the Merchant Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

26.5 The parties acknowledge that the applicable Payment Network's Operating Rules give such Payment Network certain rights to require termination or modification of the Merchant Agreement with respect to transactions involving Cards and the Payment Network and to investigate you. The parties also acknowledge that issuers of other Cards, for which we perform services on your behalf, may have similar rights under their applicable the applicable Payment Network Rules with respect to the Merchant Agreement's applicability to transactions involving such other Cards.

26.6 You may designate a third party as your agent for the purpose of delivering credit card transactions data-captured at POS Device by such agent for clearing and settlement. In such event, you agree that: (a) you must provide satisfactory notice to us if exercising use of third-party agent; (b) you understand and agree that the obligation of us to you to reimburse you for credit card transactions is limited to the amount (less fees) delivered by that agent to us; and (c) you is responsible for any failure by your agent to comply with your responsibilities under the Merchant Agreement and the Operating Rules including but not limited to any violation which results in a Chargeback.



**27. Merchant Chargeback Notification.** As a merchant participating in the Program for Card acceptance, you must be aware of the Cardholder's right to chargeback a transaction. A chargeback occurs when a Cardholder disputes purchase for any number of reasons. Please be aware of the following:

• A chargeback is initiated by the Cardholder's issuing bank, not by us.

• The chargeback process is one which ordinarily favors the Cardholder rather than the merchant.

• A chargeback does not mean that you, as a merchant, are without recourse. What it may mean, however, is that you may have to pursue a private collection action against your customer.

• A Cardholder's right to charge back is very broad. The Cardholder simply has to file a written dispute with his/her issuing bank. The issuing bank must then charge the item back to the acquiring bank.

• An Authorization does not guarantee your Card Sale, should the Cardholder dispute the Card Sale.

• A Cardholder has significant rights to return merchandise. Please note the applicable provisions of the Operating Rules with respect to returns and disclosure of Merchant's return policy(ies). Should the cardholder claim he/she was not made aware of the disclosure (the merchant's return policy), a Chargeback will likely be initiated.

• The acquiring bank is simply the messenger when a chargeback is initiated by a cardholder. The acquiring bank must process the chargeback to the merchant's account per the applicable Payment Network Operating Rules.

**28. Definitions.** As used in the Merchant Agreement, the terms below will have the following meanings:

"Applicable Law" means any law, ordinance, statute, treaty, rule, judgment, decree, regulation, official directive, consent, approval, authorization, order or other determination or finding of any governmental authority applicable to or binding upon you or to which you are subject, whether federal, state, county, local, foreign or otherwise, including state usury laws, the Truth-In-Lending Act, the Fair Debt Collection Practices Act, the Federal Equal Credit Opportunity Act, the Fair Credit Reporting Act as amended by the Fair and Accurate Credit Transactions Act, the National Bank Act, the Bank Secrecy Act as amended by the USA PATRIOT Act together with implementing federal regulations, the Trading With the Enemy Act, the International Emergency Economic Powers Act and the United Nations Participation Act and related Executive Orders and implementing U.S. Department of the Treasury regulations, the Electronic Funds Transfer Act, the Telephone Consumer Protection Act, the Gramm-Leach-Bliley Act, the Foreign Corrupt Practices Act, the Anti-Boycott provisions of the Export Administration Act and implementing U.S. Department of Commerce regulations, the Federal Trade Commission Act, the Sarbanes-Oxley Act and implementing federal regulations, and Regulations B, E, P and Z of the Board of Governors of the Federal Reserve System.

"Authorization" means approval by, or on behalf of, the Issuer to validate a Card Transaction. An Authorization indicates only the availability of the Cardholder's credit limit at the time the Authorization is requested.

"Automatic Payment Plan" means an obligation, either of a fixed or variable amount, that is paid by a Cardholder with a series of charges to a Card account over a period time pursuant to an agreement between the Cardholder and the merchant.

"Card Not Present" means a Card Sale or Credit that occurs when neither the Card nor the Cardholder is present at the point-of-sale to conduct the Card Sale or Credit, including Internet, mail-order and telephone-order Card Sales and Credits.

"Card Present" means a Card Sale, Cash Advance or Credit that occurs where the Card and the Cardholder are present at the point-of-sale and the Card is used to conduct the Card Sale, Cash Advance or Credit, as evidenced by our receipt of Track Data in the Authorization request (except with respect to Biometric Card Transactions, which constitute Card Present sale but will not include CVV with the Authorization request).

"Card Sale" means a sale of goods or services to a Cardholder by a merchant, either in a Card Present environment or as a Card Not Present transaction, either of which is conducted pursuant to a merchant agreement where the amount of such sale is applied to a Card account and considered an obligation of the Cardholder.

"Card Transaction" means a transaction involving a Card, including any Card Sale, Cash Advance, Credit, Chargeback, Reversal or Correction.

"Cardholder" means the individual whose name is embossed on a Card (credit card or debit card, as applicable) and any authorized user of such Card.

"Chargeback" means the procedure by which a Sales Draft or other indicator of a Card transaction (or disputed portion thereof) is returned to Bank or the Issuing Bank, the liability for which is the Merchant's responsibility.

"Chargeback Fee" means a fee incurred each time a transaction is charged back to you.

"CID" or "Card Identification Data" means the three digit number that follows the complete or truncated Card Number in the signature panel or in a separate box directly to the right of the signature panel on the back of each Card.

"Credit" means a refund or price adjustment given for a previous purchase transaction.

"CVV" or "Card Verification Value" means the three digit number that follows the complete or truncated Card account number in the signature panel or in a separate box directly to the the right of the signature panel on the back of each Card.

"Dial-Up Terminal" means an Authorization device which, like a telephone, dials an Authorization center for validation of transactions.

"Discount Rate" means an amount charged for processing credit Card transactions or signature debit Card Sales. Discount Rates are charged on all sales and refunds.

"Dispute" means a ticket retrieval request, request for a Chargeback, request for representment of a Card Transaction, or representment of a Card Transaction, as the context may require, by an Issuer, us or the applicable Payment Network, including supporting information and documentation provided by the Issuer or us in connection with any of the foregoing, and the applicable Payment Network's process of resolving or effecting any of the foregoing, including Dispute arbitration, as more fully described in the Dispute Rules.

Case 2:20-cv-00026-GW-MAA Document 1-1 Filed 01/02/20 Page 167 of 232 Page ID #:175



"Dispute Rules" means the document that contains instructions and requirements relating to the resolution of Disputes relating to Card Transactions, including Chargebacks, Credits and corrections, as such document may be amended from time to time by the applicable Payment Network.

"Fees" means the fees and charges we or the applicable Payment Network assess for or related to the Services.

"Interchange" means a charge assessed by the applicable Payment Network and paid to the Issuer.

"Imprinter" means a manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on a Sales Draft.

"Issuer" means the bank or other party that has issued a Card.

"Magnetic Stripe" means a stripe of magnetic information affixed to the back of a plastic credit or Debit Card. The magnetic stripe contains essential Cardholder and account information.

"Operating Rules" means the rules, regulations, bylaws, releases, interpretations and other requirements (whether contractual or otherwise) now or hereafter imposed, adopted or communicated by the applicable Payment Network, as such may be amended, modified or supplemented from time to time.

"Payment Network(s)" means Visa U.S.A. Inc. ("VISA"), MasterCard International, Inc. ("MasterCard") and Discover Financial Services ("Discover") payment card networks, and other payment card networks or systems

"Person" means an individual, partnership, joint venture, corporation, association, or other legal entity, however organized.

"POS Device" means an electronic point-of-sale device, cash register, or terminal and any necessary software, including a CAT and a self-service terminal, located at the physical premises of a merchant that is capable of electronically capturing data from Cards and receiving electronic evidence of Authorization responses and which may also be capable of transmitting electronic evidence of Sales Data.

"Program Marks" means any and all trademarks and service marks of a Payment Network which are provided to you or approved by us for your use in connection with the Services.

"Referral Code" means the message received from an Issuing Bank when an attempt for Authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

"Reserve Account" means a fund established and managed by us in a depository selected by us to protect against actual or contingent liability arising from Chargebacks, adjustments, fees and other charges.

"Retrieval Request/Transaction Documentation Request" means a request for documentation related to a Card Transaction such as a copy of a Sales Draft or other Card Transaction source documents.

"Sales Data" means evidence of Card Sales and Credits in electronic format that is captured, prepared and/or transmitted by you for a Card Sale or Credit.

"Sales Draft" means evidence of a purchase of goods or services by a Cardholder from Merchant using a Card, regardless of whether the form of such evidence is in paper, electronic or otherwise, all of which must conform to the applicable Payment Network Rules.

"Security Requirements" means (i) the VISA's Cardholder Information Security Program ("CISP"), MasterCard's Site Data Protection Program ("SDP"), the Payment Card Industry ("PCI") PIN Security Requirements, the Payment Card Industry Data Security Standard ("PCI-DSS") located at www.pcisecuritystandards.org, in each case, as interpreted and communicated to Merchant by us and/or the Payment Network, and as may be amended and supplemented from time to time, which is incorporated herein by reference and all related compliance requirements, and (ii) any additional security requirements and all related compliance requirements promulgated by the applicable Payment Network from time to time.

"Services" means the activities undertaken by us to authorize, process and settle all United States Dollar-denominated Card Transactions undertaken by Cardholders at Merchant's location(s) in the United States, and all other activities necessary for us to perform the functions required by the Merchant Agreement for all Cards covered by the Merchant Agreement.

"Settlement Account" means an account at a financial institution designated by Merchant as the account to be debited and credited by us for Card transactions, fees, Chargebacks and other amounts due under the Merchant Agreement or in connection with the Merchant Agreement.

"Transaction Documentation" means, collectively, Transaction Receipts and Transaction Slips.

"Transaction Receipt" means a paper or electronic copy of Card Transaction data generated at the point -of -sale when the Card Transaction is conducted using a POS Device, a copy of which is provided to the Cardholder.

"Transaction Slip" means a form used by you to capture Card Transaction data in transactions where a POS Device is not used, one copy of which is provided to the Cardholder and one copy of which is provided to us for settlement of the Card Transaction, including a Sales Slip or a Credit Slip, as applicable or appropriate under the circumstances.

Merchant T&C v17-1-1        Fidelity Information Services, LLC is a registered ISO of Wells Fargo Bank, N.A., Concord, CA        Initials/Date _____/

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 8

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# **US** bank.

## Transaction History

**Premium Business Checking**
Account ending in 2474

Date Printed: 12/16/19
Printed By: APDARAB
Page 1 of 4

| | ACCOUNT BALANCE | AVAILABLE BALANCE |
|---|---|---|
| | $4.50 | $4.50 |

| Post Date Trans Time | Trace ID/Ref Num | Description | Check # | Debit | Credit | Account Balance | Available Balance | Unavailable Funds |
|---|---|---|---|---|---|---|---|---|
| 12-13-19 01:21:00 AM | -119121300018575 | OD ADV FROM BUSINESS CARD   ********* | | $0.00 | $200.00 | $4.50 | $4.50 | |
| 12-13-19 09:46:00 PM | 119121300000000 | ANALYSIS SERVICE CHARGE - DEBIT | | $221.31 | $0.00 | ($195.50) | ($195.50) | |
| 12-12-19 12:21:00 AM | 18598654749849 | OVERDRAFT RETURNED FEE | | $37.00 | $0.00 | $25.81 | $25.81 | |
| 12-12-19 03:34:00 PM | 153406191212 | MOBILE TRANSFER DEBIT | | $1,470.00 | $0.00 | $62.81 | $62.81 | |
| 12-12-19 01:56:00 PM | 135648191212 | MOBILE TRANSFER DEBIT | | $6,000.00 | $0.00 | $1,532.81 | $1,532.81 | |
| 12-12-19 01:25:00 PM | 132514191212 | MOBILE TRANSFER CREDIT | | $0.00 | $1,500.00 | $7,532.81 | $7,532.81 | |
| 12-12-19 01:23:00 PM | 132324191212 | MOBILE TRANSFER CREDIT | | $0.00 | $6,000.00 | $6,032.81 | $6,032.81 | |
| 12-09-19 10:26:00 AM | 102614191207 | MOBILE TRANSFER DEBIT | | $100.00 | $0.00 | $32.81 | $32.81 | |
| 12-09-19 10:24:00 AM | 102445191207 | MOBILE TRANSFER DEBIT | | $110.00 | $0.00 | $132.81 | $132.81 | |
| 12-09-19 10:24:00 AM | 102406191207 | MOBILE TRANSFER DEBIT | | $110.00 | $0.00 | $242.81 | $242.81 | |
| 12-06-19 01:13:00 AM | 19339005768217000 | ACH PMNTS D420747941 1073-1638865 | | $1,007.47 | $0.00 | $352.81 | $352.81 | |
| 12-06-19 01:13:00 AM | 19339001927133000 | 120519EFT PYMT 1952575893 G68233308009 | | $650.00 | $0.00 | $1,360.28 | $1,360.28 | |
| 12-06-19 12:03:00 AM | 21189256064456 | CUSTOMER DEPOSIT | | $0.00 | $2,000.00 | $2,010.28 | $2,010.28 | |
| 12-03-19 06:24:00 AM | 062439191203 | MOBILE TRANSFER DEBIT | | $10.00 | $0.00 | $10.28 | $10.28 | |
| 12-02-19 09:40:00 PM | 214043191202 | MOBILE TRANSFER DEBIT | | $50.00 | $0.00 | $20.28 | $20.28 | |
| 11-29-19 04:48:00 AM | 19333005032671000 | B193318886826671459222527 2KBLFZX0EIBK | | $941.80 | $0.00 | $70.28 | $70.28 | |
| 11-29-19 02:16:00 PM | 141602191129 | MOBILE TRANSFER CREDIT | | $0.00 | $1,000.00 | $1,012.08 | $1,012.08 | |
| 11-27-19 01:07:00 PM | 130742191127 | MOBILE TRANSFER DEBIT | | $100.00 | $0.00 | $12.08 | $12.08 | |
| 11-26-19 12:01:00 AM | 22458357616707 | TELLER SAVINGS WITHDRAWAL | | $9,000.00 | $0.00 | $112.08 | $112.08 | |
| 11-26-19 08:35:00 PM | 203504191126 | MOBILE TRANSFER DEBIT | | $4,600.00 | $0.00 | $9,112.08 | $9,112.08 | |
| 11-25-19 12:03:00 AM | 27378058957862 | CUSTOMER DEPOSIT | | $0.00 | $13,700.00 | $13,712.08 | $13,712.08 | |
| 11-18-19 04:38:00 PM | 063808150007191118 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | $12.08 | $12.08 | |
| 11-18-19 04:37:00 PM | 063745500007191118 | OVERDRAFT PAID FEE REFUND | | $0.00 | $37.00 | ($24.92) | ($24.92) | |
| 11-18-19 04:37:00 PM | 063731210007191118 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | ($61.92) | ($61.92) | |
| 11-18-19 04:37:00 PM | 063708090007191118 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | ($98.92) | ($98.92) | |
| 11-18-19 04:36:00 PM | 063657290007191118 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | ($135.92) | ($135.92) | |
| 11-18-19 04:36:00 PM | 063645530007191118 | OVERDRAFT PAID FEE REFUND | | $0.00 | $37.00 | ($172.92) | ($172.92) | |
| 11-15-19 09:47:00 PM | 119111500000000 | ANALYSIS SERVICE CHARGE - DEBIT | | $209.92 | $0.00 | ($209.92) | ($209.92) | |
| 11-13-19 12:58:00 AM | 19312006220431000 | OVERDRAFT RETURNED FEE | | $37.00 | $0.00 | $0.00 | $0.00 | |
| 11-13-19 05:05:00 AM | 19316009596637000 | OVERDRAFT RETURNED FEE | | $37.00 | $0.00 | $37.00 | $37.00 | |

This is informational only. It does not constitute your official statement.

Form TRHIST 092012

U.S. Bank
Customer Confidential



# Transaction History (Cont'd.)

Premium Business Checking
Account ending in 2474

Date Printed: 12/16/19
Printed By: APDARAB
Page 2 of 4

| Post Date Trans Time | Trace ID/Ref Num | Description | Check # | Debit | Credit | Account Balance | Available Balance | Unavailable Funds |
|---|---|---|---|---|---|---|---|---|
| 11-13-19 03:31:00 PM | 053137920007191113 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | $74.00 | $74.00 | |
| 11-13-19 03:31:00 PM | 053113790007191113 | OVERDRAFT RETURNED FEE REFUND | | $0.00 | $37.00 | $37.00 | $37.00 | |
| 11-06-19 01:07:00 AM | 19309012577662000 | ACH PMNTS D420747941 1073-1638865 | | $1,007.47 | $0.00 | $0.00 | $0.00 | |
| 11-06-19 01:59:00 PM | 135952191106 | MOBILE TRANSFER CREDIT | | $0.00 | $507.47 | $1,007.47 | $1,007.47 | |
| 11-06-19 01:59:00 PM | 135915191106 | MOBILE TRANSFER CREDIT | | $0.00 | $500.00 | $500.00 | $500.00 | |
| 11-04-19 04:55:00 AM | 19308012160765000 | 110219EFT PYMT 1952575893 G68233308009 | | $719.94 | $0.00 | $0.00 | $0.00 | |
| 11-04-19 09:36:00 AM | 093607191104 | MOBILE TRANSFER CREDIT | | $0.00 | $719.94 | $719.94 | $719.94 | |
| 10-30-19 01:05:00 AM | 19302011575745000 | B19302886682667145922222527 2K6AXZ1H2XDH | | $941.80 | $0.00 | $0.00 | $0.00 | |
| 10-30-19 12:21:00 PM | 122127191030 | MOBILE TRANSFER CREDIT | | $0.00 | $941.80 | $941.80 | $941.80 | |
| 10-25-19 01:25:00 PM | 032545480007191025 | OVERDRAFT PAID FEE REFUND | | $0.00 | $37.00 | $0.00 | $0.00 | |
| 10-24-19 12:22:00 AM | 18178654650997 | OVERDRAFT PAID FEE | | $37.00 | $0.00 | ($37.00) | ($37.00) | |
| 10-24-19 06:01:00 AM | 060141191024 | MOBILE TRANSFER CREDIT | | $0.00 | $347.50 | $0.00 | $0.00 | |
| 10-23-19 12:22:00 AM | 18178654650997 | COUNTER CHECK | | $347.50 | $0.00 | ($347.50) | ($347.50) | |
| 10-18-19 01:12:00 AM | 19290010905827000 | 101719EFT PYMT 1952575893 G68233308009 | | $654.07 | $0.00 | $0.00 | $0.00 | |
| 10-18-19 08:05:00 PM | 200558191018 | MOBILE TRANSFER DEBIT | | $24.50 | $0.00 | $654.07 | $654.07 | |
| 10-18-19 12:41:00 PM | 124143191018 | MOBILE TRANSFER CREDIT | | $0.00 | $650.00 | $678.57 | $678.57 | |
| 10-18-19 11:09:00 AM | 110951191018 | MOBILE TRANSFER CREDIT | | $0.00 | $1,000.00 | $28.57 | $28.57 | |
| 10-17-19 09:00:00 PM | -119101700015371 | CDS TRANSFER FUNDS DEBIT | | $1,000.00 | $0.00 | ($971.43) | ($971.43) | |
| 10-16-19 01:22:00 AM | 19288026722167000 | 191015EPAY 5760039224 4349778437 | | $520.00 | $0.00 | $28.57 | $28.57 | |
| 10-16-19 05:08:00 AM | 19288013028554000 | OVERDRAFT PAID FEE | | $37.00 | $0.00 | $548.57 | $548.57 | |
| 10-16-19 12:02:00 AM | 22778659003400 | CUSTOMER DEPOSIT | | $0.00 | $50.00 | $585.57 | $585.57 | |
| 10-16-19 10:49:00 AM | 104926191016 | MOBILE TRANSFER CREDIT | | $0.00 | $850.00 | $535.57 | $535.57 | |
| 10-16-19 06:19:00 AM | 061959191016 | MOBILE TRANSFER CREDIT | | $0.00 | $70.00 | ($314.43) | ($314.43) | |
| 10-15-19 05:08:00 AM | 19288013028554000 | 191011MOBILE PMT9279744980 928439800564 | | $7,000.00 | $0.00 | ($384.43) | ($384.43) | |
| 10-15-19 09:49:00 PM | 119101500000000 | ANALYSIS SERVICE CHARGE - DEBIT | | $421.20 | $0.00 | $6,615.57 | $6,615.57 | |
| 10-15-19 12:10:00 PM | 121019191015 | MOBILE TRANSFER DEBIT | | $200.00 | $0.00 | $7,036.77 | $7,036.77 | |
| 10-11-19 11:58:00 AM | 115824191011 | MOBILE TRANSFER CREDIT | | $0.00 | $6,000.00 | $7,236.77 | $7,236.77 | |
| 10-11-19 11:58:00 AM | 115803191011 | MOBILE TRANSFER CREDIT | | $0.00 | $1,000.00 | $1,236.77 | $1,236.77 | |
| 10-10-19 09:00:00 PM | -119101000005781 | CDS TRANSFER FUNDS DEBIT | | $1,000.00 | $0.00 | $236.77 | $236.77 | |
| 10-10-19 11:10:00 PM | 19283012496203000 | 191010MERCH DEP 2841010148 8034088776 | | $0.00 | $756.95 | $1,236.77 | $1,236.77 | |
| 10-10-19 12:36:00 PM | 123602191010 | MOBILE TRANSFER DEBIT | | $26,000.00 | $0.00 | $479.82 | $479.82 | |

This is informational only. It does not constitute your official statement.

Form TRHIST 092012

U.S. Bank
Customer Confidential

# **usbank.**

## Transaction History (Cont'd.)

Premium Business Checking
Account ending in 2474

Date Printed: 12/16/19
Printed By: APDARAB
Page 3 of 4

| Post Date Trans Time | Trace ID/Ref Num | Description | Check # | Debit | Credit | Account Balance | Available Balance | Unavailable Funds |
|---|---|---|---|---|---|---|---|---|
| 10-10-19 12:28:00 PM | 19283006726107000 | 191010MERCH DEP 2841010148 8034088776 | | $0.00 | $25,451.00 | $26,479.82 | $26,479.82 | |
| 10-10-19 12:28:00 PM | 19283006725967000 | 191010MERCH DEP 2841010148 8034088776 | | $0.00 | $45.00 | $1,028.82 | $1,028.82 | |
| 10-09-19 01:04:00 AM | 19281012349127000 | ACH PMNTS D420747941 1073-1638865 | | $1,007.47 | $0.00 | $983.82 | $983.82 | |
| 10-09-19 02:30:00 AM | 928100000354231 | MERCH 8034088776 ENCINO ARCS CHA | | $700.00 | $0.00 | $1,991.29 | $1,991.29 | |
| 10-09-19 09:52:00 PM | 928200000317025 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $524.99 | $2,691.29 | $2,691.29 | |
| 10-09-19 12:26:00 PM | 122625191009 | MOBILE TRANSFER CREDIT | | $0.00 | $1,000.00 | $2,166.30 | $2,166.30 | |
| 10-08-19 01:06:00 AM | 19280015299890000 | B19280886826671459222527 2K2CKBQD3071 | | $941.80 | $0.00 | $1,166.30 | $1,166.30 | |
| 10-08-19 09:50:00 PM | 928100000317273 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $865.69 | $2,108.10 | $2,108.10 | |
| 10-08-19 09:22:00 PM | 212234191008 | MOBILE TRANSFER DEBIT | | $500.00 | $0.00 | $1,242.41 | $1,242.41 | |
| 10-07-19 12:00:00 AM | 25338058730331 | COUNTER CHECK | | $700.00 | $0.00 | $1,742.41 | $1,742.41 | |
| 10-07-19 12:04:00 AM | 28058150119611 | TELLER SAVINGS WITHDRAWAL | | $5,008.00 | $0.00 | $2,442.41 | $2,442.41 | |
| 10-07-19 02:30:00 AM | 927900000142327 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $15.00 | $7,450.41 | $7,450.41 | |
| 10-07-19 02:30:00 AM | 927800000225826 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $18.00 | $7,435.41 | $7,435.41 | |
| 10-07-19 02:30:00 AM | 927900000142326 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $562.00 | $7,417.41 | $7,417.41 | |
| 10-07-19 09:51:00 PM | 928000000235125 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $661.05 | $6,855.41 | $6,855.41 | |
| 10-07-19 11:20:00 AM | 928000000064521 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $5,290.00 | $6,194.36 | $6,194.36 | |
| 10-07-19 02:30:00 AM | 927900000142325 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $6,742.00 | $904.36 | $904.36 | |
| 10-07-19 05:03:00 AM | 050335191007 | MOBILE TRANSFER DEBIT | | $10,000.00 | $0.00 | ($5,837.64) | ($5,837.64) | |
| 10-04-19 09:54:00 PM | 927700000328205 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $755.51 | $4,162.36 | $4,162.36 | |
| 10-04-19 09:00:00 PM | -119100400002490 | CDS TRANSFER FUNDS DEBIT | | $1,000.00 | $0.00 | $3,406.85 | $3,406.85 | |
| 10-04-19 02:14:00 PM | 141423191004 | MOBILE TRANSFER DEBIT | | $1,500.00 | $0.00 | $4,406.85 | $4,406.85 | |
| 10-02-19 12:02:00 AM | 23388358488719 | CUSTOMER DEPOSIT | | $0.00 | $4,600.00 | $5,906.85 | $5,906.85 | |
| 09-30-19 11:43:00 AM | -119093000006490 | 092919PLUSTERM8812 CORBIN AVE NORTHRIDGE | | $2.50 | $0.00 | $1,306.85 | $1,306.85 | |
| 09-30-19 11:43:00 AM | 709135114353 | 092919PLUSTERM8812 CORBIN AVE NORTHRIDGE | | $503.00 | $0.00 | $1,309.35 | $1,309.35 | |
| 09-30-19 10:19:00 PM | 06949409292219 | 092919MAESTERMSABZEE MARKET ENCINO | | $52.99 | $0.00 | $1,812.35 | $1,812.35 | |
| 09-30-19 09:30:00 AM | 24692169270100236805 | 092719CHEXTRA CHEVRON 0376628 ENCINO | | $85.72 | $0.00 | $1,865.34 | $1,865.34 | |
| 09-30-19 09:30:00 AM | 24492159270894630093 | 092619CHEXTRA NEUROBIOLOGIX 866-500-53 | | $168.80 | $0.00 | $1,951.06 | $1,951.06 | |
| 09-30-19 12:03:00 AM | 27238059220422 | TELLER SAVINGS WITHDRAWAL | | $6,000.00 | $0.00 | $2,119.86 | $2,119.86 | |
| 09-30-19 12:23:00 AM | 18529254254580 | OVERDRAFT RETURNED FEE | 1095 | $37.00 | $0.00 | $8,119.86 | $8,119.86 | |
| 09-30-19 12:23:00 AM | 18529254254579 | OVERDRAFT RETURNED FEE | 1094 | $37.00 | $0.00 | $8,156.86 | $8,156.86 | |
| 09-30-19 02:30:00 AM | 927200000138105 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $42.00 | $8,193.86 | $8,193.86 | |

This is informational only. It does not constitute your official statement.

Form TRHIST 092012

U.S. Bank
Customer Confidential



Premium Business Checking
Account ending in 2474

Date Printed: 12/16/19
Printed By: APDARAB
Page 4 of 4

| Post Date Trans Time | Trace ID/Ref Num | Description | Check # | Debit | Credit | Account Balance | Available Balance | Unavailable Funds |
|---|---|---|---|---|---|---|---|---|
| 09-30-19 02:30:00 AM | 927100000224007 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $270.00 | $8,151.86 | $8,151.86 | |
| 09-30-19 09:52:00 PM | 927300000240954 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $320.04 | $7,881.86 | $7,881.86 | |
| 09-30-19 02:30:00 AM | 927200000138104 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $426.00 | $7,561.82 | $7,561.82 | |
| 09-30-19 02:30:00 AM | 927100000224006 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $2,455.31 | $7,135.82 | $7,135.82 | |
| 09-30-19 02:30:00 AM | 927200000138106 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $8,870.00 | $4,680.51 | $4,680.51 | |
| 09-30-19 11:02:00 AM | 110209190930 | MOBILE TRANSFER DEBIT | | $5,000.00 | $0.00 | ($4,189.49) | ($4,359.29) | $169.80 |
| 09-30-19 01:46:00 AM | 014628190930 | MOBILE TRANSFER DEBIT | | $400.00 | $0.00 | $810.51 | $640.71 | $169.80 |
| 09-30-19 01:44:00 AM | -119093000000001 | FOREIGN ATM BALANCE FEE | | $2.50 | $0.00 | $1,210.51 | $1,040.71 | $169.80 |
| 09-30-19 01:43:00 AM | -119093000000001 | FOREIGN ATM BALANCE FEE | | $2.50 | $0.00 | $1,213.01 | $1,043.21 | $169.80 |
| 09-27-19 11:32:00 AM | 927000000137142 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $177.00 | $1,215.51 | $1,045.71 | $169.80 |
| 09-26-19 09:52:00 AM | 0027450952254519 | 092619SUS4T519US BANK ENCINO CENCINO | | $260.00 | $0.00 | $1,038.51 | $888.71 | $169.80 |
| 09-26-19 09:50:00 AM | 0027430950594519 | 092619SUS4T519US BANK ENCINO CENCINO | | $40.00 | $0.00 | $1,298.51 | $1,128.71 | $169.80 |
| 09-26-19 11:26:00 AM | 928900000135981 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $314.00 | $1,338.51 | $1,168.71 | $169.80 |
| 09-28-19 09:57:00 PM | 928900000325781 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $901.61 | $1,024.51 | $854.71 | $169.80 |
| 09-26-19 07:37:00 PM | 0045611937324445 | 092619SUS4T445US BANK ENCINO ENCINO | | $0.00 | $4,200.00 | $122.90 | ($46.90) | $169.80 |
| 09-26-19 11:26:00 AM | 928900000135980 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $6,330.00 | ($4,077.10) | ($4,246.90) | $169.80 |
| 09-26-19 09:38:00 PM | 213810190926 | MOBILE TRANSFER DEBIT | | $4,100.00 | $0.00 | ($10,407.10) | ($10,407.10) | |
| 09-26-19 03:43:00 PM | 154316190926 | MOBILE TRANSFER DEBIT | | $8,800.00 | $0.00 | ($6,307.10) | ($6,307.10) | |
| 09-25-19 09:25:00 AM | 24692169268100839640 | 092419CHEXTRA CHEVRON 0091660 COSTA MESA | | $78.26 | $0.00 | $2,492.90 | $2,492.90 | |
| 09-25-19 11:21:00 AM | 926800000133197 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $100.00 | $2,571.16 | $2,571.16 | |
| 09-25-19 09:52:00 PM | 926800000322014 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $677.02 | $2,471.16 | $2,471.16 | |
| 09-25-19 12:01:00 AM | 20798655265353 | CUSTOMER DEPOSIT | | $0.00 | $1,500.00 | $1,794.14 | $1,794.14 | |
| 09-25-19 05:11:00 AM | 051150190925 | MOBILE TRANSFER DEBIT | | $1,700.00 | $0.00 | $294.14 | $293.14 | $1.00 |
| 09-24-19 09:52:00 PM | 926700000315285 | MERCH 8034088776 ENCINO DEPOSIT | | $0.00 | $606.48 | $1,994.14 | $1,993.14 | $1.00 |
| 09-24-19 05:20:00 AM | 052021190924 | MOBILE TRANSFER DEBIT | | $1,900.00 | $0.00 | $1,387.66 | $1,387.66 | |
| 09-23-19 09:23:00 AM | 24137469265500825775 | 092119CHEXTRA JONS MARKET 24 RESEDA | | $948.84 | $0.00 | $3,287.66 | $3,287.66 | |
| 09-23-19 09:23:00 AM | 24906419263079850276 | 092019CHEXTRA IDT*Boss Intl Ca800-676631 | | $20.00 | $0.00 | $4,236.50 | $4,236.50 | |
| 09-23-19 12:02:00 AM | 26558058669400 | TELLER SAVINGS WITHDRAWAL | | $2,000.00 | $0.00 | $4,256.50 | $4,256.50 | |

This is informational only. It does not constitute your official statement.

Form TRHIST 092012

U.S. Bank
Customer Confidential

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 9

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

ILLINOIS

Jesse White • Secretary of State

**DRIVER'S LICENSE**

4d LIC NO: D231-2409-6086

3 DOB: 03/24/1996

4b EXP: 03/24/2022

8 157 OAK MILL STREET
ADDISON, IL 60101

1 DISTEFANO
2 FRANCESCO

9 CLASS: DM    9a END: NONE

12 REST: B

15 SEX: M    16 HGT: 5'-09"

17 WGT: 210 lbs    18 EYES: BRN

5 DD 20170324310HS8635

4a ISS: 03/24/2017

19 TYPE: ORG

USA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 10

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

PRI VY

Home
Dashboard
Resellers
Reports
Merchants
Documents
Help

Account  Edit Pricing  Edit Products  Show Rates  Add New Notes  Show Activity Log  Show Merchant Info

MERCHANT RECORD

DBA  Corp  Director  Obituary  Banking  Sales  Provision  Pricing  Reseller

| | |
|---|---|
| Merch Name | CABERNET TEHRAN |
| Address | 16101 VENTURA BLVD |
| | #160 |
| | ENCINO, CA 91436 |
| Merchant Phone | (818) 985-5800 |
| Federal Tax / EIN | XX-XXXX101 |
| MCC | 5813 |
| MID | 769020632860 |
| Amex# | 5098567449 |
| Discover# | 601116/77179512 |
| PCI Status | Not Started |

Edit Merchant

■ Corporate/Legal Business Information

| Corporate Name | Corporate Address | Corporate City | Corporate State | Corporate Zip | Email |
|---|---|---|---|---|---|
| EMPEROR ENTERTAI | | | | | |

| Phone | Yrs in Business | Website | Where do you want us to send your mail? | | |
|---|---|---|---|---|---|
| | | | | | |

# DEFYNE
## PAYMENTS
DEFYNE YOUR SUCCESS

PO Box 467472
Atlanta GA 31146

## Monthly Merchant Statement

| Statement Date: | 07/01/19 - 07/31/19 |
|---|---|
| Merchant Number | 769020632860 |
| Monthly Fees Account | XXXXXXXX9955 |

00000544  MMPSI080119153618000 03 000000

CABERNET TEHRAN
16101 VENTURA BLVD #160
ENCINO, CA 91436



| Summary | |
|---|---|
| **p2** Total Net Deposits | $89,795.77 |
| Charges | $2,699.47 |
| **Total Amount Funded** | **$87,096.30** |

| Contact | |
|---|---|
| ✉ | Defyne Payments<br>PO Box 467472<br>Atlanta GA 31146 |
| ✉ | service@issueresolve.com |
| 📞 | 800.711.5769 |
| 🖨 | .. |

All billing and statement inquiries must be addressed within 30 days.

## Important

**PULSE Network Annual Fee** – Billed to Participating Merchants
The PULSE Network annual fee has been assessed on this statement for participating merchants.

**ACTION MAY BE REQUIRED** – IRS Data Integrity Fee
As your Merchant Services provider, the Internal Revenue Service (IRS) holds us responsible for filing your card volume, as well as ensuring that your Tax ID and Legal Name in our system matches what is on file with the IRS. The monthly IRS Data Integrity Fee billed to mismatched merchants has increased from $24.95 to $150. Any merchants who remain in a mismatched status will be billed the $150 IRS Data Integrity Fee until resolved. The fee will be assessed each month until the mismatched information is corrected.



00000544 0031741 0001-0005 MMPSI080119153618000 03 S



**DeFYNE PAYMENTS**
DEFYNE YOUR SUCCESS

| | Merchant No. | Statement Date |
|---|---|---|
| | 769020632860 | 07/01/19 - 07/31/19 |

## Card Summary

| Plan Code | Number of Sales | Amount of Sales | Number of Credits | Amount of Credits | Net Sales | Average Ticket |
|---|---|---|---|---|---|---|
| AM | 172 | 49,771.82 | 0 | 0.00 | 49,771.82 | 289.37 |
| VS | 622 | 30,768.16 | 1 | 9.78 | 30,758.38 | 49.53 |
| MC | 161 | 8,505.72 | 0 | 0.00 | 8,505.72 | 52.83 |
| DS | 13 | 759.85 | 0 | 0.00 | 759.85 | 58.45 |
| ** | 968 | 89,805.55 | 1 | 9.78 | 89,795.77 | 92.86 |

## Deposits Funded by Batch

| Date Submitted | ACH Reference Code | Number of Sales | Amount of Sales | Amount of Credits | Net Deposit | Daily Collected Amount | Funded Amount |
|---|---|---|---|---|---|---|---|
| 07/01/19 | 9001000004951532 | 33 | $709.26 | $0.00 | $709.26 | $0.00 | $709.26 |
| 07/02/19 | 9001000004954635 | 1 | $13.06 | $0.00 | $13.06 | $0.00 | $13.06 |
| 07/02/19 | 9001000004959810 | 39 | $1,126.72 | $0.00 | $1,126.72 | $0.00 | $1,126.72 |
| 07/02/19 | 9001000004959811 | 1 | $70.00 | $0.00 | $70.00 | $0.00 | $70.00 |
| 07/03/19 | 9001000004967753 | 29 | $799.98 | $0.00 | $799.98 | $0.00 | $799.98 |
| 07/04/19 | 9001000004970393 | 5 | $55.00 | $0.00 | $55.00 | $0.00 | $55.00 |
| 07/05/19 | 9001000004977915 | 8 | $256.44 | $0.00 | $256.44 | $0.00 | $256.44 |
| 07/07/19 | 9001000004981461 | 4 | $130.00 | $0.00 | $130.00 | $0.00 | $130.00 |
| 07/07/19 | 9001000004981462 | 6 | $195.50 | $0.00 | $195.50 | $0.00 | $195.50 |
| 07/08/19 | 9001000004991436 | 22 | $947.88 | $0.00 | $947.88 | $0.00 | $947.88 |
| 07/09/19 | 9001000004999087 | 22 | $568.22 | $0.00 | $568.22 | $0.00 | $568.22 |
| 07/10/19 | 9001000005001785 | 1 | $20,150.00 | $0.00 | $20,150.00 | $0.00 | $20,150.00 |
| 07/10/19 | 9001000005006593 | 20 | $745.73 | $0.00 | $745.73 | $0.00 | $745.73 |
| 07/11/19 | 9001000005009382 | 11 | $156.00 | $0.00 | $156.00 | $0.00 | $156.00 |
| 07/11/19 | 9001000005014187 | 40 | $1,022.59 | $0.00 | $1,022.59 | $0.00 | $1,022.59 |
| 07/12/19 | 9001000005021872 | 25 | $753.25 | $9.78 | $743.47 | $0.00 | $743.47 |
| 07/14/19 | 9001000005026014 | 1 | $45.00 | $0.00 | $45.00 | $0.00 | $45.00 |
| 07/14/19 | 9001000005026015 | 1 | $6.00 | $0.00 | $6.00 | $0.00 | $6.00 |
| 07/14/19 | 9001000005026016 | 17 | $3,231.00 | $0.00 | $3,231.00 | $0.00 | $3,231.00 |
| 07/15/19 | 9001000005036715 | 25 | $611.72 | $0.00 | $611.72 | $0.00 | $611.72 |
| 07/15/19 | 9001000005032314 | 1 | $17,000.00 | $0.00 | $17,000.00 | $0.00 | $17,000.00 |
| 07/16/19 | 9001000005044370 | 16 | $330.30 | $0.00 | $330.30 | $0.00 | $330.30 |
| 07/17/19 | 9001000005051895 | 24 | $601.45 | $0.00 | $601.45 | $0.00 | $601.45 |
| 07/18/19 | 9001000005054746 | 48 | $2,415.00 | $0.00 | $2,415.00 | $0.00 | $2,415.00 |
| 07/18/19 | 9001000005054747 | 22 | $1,879.00 | $0.00 | $1,879.00 | $0.00 | $1,879.00 |
| 07/18/19 | 9001000005059527 | 18 | $499.25 | $0.00 | $499.25 | $0.00 | $499.25 |
| 07/18/19 | 9001000005054748 | 11 | $262.00 | $0.00 | $262.00 | $0.00 | $262.00 |
| 07/19/19 | 9001000005062281 | 66 | $6,907.00 | $0.00 | $6,907.00 | $0.00 | $6,907.00 |
| 07/19/19 | 9001000005067128 | 40 | $847.92 | $0.00 | $847.92 | $0.00 | $847.92 |
| 07/19/19 | 9001000005062282 | 4 | $147.00 | $0.00 | $147.00 | $0.00 | $147.00 |
| 07/21/19 | 9001000005071146 | 2 | $300.00 | $0.00 | $300.00 | $0.00 | $300.00 |
| 07/21/19 | 9001000005071147 | 1 | $200.00 | $0.00 | $200.00 | $0.00 | $200.00 |
| 07/21/19 | 9001000005071148 | 35 | $5,145.00 | $0.00 | $5,145.00 | $0.00 | $5,145.00 |
| 07/21/19 | 9001000005071149 | 26 | $2,097.00 | $0.00 | $2,097.00 | $0.00 | $2,097.00 |
| 07/21/19 | 9001000005071150 | 7 | $608.00 | $0.00 | $608.00 | $0.00 | $608.00 |
| 07/21/19 | 9001000005071151 | 1 | $22.00 | $0.00 | $22.00 | $0.00 | $22.00 |



00000544 0031742 0002-0005 MMPSI080118153618000 03 S

**DEFYNE PAYMENTS**
DEFYNE YOUR SUCCESS

| Merchant Nu. | Statement Date |
|---|---|
| 769020632860 | 07/01/19 - 07/31/19 |

## Deposits Funded by Batch

| Date Submitted | ACH Reference Code | Number of Sales | Amount of Sales | Amount of Credits | Net Deposit | Daily Collected Amount | Funded Amount |
|---|---|---|---|---|---|---|---|
| 07/22/19 | 9001000005081654 | 15 | $578.19 | $0.00 | $578.19 | $0.00 | $578.19 |
| 07/23/19 | 9001000005089148 | 30 | $787.15 | $0.00 | $787.15 | $0.00 | $787.15 |
| 07/24/19 | 9001000005096616 | 29 | $855.02 | $0.00 | $855.02 | $0.00 | $855.02 |
| 07/25/19 | 9001000005099325 | 39 | $2,250.00 | $0.00 | $2,250.00 | $0.00 | $2,250.00 |
| 07/25/19 | 9001000005104057 | 22 | $446.96 | $0.00 | $446.96 | $0.00 | $446.96 |
| 07/25/19 | 9001000005099326 | 9 | $170.00 | $0.00 | $170.00 | $0.00 | $170.00 |
| 07/26/19 | 9001000005111831 | 21 | $583.70 | $0.00 | $583.70 | $0.00 | $583.70 |
| 07/28/19 | 9001000005115979 | 10 | $931.00 | $0.00 | $931.00 | $0.00 | $931.00 |
| 07/28/19 | 9001000005115980 | 39 | $7,660.00 | $0.00 | $7,660.00 | $0.00 | $7,660.00 |
| 07/28/19 | 9001000005115981 | 24 | $2,371.00 | $0.00 | $2,371.00 | $0.00 | $2,371.00 |
| 07/28/19 | 9001000005115982 | 10 | $204.50 | $0.00 | $204.50 | $0.00 | $204.50 |
| 07/29/19 | 9001000005126607 | 23 | $746.89 | $0.00 | $746.89 | $0.00 | $746.89 |
| 07/30/19 | 9001000005134120 | 31 | $651.73 | $0.00 | $651.73 | $0.00 | $651.73 |
| 07/31/19 | 9001000005141665 | 33 | $715.14 | $0.00 | $715.14 | $0.00 | $715.14 |
| **Total** | | **968** | **$89,805.55** | **$9.78** | **$89,795.77** | **$0.00** | **$89,795.77** |

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| FEE | 1 | 0.00 | MC Merchant Location Fee | 0.00000 | 1.2500 | 1.25 |
| FEE | 1 | 0.00 | Fixed Acquirer Network - 1B | 0.00000 | 2.0000 | 2.00 |
| FEE | 1 | 0.00 | Fixed Acquirer Network - 2 | 0.00000 | 1.2200 | 1.22 |
| FEE | 172 | 49,771.82 | AmEx Network | 0.00150 | 0.0000 | 74.66 |
| FEE | 7 | 403.47 | AmEx Card Not Present | 0.00300 | 0.0000 | 1.21 |
| FEE | 311 | 18,470.41 | Visa APF Credit | 0.00000 | 0.0195 | 6.06 |
| FEE | 298 | 9,725.17 | Visa APF Debit | 0.00000 | 0.0155 | 4.62 |
| FEE | 623 | 30,777.94 | Visa Base II Transmission | 0.00000 | 0.0018 | 1.12 |
| FEE | 1 | 9.78 | Visa Credit Voucher APF Debit | 0.00000 | 0.0155 | 0.02 |
| FEE | 3 | 230.39 | Visa IAF | 0.00450 | 0.0000 | 1.04 |
| FEE | 3 | 230.39 | Visa ISA Purchasing | 0.01000 | 0.0000 | 2.30 |
| FEE | 321 | 20,241.20 | Visa Assessment Credit | 0.00140 | 0.0000 | 28.34 |
| FEE | 301 | 10,526.96 | Visa Assessment Debit | 0.00130 | 0.0000 | 13.69 |
| FEE | 2 | 104.39 | Visa Credit Voucher APF Credit International | 0.00000 | 0.0395 | 0.08 |
| FEE | 1 | 110.00 | Visa Credit Voucher APF Debit International | 0.00000 | 0.0355 | 0.04 |
| FEE | 161 | 8,505.72 | MasterCard Acquirer License Fee | 0.00005 | 0.0000 | 0.43 |
| FEE | 161 | 8,505.72 | MasterCard ABVF | 0.00130 | 0.0000 | 11.06 |
| FEE | 4 | 390.00 | MasterCard APSF | 0.00850 | 0.0000 | 3.32 |
| FEE | 160 | 7,863.67 | MasterCard NABU | 0.00000 | 0.0195 | 3.12 |
| FEE | 4 | 390.00 | MasterCard Cross Border Domestic | 0.00600 | 0.0000 | 2.34 |
| FEE | 161 | 8,505.72 | MC Humanitarian Fee | 0.00000 | 0.0025 | 0.40 |
| FEE | 13 | 759.85 | Discover Assessment | 0.00130 | 0.0000 | 0.99 |
| FEE | 13 | 719.10 | Discover Network Auths | 0.00000 | 0.0025 | 0.03 |
| FEE | 13 | 759.85 | Discover Data Usage | 0.00000 | 0.0195 | 0.25 |
| | | | **TOTAL FEE** | | | **$159.59** |





**DEFYNE PAYMENTS**
DEFYNE YOUR SUCCESS

| Merchant Nu. | Statement Date |
|---|---|
| 769020632860 | 07/01/19 - 07/31/19 |

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| PROGRAM | 2 | 75.24 | AmEx Prepaid 1 | 0.01350 | 0.1000 | 1.22 |
| PROGRAM | 29 | 358.78 | AmEx Restaurant 1 | 0.01600 | 0.0400 | 6.90 |
| PROGRAM | 31 | 741.71 | AmEx Restaurant 2 | 0.01850 | 0.1000 | 16.85 |
| PROGRAM | 92 | 6,719.57 | AmEx Restaurant 3 | 0.02500 | 0.1000 | 177.27 |
| PROGRAM | 18 | 41,876.52 | AmEx Restaurant 4 | 0.02850 | 0.1000 | 1,195.26 |
| PROGRAM | 31 | 3,616.90 | VS CPS/Rewards 2 | 0.01950 | 0.1000 | 73.64 |
| PROGRAM | 1 | 36.48 | VS Intl Premium Card | 0.01800 | 0.0000 | 0.66 |
| PROGRAM | 1 | 110.00 | VS Intl Electronic | 0.01100 | 0.0000 | 1.21 |
| PROGRAM | 1 | 83.91 | VS Intl Super Premium | 0.01970 | 0.0000 | 1.65 |
| PROGRAM | 9 | 748.07 | VS Business Electronic T1 | 0.02400 | 0.1000 | 18.86 |
| PROGRAM | 12 | 957.91 | VS Business Electronic T2 | 0.02750 | 0.1500 | 28.15 |
| PROGRAM | 10 | 872.26 | VS Business Electronic T3 | 0.02850 | 0.2000 | 26.87 |
| PROGRAM | 13 | 1,018.23 | VS Business Electronic T4 | 0.02950 | 0.2000 | 32.64 |
| PROGRAM | 2 | 107.07 | VS Corporate Travel Service | 0.02650 | 0.1000 | 3.04 |
| PROGRAM | 93 | 1,105.53 | VS CPS/Small Ticket Regulated | 0.00050 | 0.2200 | 21.26 |
| PROGRAM | 63 | 4,086.04 | VS EIRF Credit | 0.02300 | 0.1000 | 100.32 |
| PROGRAM | 4 | 463.03 | VS Purch Card Travel Service | 0.02650 | 0.1000 | 12.68 |
| PROGRAM | 13 | 1,660.07 | VS CPS/Restaurant Credit | 0.01540 | 0.1000 | 26.88 |
| PROGRAM | 5 | 201.88 | VS CPS/Restaurant Debit | 0.01190 | 0.1000 | 2.90 |
| PROGRAM | 1 | 17.43 | VS CPS/Restaurant Prepaid | 0.01150 | 0.1500 | 0.35 |
| PROGRAM | 191 | 8,967.48 | VS Regulated Debit | 0.00050 | 0.2200 | 46.69 |
| PROGRAM | 25 | 1,052.79 | VS Infinite Electronic | 0.02400 | 0.1000 | 27.75 |
| PROGRAM | 1 | 17.06 | VS Infinite Standard | 0.02950 | 0.1000 | 0.60 |
| PROGRAM | 27 | 338.64 | VS CPS/Small Ticket Credit | 0.01650 | 0.0400 | 6.70 |
| PROGRAM | 8 | 95.55 | VS CPS/Small Ticket Debit | 0.01550 | 0.0400 | 1.79 |
| PROGRAM | 3 | 63.72 | VS Standard Credit | 0.02700 | 0.1000 | 2.02 |
| PROGRAM | 1 | 18.22 | VS Standard Debit | 0.01900 | 0.2500 | 0.60 |
| PROGRAM | 1 | 10.87 | VS Standard Prepaid | 0.01900 | 0.2500 | 0.46 |
| PROGRAM | 104 | 5,019.00 | VS Signature Pref Electronic | 0.02400 | 0.1000 | 130.80 |
| PROGRAM | 2 | 100.02 | VS Signature Pref Standard | 0.02950 | 0.1000 | 3.15 |
| PROGRAM | 2 | 51.49 | MC Business Level 2 Standard | 0.03100 | 0.1000 | 1.80 |
| PROGRAM | 2 | 250.00 | MC Bus Level 2 T&E Rate II | 0.02500 | 0.1000 | 6.45 |
| PROGRAM | 3 | 60.19 | MC Business Level 3 Standard | 0.03150 | 0.1000 | 2.19 |
| PROGRAM | 2 | 300.00 | MC Bus Level 3 T&E Rate II | 0.02550 | 0.1000 | 7.85 |
| PROGRAM | 4 | 54.27 | MC Business Level 4 Standard | 0.03250 | 0.1000 | 2.17 |
| PROGRAM | 1 | 75.00 | MC Bus Level 4 T&E Rate II | 0.02650 | 0.1000 | 2.09 |
| PROGRAM | 1 | 25.00 | MC Commercial Standard Level 5 | 0.03300 | 0.1000 | 0.93 |
| PROGRAM | 1 | 10.87 | MC Key Entered Debit | 0.01650 | 0.1500 | 0.33 |
| PROGRAM | 3 | 268.00 | MC Merit III Debit | 0.01050 | 0.1500 | 3.27 |
| PROGRAM | 4 | 127.00 | MC Restaurant Debit | 0.01190 | 0.1000 | 1.92 |
| PROGRAM | 6 | 70.35 | MC Small Ticket Debit | 0.01550 | 0.0400 | 1.33 |
| PROGRAM | 7 | 109.26 | MC High Value Restaurant | 0.02200 | 0.1000 | 3.10 |
| PROGRAM | 1 | 75.00 | MC High Value T&E | 0.02750 | 0.1000 | 2.16 |
| PROGRAM | 4 | 390.00 | MC Intl Electronic | 0.01100 | 0.0000 | 4.30 |
| PROGRAM | 2 | 74.89 | MC Key Entered Prepaid | 0.01760 | 0.2000 | 1.72 |
| PROGRAM | 1 | 75.00 | MC Comm T&E Rate II Bus World | 0.02350 | 0.1000 | 1.86 |



00000544 0031744 0004-0005 MMPSI080119153618000 03 S

**DeFYNe PAYMENTS**
DEFYNE YOUR SUCCESS

| Merchant Nu... | Statement Date |
|---|---|
| 769020632860 | 07/01/19 - 07/31/19 |

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| PROGRAM | 3 | 83.04 | MC US Corporate Standard | 0.02950 | 0.1000 | 2.75 |
| PROGRAM | 1 | 17.12 | MC Business Level 1 Standard | 0.02950 | 0.1000 | 0.61 |
| PROGRAM | 3 | 149.20 | MC Large Market Standard | 0.02950 | 0.1000 | 4.71 |
| PROGRAM | 2 | 39.98 | MC Enhanced Key-Entered | 0.02040 | 0.1000 | 1.01 |
| PROGRAM | 11 | 1,073.78 | MC Enhanced Merit III | 0.01730 | 0.1000 | 19.68 |
| PROGRAM | 1 | 20.06 | MC Key Entered Credit | 0.01890 | 0.1000 | 0.48 |
| PROGRAM | 17 | 1,377.88 | MC Merit III | 0.01580 | 0.1000 | 23.48 |
| PROGRAM | 32 | 1,207.95 | MC US Cons Regulated POS Debit | 0.00050 | 0.2200 | 7.72 |
| PROGRAM | 20 | 492.52 | MC World Elite Restaurant | 0.02200 | 0.1000 | 12.85 |
| PROGRAM | 7 | 1,306.26 | MC World Elite T&E | 0.02750 | 0.1000 | 36.61 |
| PROGRAM | 4 | 243.74 | MC World T/E | 0.02300 | 0.1000 | 6.02 |
| PROGRAM | 16 | 477.87 | MC World Restaurant | 0.01730 | 0.1000 | 9.86 |
| PROGRAM | 6 | 464.74 | DS Commercial Electronic | 0.02300 | 0.1000 | 11.29 |
| PROGRAM | 2 | 26.68 | DS Express Services Rewards | 0.01950 | 0.0000 | 0.52 |
| PROGRAM | 1 | 15.06 | DS Key Entry Rewards | 0.02000 | 0.1000 | 0.40 |
| PROGRAM | 4 | 253.37 | DS Restaurants Rewards | 0.01950 | 0.1000 | 5.35 |
| | | | **TOTAL PROGRAM** | | | **$2,155.98** |
| SERVICE | 965 | 87,149.00 | SSL Authorizations | 0.00000 | 0.1000 | 96.50 |
| SERVICE | 50 | 3.00 | Batch Capture | 0.00000 | 0.0600 | 3.00 |
| SERVICE | 1 | 9.78 | Refund Transactions | 0.00000 | 0.1000 | 0.10 |
| SERVICE | 1 | 195.00 | AVS Processing | 0.00000 | 0.1000 | 0.10 |
| SERVICE | 1 | 5.00 | Support | 0.00000 | 5.0000 | 5.00 |
| SERVICE | 172 | 49,771.82 | AmEx Discount | 0.00400 | 0.0000 | 199.06 |
| SERVICE | 622 | 30,768.16 | Visa Discount | 0.00200 | 0.0000 | 61.56 |
| SERVICE | 161 | 8,505.72 | MasterCard Discount | 0.00200 | 0.0000 | 17.06 |
| SERVICE | 13 | 759.85 | Discover Discount | 0.00200 | 0.0000 | 1.52 |
| | | | **TOTAL SERVICE** | | | **$383.90** |
| | | | **TOTAL CHARGES** | | | **$2,699.47** |



00000544 0031745 0005-0005 MMPSI0801191536180000 03 S

Case 2:20-cv-00026-GW-MAA   Document 1-1   Filed 01/02/20   Page 182 of 232   Page ID #:190

# DEFYNE
**PAYMENTS**
DEFYNE YOUR SUCCESS

PO Box 467472
Atlanta GA 31146

## Monthly M   hant Statement

| | |
|---|---|
| **Statement Date:** | 04/01/19 - 04/30/19 |
| **Merchant Number** | 769020632860 |
| **Monthly Fees Account** | XXXXXXXX9955 |

00000398 MMPSI050119164327000 03 000000

CABERNET TEHRAN
16101 VENTURA BLVD #160
ENCINO, CA 91436

## Summary

| | |
|---|---|
| Charges | $5.60 |
| **Total Amount Funded** | -$5.60 |

## Contact



Defyne Payments
PO Box 467472
Atlanta GA 31146

service@issueresolve.com

800.711.5769

All billing and statement inquiries must be addressed within 30 days.

## Important

### April Card Brand Updates
Visa, Mastercard, Discover and American Express have announced changes for the April Card Brand compliance release. All updates have been applied to systems and changes to rates are reflected on this statement.

### NYCE Annual Fee – Billed to Participating Merchants
The NYCE debit network will assess the annual fee to participating merchants on the May 2019 statement.

### PREVENT PCI NON-COMPLIANCE FEES – Complete your Annual PCI Compliance Requirement
The Card Brands require merchants to maintain PCI compliance in order to secure private cardholder information. An easy-to-use PCI module is available to you 24/7 through the Merchant Intelligence Center (MIC) (www.merchantintel.com/MIC). Log in today to complete your certification and fulfill this important requirement.

**Monthly fees may be assessed to merchants whose PCI certification has not been renewed on schedule and will continue to be assessed each month until compliance is achieved.** If you need more information regarding how to achieve compliance, please contact Merchant Support.



00000398 0031269 0001-0002 MMPSI050119164327000 03 S



| | | | | Merchant Nu. 769020632860 | | Statement Date 04/01/19 - 04/30/19 |
|---|---|---|---|---|---|---|

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| SERVICE | 6 | 0.06 | SSL Authorizations | 0.00000 | 0.1000 | 0.60 |
| SERVICE | 1 | 5.00 | Support | 0.00000 | 5.0000 | 5.00 |
| | | | **TOTAL SERVICE** | | | **$5.60** |
| | | | **TOTAL CHARGES** | | | **$5.60** |



00000398 0031270 0002-0002 MMPSI050119164327000 03 S

# DEFYNE
## PAYMENTS
DEFYNE YOUR SUCCESS

PO Box 467472
Atlanta GA 31146

## Monthly Merchant Statement

| | |
|---|---|
| Statement Date: | 06/01/19 - 06/30/19 |
| Merchant Number | 769020632860 |
| Monthly Fees Account | XXXXXXXX9955 |

00000500 MMPSI070119152904000 03 000000

CABERNET TEHRAN
16101 VENTURA BLVD #160
ENCINO, CA 91436

## Summary

| | | |
|---|---|---|
| p2 Total Net Deposits | | $25,120.79 |
| Charges | | $793.97 |
| **Total Amount Funded** | | **$24,326.82** |

## Contact



Defyne Payments
PO Box 467472
Atlanta GA 31146

service@issueresolve.com

800.711.5769

All billing and statement inquiries must be addressed within 30 days.

## Important

**PULSE Network Annual Fee –** Billed to Participating Merchants
The PULSE Network annual fee for 2019 will be assessed per location for participating merchants on the July 2019 statement.

**Your Merchant Intelligence Center -** Log in to View Your Program
Are you taking advantage of all the Merchant Intelligence Center (MIC) (www.merchantintel.com/MIC) has to offer? View statements, transaction and batch history, validate PCI compliance, and more – all in MIC and available 24/7.

**PREVENT PCI NON-COMPLIANCE FEES –** Complete your Annual PCI Compliance Requirement
The Card Brands require merchants to maintain PCI compliance in order to secure private cardholder information. An easy-to-use PCI module is available to you 24/7 through the Merchant Intelligence Center (MIC). Log in today to complete your certification and fulfill this important requirement.

Monthly fees may be assessed to merchants whose PCI certification has not been renewed on schedule and will continue to be assessed each month until compliance is achieved. If you need more information regarding how to achieve compliance, please contact Merchant Support.



00000500 0031585 0001-0004 MMPSI070119152904000 03 S



| | Merchant Nu | Statement Date |
|---|---|---|
| | 769020632860 | 06/01/19 - 06/30/19 |

## Card Summary

| Plan Code | Number of Sales | Amount of Sales | Number of Credits | Amount of Credits | Net Sales | Average Ticket |
|---|---|---|---|---|---|---|
| AM | 92 | 11,463.23 | 0 | 0.00 | 11,463.23 | 124.60 |
| VS | 406 | 11,162.01 | 1 | 179.39 | 10,982.62 | 27.12 |
| MC | 104 | 2,477.53 | 0 | 0.00 | 2,477.53 | 23.82 |
| DS | 6 | 197.41 | 0 | 0.00 | 197.41 | 32.90 |
| ** | 608 | 25,300.18 | 1 | 179.39 | 25,120.79 | 41.39 |

## Deposits Funded by Batch

| Date Submitted | ACH Reference Code | Number of Sales | Amount of Sales | Amount of Credits | Net Deposit | Daily Collected Amount | Funded Amount |
|---|---|---|---|---|---|---|---|
| 06/02/19 | 9001000004737357 | 4 | $134.00 | $0.00 | $134.00 | $0.00 | $134.00 |
| 06/03/19 | 9001000004760620 | 29 | $740.71 | $0.00 | $740.71 | $0.00 | $740.71 |
| 06/04/19 | 9001000004768326 | 28 | $633.72 | $0.00 | $633.72 | $0.00 | $633.72 |
| 06/05/19 | 9001000004775835 | 24 | $573.25 | $0.00 | $573.25 | $0.00 | $573.25 |
| 06/06/19 | 9001000004778638 | 7 | $162.00 | $0.00 | $162.00 | $0.00 | $162.00 |
| 06/06/19 | 9001000004783338 | 32 | $1,195.21 | $0.00 | $1,195.21 | $0.00 | $1,195.21 |
| 06/07/19 | 9001000004790886 | 26 | $474.12 | $0.00 | $474.12 | $0.00 | $474.12 |
| 06/09/19 | 9001000004794935 | 2 | $37.00 | $0.00 | $37.00 | $0.00 | $37.00 |
| 06/09/19 | 9001000004794936 | 1 | $40.00 | $0.00 | $40.00 | $0.00 | $40.00 |
| 06/10/19 | 9001000004805248 | 30 | $1,082.33 | $0.00 | $1,082.33 | $0.00 | $1,082.33 |
| 06/11/19 | 9001000004807848 | 1 | $8,550.00 | $0.00 | $8,550.00 | $0.00 | $8,550.00 |
| 06/11/19 | 9001000004812507 | 38 | $1,308.76 | $0.00 | $1,308.76 | $0.00 | $1,308.76 |
| 06/12/19 | 9001000004819906 | 20 | $670.07 | $0.00 | $670.07 | $0.00 | $670.07 |
| 06/13/19 | 9001000004822745 | 9 | $255.00 | $0.00 | $255.00 | $0.00 | $255.00 |
| 06/13/19 | 9001000004827436 | 20 | $506.13 | $0.00 | $506.13 | $0.00 | $506.13 |
| 06/14/19 | 9001000004830270 | 1 | $50.00 | $0.00 | $50.00 | $0.00 | $50.00 |
| 06/14/19 | 9001000004835130 | 20 | $518.58 | $179.39 | $339.19 | $0.00 | $339.19 |
| 06/16/19 | 9001000004839179 | 1 | $25.00 | $0.00 | $25.00 | $0.00 | $25.00 |
| 06/16/19 | 9001000004839180 | 1 | $70.00 | $0.00 | $70.00 | $0.00 | $70.00 |
| 06/16/19 | 9001000004839181 | 1 | $185.00 | $0.00 | $185.00 | $0.00 | $185.00 |
| 06/17/19 | 9001000004849559 | 31 | $837.66 | $0.00 | $837.66 | $0.00 | $837.66 |
| 06/18/19 | 9001000004852258 | 23 | $500.69 | $0.00 | $500.69 | $0.00 | $500.69 |
| 06/19/19 | 9001000004859595 | 21 | $464.49 | $0.00 | $464.49 | $0.00 | $464.49 |
| 06/19/19 | 9001000004864321 | 1 | $10.59 | $0.00 | $10.59 | $0.00 | $10.59 |
| 06/20/19 | 9001000004867095 | 20 | $464.00 | $0.00 | $464.00 | $0.00 | $464.00 |
| 06/20/19 | 9001000004871792 | 23 | $648.13 | $0.00 | $648.13 | $0.00 | $648.13 |
| 06/21/19 | 9001000004879525 | 18 | $455.01 | $0.00 | $455.01 | $0.00 | $455.01 |
| 06/23/19 | 9001000004883568 | 16 | $473.00 | $0.00 | $473.00 | $0.00 | $473.00 |
| 06/23/19 | 9001000004883569 | 7 | $257.00 | $0.00 | $257.00 | $0.00 | $257.00 |
| 06/24/19 | 9001000004893867 | 34 | $684.65 | $0.00 | $684.65 | $0.00 | $684.65 |
| 06/25/19 | 9001000004901276 | 30 | $563.59 | $0.00 | $563.59 | $0.00 | $563.59 |
| 06/26/19 | 9001000004908532 | 28 | $912.15 | $0.00 | $912.15 | $0.00 | $912.15 |
| 06/27/19 | 9001000004911385 | 8 | $337.00 | $0.00 | $337.00 | $0.00 | $337.00 |
| 06/27/19 | 9001000004916195 | 23 | $781.28 | $0.00 | $781.28 | $0.00 | $781.28 |
| 06/28/19 | 9001000004923863 | 27 | $622.73 | $0.00 | $622.73 | $0.00 | $622.73 |
| 06/30/19 | 9001000004927922 | 1 | $15.00 | $0.00 | $15.00 | $0.00 | $15.00 |



00000500 0031586 0002-0004 MMPSI070119152904000 03 S



| | Merchant Nu | Statement Date |
|---|---|---|
| | 769020632860 | 06/01/19 - 06/30/19 |

## Deposits Funded by Batch

| Date Submitted | ACH Reference Code | Number of Sales | Amount of Sales | Amount of Credits | Net Deposit | Daily Collected Amount | Funded Amount |
|---|---|---|---|---|---|---|---|
| 06/30/19 | 9001000004927923 | 1 | $30.00 | $0.00 | $30.00 | $0.00 | $30.00 |
| 06/30/19 | 9001000004927924 | 1 | $32.33 | $0.00 | $32.33 | $0.00 | $32.33 |
| Total | | 608 | $25,300.18 | $179.39 | $25,120.79 | $0.00 | $25,120.79 |

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| FEE | 1 | 0.00 | MC Merchant Location Fee | 0.00000 | 1.2500 | 1.25 |
| FEE | 1 | 0.00 | Fixed Acquirer Network - 1B | 0.00000 | 2.0000 | 2.00 |
| FEE | 1 | 0.00 | Fixed Acquirer Network - 2 | 0.00000 | 0.8200 | 0.82 |
| FEE | 92 | 11,463.23 | AmEx Network | 0.00150 | 0.0000 | 17.19 |
| FEE | 6 | 176.28 | AmEx Card Not Present | 0.00300 | 0.0000 | 0.53 |
| FEE | 188 | 5,477.19 | Visa APF Credit | 0.00000 | 0.0195 | 3.67 |
| FEE | 238 | 4,880.16 | Visa APF Debit | 0.00000 | 0.0155 | 3.69 |
| FEE | 407 | 11,341.40 | Visa Base II Transmission | 0.00000 | 0.0018 | 0.73 |
| FEE | 1 | 179.39 | Visa Credit Voucher APF Credit | 0.00000 | 0.0195 | 0.02 |
| FEE | 3 | 91.39 | Visa IAF | 0.00450 | 0.0000 | 0.41 |
| FEE | 3 | 91.39 | Visa ISA Purchasing | 0.01000 | 0.0000 | 0.91 |
| FEE | 180 | 5,974.45 | Visa Assessment Credit | 0.00150 | 0.0000 | 8.96 |
| FEE | 226 | 5,187.56 | Visa Assessment Debit | 0.00140 | 0.0000 | 7.26 |
| FEE | 2 | 53.86 | Visa Credit Voucher APF Credit International | 0.00000 | 0.0395 | 0.08 |
| FEE | 2 | 48.00 | Visa Credit Voucher APF Debit International | 0.00000 | 0.0355 | 0.07 |
| FEE | 104 | 2,477.53 | MasterCard Acquirer License Fee | 0.00005 | 0.0000 | 0.12 |
| FEE | 104 | 2,477.53 | MasterCard ABVF | 0.00140 | 0.0000 | 3.47 |
| FEE | 111 | 2,307.76 | MasterCard NABU | 0.00000 | 0.0195 | 2.16 |
| FEE | 104 | 2,477.53 | MC Humanitarian Fee | 0.00000 | 0.0025 | 0.26 |
| FEE | 6 | 197.41 | Discover Assessment | 0.00130 | 0.0000 | 0.26 |
| FEE | 6 | 175.52 | Discover Network Auths | 0.00000 | 0.0025 | 0.02 |
| FEE | 6 | 197.41 | Discover Data Usage | 0.00000 | 0.0195 | 0.12 |
| | | | **TOTAL FEE** | | | **$54.00** |
| PROGRAM | 1 | 21.74 | AmEx Prepaid 1 | 0.01350 | 0.1000 | 0.39 |
| PROGRAM | 26 | 326.89 | AmEx Restaurant 1 | 0.01600 | 0.0400 | 6.26 |
| PROGRAM | 24 | 530.42 | AmEx Restaurant 2 | 0.01850 | 0.1000 | 12.24 |
| PROGRAM | 39 | 1,849.18 | AmEx Restaurant 3 | 0.02500 | 0.1000 | 50.15 |
| PROGRAM | 2 | 8,735.00 | AmEx Restaurant 4 | 0.02850 | 0.1000 | 249.15 |
| PROGRAM | 19 | 572.43 | VS CPS/Rewards 2 | 0.01950 | 0.1000 | 13.08 |
| PROGRAM | 1 | 28.00 | VS Intl Premium Card | 0.01800 | 0.0000 | 0.50 |
| PROGRAM | 1 | 24.00 | VS Intl Electronic | 0.01100 | 0.0000 | 0.26 |
| PROGRAM | 1 | 39.39 | VS Intl Super Premium | 0.01970 | 0.0000 | 0.78 |
| PROGRAM | 7 | 379.04 | VS Business Electronic T1 | 0.02400 | 0.1000 | 9.79 |
| PROGRAM | 5 | 140.65 | VS Business Electronic T2 | 0.02750 | 0.1500 | 4.62 |
| PROGRAM | 8 | 315.10 | VS Business Electronic T3 | 0.02850 | 0.2000 | 10.58 |
| PROGRAM | 10 | 379.94 | VS Business Electronic T4 | 0.02950 | 0.2000 | 13.21 |
| PROGRAM | 4 | 244.87 | VS Corporate Travel Service | 0.02650 | 0.1000 | 6.90 |



00000500 0031587 0003-0004 MMPSI070119152904000 03 S



**DEFYNE**
**PAYMENTS**
DEFYNE YOUR SUCCESS

| Merchant Nu | Statement Date |
|---|---|
| 769020632860 | 06/01/19 - 06/30/19 |

## Charges

| Transaction Type | Quantity | Amount | Description | Rate | Per Item | Total |
|---|---|---|---|---|---|---|
| PROGRAM | 87 | 974.47 | VS CPS/Small Ticket Regulated | 0.00050 | 0.2200 | 19.81 |
| PROGRAM | 23 | 857.45 | VS EIRF Credit | 0.02300 | 0.1000 | 22.05 |
| PROGRAM | 9 | 316.22 | VS Purch Card Travel Service | 0.02650 | 0.1000 | 9.28 |
| PROGRAM | 4 | 138.67 | VS CPS/Restaurant Credit | 0.01540 | 0.1000 | 2.54 |
| PROGRAM | 7 | 174.01 | VS CPS/Restaurant Debit | 0.01190 | 0.1000 | 2.76 |
| PROGRAM | 122 | 3,897.85 | VS Regulated Debit | 0.00050 | 0.2200 | 28.89 |
| PROGRAM | 7 | 122.00 | VS Infinite Electronic | 0.02400 | 0.1000 | 3.64 |
| PROGRAM | 10 | 128.46 | VS CPS/Small Ticket Credit | 0.01650 | 0.0400 | 2.50 |
| PROGRAM | 8 | 109.82 | VS CPS/Small Ticket Debit | 0.01550 | 0.0400 | 2.01 |
| PROGRAM | 4 | 87.37 | VS Standard Credit | 0.02700 | 0.1000 | 2.76 |
| PROGRAM | 1 | 7.41 | VS Standard Debit | 0.01900 | 0.2500 | 0.39 |
| PROGRAM | 66 | 2,189.53 | VS Signature Pref Electronic | 0.02400 | 0.1000 | 59.18 |
| PROGRAM | 2 | 35.33 | VS Signature Pref Standard | 0.02950 | 0.1000 | 1.24 |
| PROGRAM | 2 | 78.52 | MC Business Level 2 Standard | 0.03100 | 0.1000 | 2.63 |
| PROGRAM | 3 | 89.50 | MC Business Level 4 Standard | 0.03250 | 0.1000 | 3.21 |
| PROGRAM | 2 | 25.93 | MC Key Entered Debit | 0.01650 | 0.1500 | 0.73 |
| PROGRAM | 1 | 90.00 | MC Merit III Debit | 0.01050 | 0.1500 | 1.10 |
| PROGRAM | 6 | 130.39 | MC Restaurant Debit | 0.01190 | 0.1000 | 2.15 |
| PROGRAM | 2 | 23.59 | MC Small Ticket Debit | 0.01550 | 0.0400 | 0.44 |
| PROGRAM | 5 | 85.06 | MC High Value Restaurant | 0.02200 | 0.1000 | 2.37 |
| PROGRAM | 1 | 27.15 | MC US Corporate Standard | 0.02950 | 0.1000 | 0.90 |
| PROGRAM | 1 | 16.12 | MC Business Level 1 Standard | 0.02950 | 0.1000 | 0.58 |
| PROGRAM | 3 | 97.68 | MC Large Market Standard | 0.02950 | 0.1000 | 3.18 |
| PROGRAM | 1 | 89.84 | MC Large Market - T&E Rate II | 0.02650 | 0.1000 | 2.48 |
| PROGRAM | 1 | 10.87 | MC Enhanced Merit III | 0.01730 | 0.1000 | 0.29 |
| PROGRAM | 3 | 85.56 | MC Key Entered Credit | 0.01690 | 0.1000 | 1.91 |
| PROGRAM | 8 | 303.53 | MC Merit III | 0.01580 | 0.1000 | 5.61 |
| PROGRAM | 25 | 515.42 | MC US Cons Regulated POS Debit | 0.00050 | 0.2200 | 5.80 |
| PROGRAM | 27 | 570.72 | MC World Elite Restaurant | 0.02200 | 0.1000 | 15.25 |
| PROGRAM | 2 | 38.80 | MC World T/E | 0.02300 | 0.1000 | 1.09 |
| PROGRAM | 11 | 198.85 | MC World Restaurant | 0.01730 | 0.1000 | 4.53 |
| PROGRAM | 1 | 100.00 | DS Commercial Electronic | 0.02300 | 0.1000 | 2.40 |
| PROGRAM | 2 | 22.06 | DS Express Services Rewards | 0.01950 | 0.0000 | 0.43 |
| PROGRAM | 3 | 75.35 | DS Restaurants Rewards | 0.01950 | 0.1000 | 1.77 |
| | | | **TOTAL PROGRAM** | | | **$593.81** |
| SERVICE | 649 | 24,295.07 | SSL Authorizations | 0.00000 | 0.1000 | 64.90 |
| SERVICE | 38 | 2.28 | Batch Capture | 0.00000 | 0.0600 | 2.28 |
| SERVICE | 1 | 179.39 | Refund Transactions | 0.00000 | 0.1000 | 0.10 |
| SERVICE | 4 | 124.55 | AVS Processing | 0.00000 | 0.1000 | 0.40 |
| SERVICE | 1 | 5.00 | Support | 0.00000 | 5.0000 | 5.00 |
| SERVICE | 92 | 11,463.23 | AmEx Discount | 0.00400 | 0.0000 | 45.81 |
| SERVICE | 406 | 11,162.01 | Visa Discount | 0.00200 | 0.0000 | 22.34 |
| SERVICE | 104 | 2,477.53 | MasterCard Discount | 0.00200 | 0.0000 | 4.92 |
| SERVICE | 6 | 197.41 | Discover Discount | 0.00200 | 0.0000 | 0.41 |
| | | | **TOTAL SERVICE** | | | **$146.16** |
| | | | **TOTAL CHARGES** | | | **$793.97** |



00000500 0031588 0004-0004 MMPSI070119152904000 03 S

# DEFYNE
## PAYMENTS
DEFYNE YOUR SUCCESS

PO Box 467472
Atlanta GA 31146

**Monthly Merchant Statement**

| | |
|---|---|
| **Statement Date:** | 07/01/19 - 07/31/19 |
| **Merchant Number** | 769020632860 |
| **Monthly Fees Account** | XXXXXXXX9955 |

00000544 MMPSI080119153618000 03 000000

CABERNET TEHRAN
16101 VENTURA BLVD #160
ENCINO, CA 91436

| Summary | |
|---|---|
| p2  Total Net Deposits | $89,795.77 |
| Charges | $2,699.47 |
| **Total Amount Funded** | **$87,096.30** |



| Contact | |
|---|---|
| ✉ | Defyne Payments<br>PO Box 467472<br>Atlanta GA 31146 |
| ✉ | service@issueresolve.com |
| ☎ | 800.711.5769 |
| 🖨 | .. |

All billing and statement inquiries must be addressed within 30 days.

## Important

**PULSE Network Annual Fee –** Billed to Participating Merchants
The PULSE Network annual fee has been assessed on this statement for participating merchants.

**ACTION MAY BE REQUIRED –** IRS Data Integrity Fee
As your Merchant Services provider, the Internal Revenue Service (IRS) holds us responsible for filing your card volume, as well as ensuring that your Tax ID and Legal Name in our system matches what is on file with the IRS. The monthly IRS Data Integrity Fee billed to mismatched merchants has increased from $24.95 to $150. Any merchants who remain in a mismatched status will be billed the $150 IRS Data Integrity Fee until resolved. The fee will be assessed each month until the mismatched information is corrected.



00000544 0031741 0001-0005 MMPSI080119153618000 03 S



# PRI VY   ≡

**MERCHANT RECORD**

**DBA**   Corp   Owners   Officers   Banking

| | |
|---|---|
| **Merch Name** | CABERNET TEHRAN |
| **Address** | 16101 VENTURA BLVD #160 |
| | ENCINO, CA 91436 |
| **Merchant Phone** | (818) 985-5800 |
| **Federal Tax / EIN** | XX-XXXX101 |
| **MCC** | 5813 |
| **MID** | 769020632860 |
| **Amex#** | 5098567449 |
| **Discover#** | 601116777179512 |
| **PCI Status** | Not Started |

**Edit Merchant**

Corporate/Legal Business Information

**Corporate Name**
EMPEROR ENTERTAI

**Corporate Address**
16101 Ventura Blvd

**Phone**
(818) 985-5800

**Yrs in Business**

**Submit Changes For Review**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 11

- 42 -

 **KASH CAPITAL**

## SECURED MERCHANT AGREEMENT

**Agreement dated** 8/26/ 2019      **between Kash Capital ("KC") and the merchant listed below ("the Merchant").**

**Merchant's Legal Name:** EMPEROR ENTERTAINMENT INC    **D/B/A:** CABERNET TEHRAN

**Physical Address:** 16101 VENTURA BLVD

**City:** ENCINO    **State:** CA    **Zip:** 91436

☐ Same as Physical Address

**Type of Entity (check one):**

⊗ Corporation    ☐ Limited Liability Company

☐ Limited Partnership ☐ Limited Liability Partnership

**Mailing Address:** 16101 VENTURA BLVD

**City:** ENCINO    **State:** CA    **Zip:** 91436

☐ Sole Proprietor

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant hereby sells, assigns and transfers to KC (making KC the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount has been delivered by or on behalf of Merchant to KC.

Merchant is selling a portion of a future revenue stream to KC at a discount, not borrowing money from KC; therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by KC. The Remittance is a good faith estimate of (a) Purchased Percentage multiplied by (b) the daily average revenues of Seller during the previous calendar month divided by (c) the number of business days in the calendar month. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. KC is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and KC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give KC a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance is as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4.

KC will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, KC (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as KC receives payment in full of the Purchased Amount. Merchant hereby authorizes KC to ACH debit the Agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. KC's payment of the Purchase Price shall be deemed the acceptance and performance by KC of this Agreement. Merchant understands that it is responsible for ensuring that the Agreed Remittance to be debited by KC remains in the Account and will be held responsible for any fees incurred by KC resulting from a rejected ACH attempt or an Event of Default. KC is not responsible for any overdrafts or rejected transactions that may result from KC's ACH debiting the Agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between KC and Merchant, upon the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**Purchase Price:** $ 936000.00      **Specified Percentage:** 13      **% Receipts Purchased Amount:** $ 1000000.00

*THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.*

**MERCHANT #1** (Print Name)

**First Name:** HAMIDREZA    **Last Name:** POUSTI    [SIGN HERE]

**Title:** OWNER

**MERCHANT #2** (Print Name)

**First Name:**    **Last Name:**    [SIGN HERE]

**Title:**

**OWNER/GUARANTOR #1** (Print Name)

**First Name:** HAMIDREZA    **Last Name:** POUSTI

**Title:** OWNER

**OWNER/GUARANTOR #2** (Print Name)

**First Name:**    **Last Name:**    [SIGN HERE]

**Title:**

*ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD OR INTENTIONAL MISREPRESENTATION.*

Rev. 09/18

**Scanned with CamScanner**

## MERCHANT AGREEMENT TERMS AND CONDITIONS

### 1. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement and Processor.** Merchant shall (A) execute an agreement acceptable to KC with a Bank acceptable to KC to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to KC with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide KC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes KC and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to KC for the receipts as specified herein and to pay such amounts to KC. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by KC or not. This additional authorization is not a waiver of KC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which KC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of KC.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by KC as per the terms of this Agreement.

**1.3 Future Purchase of Increments.** Subject to the terms of this Agreement, KC offers to purchase additional Receipts in the "Increments" stated in on Page 1 of this Agreement, if any. KC reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**1.4 Adjustments to the Remittance.** If an Event of Default has not occurred, every two (2) calendar weeks after the funding of the Purchase Price to Merchant, Merchant may give notice to KC to request a decrease in the Remittance. The amount shall be decreased if the amount received by KC was more than the Purchased Percentage of all revenue of Merchant since the date of this Revenue Purchase Agreement. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Seller shall provide KC with viewing access to their bank account as well as all information reasonably requested by KC to properly-calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

**1.5 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize KC and its agents to investigate their financial responsibility and history, and will provide to KC any authorizations, bank or financial statements, tax returns, etc., as KC deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. KC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.6 Transactional History.** Merchant authorizes all of its banks, brokers and processor to provide KC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide KC with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from KC.

**1.7 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by KC for monies owed to KC from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by KC.

**1.8 No Liability.** In no event will KC be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of KC's attorney's fees and expenses resulting therefrom.

**1.9 Reliance on Terms.** Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, KC, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**1.10 Sale of Receipts.** Merchant and KC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from KC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. KC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to KC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that KC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall

automatically be reduced to the maximum rate permitted by applicable law and KC shall promptly refund to Merchant any interest received by KC in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that KC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.11 Power of Attorney.** Merchant irrevocably appoints KC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to KC from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to KC; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which KC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant and KC is authorized to use Merchant's funds to pay for same; and (vii) KC shall have the right, without waiving any of its rights and remedies and without notice to Merchant or any Owner/Guarantor, to notify any credit card processor of the sale of future payment rights and re-direct the remittance of daily settlements to an account of KC's choosing in order to settle all obligations due to KC under this Agreement.

**1.12 Protections against Default.** The following Protections 1 through 8 may be invoked by KC immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the KC electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to KC; (c) Merchant changes the electronic check processor through which the Receipts are settled

SIGN HERE _H. P_

**INITIALS**

Rev. 09/18

Scanned with CamScanner

from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of KC, and (ii) the written agreement of any KC or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to KC; (e) Merchant takes any action, fails to take any action, or offers any incentive-- economic or otherwise-- the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; or (f) Merchant fails to provide KC with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from KC. These protections are in addition to any other remedies available to KC at law, in equity or otherwise pursuant to this Agreement.

**Protection 1.** The full uncollected Purchased Amount plus all fees (including reasonable attorney's fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** KC may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s)

**Protection 3.** Merchant hereby authorizes KC to execute in the name of the Merchant a Confession of Judgment in favor of KC in the amount of Purchased Amount stated in the Agreement. Upon an Event of Default, KC may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4.** KC may enforce its security interest in the Collateral.

**Protection 5.** The entire Purchased Amount and all fee (including reasonable attorney's fees) shall become immediately payable to KC from Merchant. Protection 6. KC may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if KC recovers a Judgment against Merchant, Merchant shall be liable for all of KC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to KC. Upon breach of any provision in this Agreement, KC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. KC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to KC.

**1.13 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes KC to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that KC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus.

Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against KC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of KC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.14 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by KC, including this Agreement and any other KC documents (collectively, "Confidential Information") are proprietary and confidential information of KC. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of KC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles KC to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.15 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes KC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.16 D/B/A's.** Merchant hereby acknowledges and agrees that KC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between KC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**2 REPRESENTATIONS, WARRANTIES AND COVENANTS**

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial statements, copies of which have been furnished to KC, and future statements which will be furnished hereafter at the discretion of KC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise KC of any material adverse change in their financial condition, operation or ownership. KC may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to KC within five business days after request from KC. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the

obligations under this Agreement, all of which have been duly authorized.

**2.4 Use of Funds.** Merchant agrees that it shalluse the Purchase Price for business purposes and not for personal, family, or household purposes.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without KC's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and KC, nor shall Merchant change any of its places of business without prior written consent by KC.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis if applicable.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from KC to Merchant, execute, acknowledge and deliver to KC and/or to any other person, firm or corporation specified by KC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed againstit.

**2.10 Unencumbered Receipts,** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of KC.

**2.11 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.'

**2.12 Defaults under Other Contracts.** Merchant's execution of, and/or performance under



*H. P*
INITIALS

Rev. 09/18

Scanned with CamScanner

this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.13 Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling KC the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.**3 EVENTS OF DEFAULT AND REMEDIES**

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

(c) the sending of notice of termination by Merchant or verbally notifying KC of its intent to breach this Agreement;

(d) the Merchant fails to give KC 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, and the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;

(e) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by seller to any other party.

(f) Merchant shall transfer or sell all or substantially all of its assets;

(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;

(h) Merchant shall use multiple depository accounts without the prior written consent ofKC.

(i) Merchant shall change its depositing account without the prior written consent of KC; or

(j) Merchant shall close its depositing account used for ACH debits without the prior written consent of KC

(k) Merchant's bank returns a code other than NSF cutting KC from its collections

(l) Merchant shall default under any of the terms, covenants and conditions of any other agreement with KC.

**3.2 Limited Personal Guaranty** In the Event of a Default, KC will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to KC for all of KC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4. hereof, KC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of KC in connection with this Agreement may be exercised at any time by KC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in

addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to KC all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of KC's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give KC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give KC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets orstock.

**4 MISCELLANEOUS**

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by KC.

**4.2 Assignment.** KC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to KC shall become effective only upon receipt by KC. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of KC to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect;** Governing Law, Venue and Jurisdiction. This Agreement shall be binding upon and inure to the benefit of Merchant, KC and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of KC which consent may be withheld in KC's sole discretion. KC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if KC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by KC to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation,** etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been

satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and KC and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.10 JURY TRIAL WAIVER.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.** THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.12 Facsimile & Digital Acceptance.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.



SIGN HERE

$H \cdot P$

**INITIALS**

Rev. 09/18

**Scanned with CamScanner**



**KASH CAPITAL**

**GUARANTY**

## GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS

KC as an additional inducement for KC to enter into this Agreement, the undersigned Guarantor(s) hereby provides KC with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to KC in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations").Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, KC may seek recovery from Guarantors for all of KC's losses and damages by enforcement of KC's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral KC may hold pursuant to this Agreement or any other guaranty.

KC does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) KC's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to KC. In addition, KC may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to KC; (ii) release Merchant from its obligations to KC; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to KC under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification, or (v) contribution. In the event that KC must return any amount paid by Merchant or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Agreement shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity

### MERCHANT #1 (Print Name)

| First Name: HAMID REZA | Last Name:  POUSTI |
|---|---|
| Title:  OWNER | SSN#:  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 |
| Driver's License Number: | SIGN HERE |

### MERCHANT #2 (Print Name)

| First Name: | Last Name: |
|---|---|
| Title: | SSN#: |
| Driver's License Number: | SIGN HERE |

### OWNER/GUARANTOR #1 (Print Name)

| First Name: HAMID REZA | Last Name:  POUSTI |
|---|---|
| Title:  OWNER | SSN#:  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 |
| Driver's License Number: | SIGN HERE |

### OWNER/GUARANTOR #2 (Print Name)

| First Name: | Last Name: |
|---|---|
| Title: | SSN#: |
| Driver's License Number: | SIGN HERE |

Rev. 09/18

**Scanned with CamScanner**

 **KASH CAPITAL**

**SECURITY AGREEMENT**

| **Merchant's Legal Name:** EMPEROR ENTERTAINMENT INC | **D/B/A:** CABERNET TEHRAN |
|---|---|

**Physical Address:** 16101 VENTURA BLVD. #160

| **City:** ENCINO | **State:** CA | **Zip:** 91436 |
|---|---|---|

**Federal ID#:** 46-0797101

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grants to KC a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to KC under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to KC upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover KC's entitlements under this Agreement, KC is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of KC's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, KC or an affiliate of KC. KC is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by KC without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. KC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, KC has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.

With respect to such security interests and liens, KC will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from KC written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor (s) agree(s) that this is a contract of recoupment and KC is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by KC. Merchant and Guarantor(s) agree(s) to execute and deliver to KC such instruments and documents KC may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. KC is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name.

Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to KC under any other agreement between Merchant or Guarantor(s) and KC (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as KC deems necessary to perfect or maintain KC's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes KC to file any financing statements deemed necessary by KC to perfect or maintain KC's security interest. Merchant and Guarantor(s) shall be liable for, and KC may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by KC in protecting, preserving and enforcing KC's security interest and rights.



*H. P*

SIGN HERE ➡ INITIALS

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

Rev. 09/18

**Scanned with CamScanner**

 **KASH CAPITAL**

**APPENDIX A**
**THE FEE STRUCTURE**

## APPENDIX A: THE FEE STRUCTURE:

**A.**  **Origination Fee:** $295.00 to cover cost of Origination.

**B.**  **Underwriting Fee:** $499.00 or 10% of the proposed funding amount to cover underwriting and related expenses. This fee is deemed earned upon Seller signing the contracts. If for whatever reason, Funder determines, in its sole capacity, to cancel the deal, Merchant agrees that Funder may withdraw this non-refundable underwriting fee.

**C.**  **NSF Fee (Standard):** $50.00 (each)

**D.**  **Default Fee:** $10,000.00 when Merchant breaches any terms of this agreement.

**E.**  **Blocked Account Fee:** $5,000.00 when Merchant breaches the agreement by placing a Stop-Payment on Funder's ACH or closes the Account

**F.**  **Bank Change Fee:** $50.00 when Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

**G.**  **Wire Fee:** Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH.

**H.**  **ACH Program Fee:** $299.00 per month for the duration of the agreement.

**I.**  **Stacking Fee:** 10% of Outstanding RTR or $25,000 whichever is greater. Additionally, taking on additional financing will be deemed a breach of this agreement upon which Funder may invoke all of its rights per the terms of the agreement including but not limited to filing the Confession of Judgment and executing thereon.

**J.**  **UCC Fee:** $195.00

**K.**  **Miscellaneous Service Fees:** Merchant agrees that it shall pay for certain services related to the origination and maintenance of the accounts. Merchant shall receive their funding electronically to their Designated Account and shall be charged $50.00 per Fed Wire or $0.00 for an ACH.

**Merchant 1 (Print Name):**  HAMIDREZA POUSTI

Title:  OWNER                                                          SIGN HERE ▶

**Merchant 2 (Print Name):**
Title:                                                                    SIGN HERE ▶

Rev. 09/18

Scanned with CamScanner

 KASH CAPITAL

**ACH AUTHORIZATION FORM**

**DEFINITIONS:**

**KC:** Kash Capital

**Seller:** EMPEROR ENTERTAINMENT INC
_(Merchant's Legal Name)_

**Merchant Agreement:** Merchant Agreement between KC and Seller, dated as of 8/26/2019

**Designated Checking Account:**

**Bank Name:** _____   **Branch:** _____

**Tax ID:** 46-0797101

**ABA: Routing:** _____   **DDA: Account:** _____

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Seller attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Seller should keep a copy of this important legal document for Seller's records.**

DISBURSMENT OF ADVANCE PROCEEDS. By signing below, Seller authorizes KC to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Seller also authorizes KC to collect amounts due from Seller under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $ 843.00 _____   Weekly

(or) Percentage of each Banking Deposit:_____ %

on the Following Days: Monday - Friday _____

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Seller's financial institution for any reason, including without limitation insufficient funds, Seller understands that KC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules. Seller also authorizes KC to initiate ACH entries to correct any erroneous payment transaction.

MISCELLANEOUS. KC is not responsible for any fees charged by Seller's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until KC has received written notification from Seller at the address set forth below at least 5 banking days prior to its termination to afford KC a reasonable opportunity to act on it. The individual signing below on behalf of Seller certifies that he/she is an authorized signer on the Designate Checking Account. Seller will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Seller requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

**Seller:** EMPEROR ENTERTAINMENT INC
_(Merchant's Legal Name)_

**Merchant 1 (Print Name):** HAMIDREZA POUSTI        Date: 8/15, 2019

Title:   OWNER                                  SIGN HERE

**Merchant 2 (Print Name):** _____   Date: _____
Title: _____                        SIGN HERE

Rev. 09/18

**Scanned with CamScanner**

 **KASH CAPITAL**

**NO STACKING**
**ADDENDUM**

This Addendum entered on 08/26/2019 is to certify that I, HAMIDREZA POUSTI as a representative of EMPEROR ENTERTAINMENT INC. am prohibited from initiating a cash advance or other loan products with another lender outside to Kash Capital. Doing so will place me in a breach of contract and I will be liable for the entire amount owed to Kash Capital immediately, plus attorneys' fees, costs, liquidated damages and a default fee of $2,500 or 20% of the contract amount, whichever is greater.

Amounts received from any subsequent merchant cash advances will be subject to collections by Kash Capital to satisfy the outstanding account balance.

By their signatures below the parties agreed to be bound by this addendum.

Merchant 1 (Print Name):   HAMIDREZA POUSTI          Date: 8, 15, 2019

Title: OWNER                                          SIGN HERE

Merchant 2 (Print Name):                              Date:
Title:                                                SIGN HERE

**\*\*This authorization is to remain in full force and effect until Kash Capital receives written notification from the Merchant of its termination in such time and in such manner to afford Kash Capital a reasonable opportunity to act on it. Revocation of this authorization prior to remittance of the balance owed pursuant to the Agreement shall constitute a breach thereunder.**

Rev. 09/18

**Scanned with CamScanner**

 **KASH CAPITAL**

Dear Merchant,

Thank you for accepting an offer from Kash Capital. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please email the agreement to your funding specialist.

**Please provide information required for read-only access\* to your business account.**

*\*Be sure to indicate capital or lower case letters.*

**Bank Portal Website:** _____
**Username:** _____

**Password:** _____
**Security Question / Answer 1:** _____

**Security Question / Answer 2:** _____
**Security Question / Answer 3:** _____

**Any other information necessary to access your account:** _____

SIGN HERE  INITIALS: ___*H . P*___

Rev. 09/18

**Scanned with CamScanner**



# KASH CAPITAL

## ACH AUTHORIZATION FORM

*All information on this form is re quired unless otherwise noted.*

---

**BUSINESS AUTHORIZED TO DEBIT/CREDIT ACCOUNT:**

KASH CAPITAL
Authorized Business Name                    Authorized Business Phone Number

Authorized Business Address          City              State        Zip

---

**ACCOUNT HOLDER INFORMATION:**

HAMIDREZA            POUSTI                 EMPEROR ENTERTAINMENT INC
Account Holder First Name    Account Holder Last Name    Account Holder DBA Name (If Business Account)    Phone Number

Account Holder Address

---

**ACCOUNT HOLDER BANK INFORMATION:**

Account Holder's Bank Name          Branch City          State        Zip

How to find your Routing and Account Numbers on a check

⑆ 123456789 ⑆ 1234567890123 ⑈    ☐ Business Checking   ☐ Personal Checking   ☐ Savings
Bank Routing Code    Bank Account Number

Bank Routing Number (9 digits)          Bank Account Number

---

**TRANSACTION INFORMATION:**

Goods Purchased/Services Rendered              ☐ One-time      ☐ Recurring
                                               Rate
Amount of Transaction          Effective Date   No. of Transactions _____ or Open Ended ☐

---

**AUTHORIZATION:**

In exchange for products and/or services listed above the undersigned hereby authorizes:

to electronically draft via the Automated Clearing House system the amounts indicated above from the account identified above. This authority will continue until withdrawn in writing by the undersigned account holder. The Undersigned hereby certifies that they are duly authorized to execute this form on behalf of the above listed account holder. I acknowledge that I am subject to a $25 reject fee if items are returned for insufficient funds.

Signature of Account Holder

HAMIDREZA            POUSTI                 OWNER                    8/15/2019
First Name of Account Holder    Last Name of Account Holder    Title of Account Holder    Date

Rev. 09/18

Scanned with CamScanner

 **KASH CAPITAL**

**ADDENDUM**

This Addendum is entered on 08/26/2019 by and between, Kash Capital ("KC") and EMPEROR ENTERTAINMENT INC.. (the "Seller") and Funderslink, LLC.

Should any terms of this Addendum conflict with the Revenue Purchase Agreement dated 08/26/2019 the terms of this Addendum shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Revenue Purchase Agreement.

Seller warrants that it understands that KC must engage a third-party, namely Funderslink, LLC, to manage the ACH withdrawals, reporting and deal tracking. For this service, Seller agrees to pay Funderslink, LLC a nominal fee of $299.00 per month. This amount is due on the first day of the Agreement and every subsequent thirty days until the Purchased Amount is paid in full to KC.

Merchant 1 (Print Name): HAMIDREZA POUSTI          Date: 8, 15, 2019

Title: OWNER          [SIGN HERE]

Merchant 2 (Print Name):          Date:
Title:          [SIGN HERE]

Rev. 09/18

**Scanned with CamScanner**



## KASH CAPITAL

### BALANCE TRANSFER FORM

| | | |
|---|---|---|
| Merchant Legal Name ("Merchant"): | HAMIDREZA | POUSTI |
| Merchant Title: | OWNER | |
| Business Legal Name ("Business"): | EMPEROR ENTERTAINMENT INC | |
| DBA: | CABERNET TEHRAN | |
| Physical Address: | 16101 VENTURA BLVD #160 | |
| City: | ENCINO | |
| State: | CA | |
| Zip Code: | 91436 | |
| Date: | 08/26/2019 | |

Kash Capital
1022 Avenue M.
Brooklyn, NY 11230

Date of new secured agreement:      08/26/2019

Date of previous secured agreement: _____

Remaining RTR balance: _____

To Whom It May Concern:

I, Merchant, on behalf of Business, hereby authorize Kash Capital to debit the remaining RTR balance which is currently due and owing to Kash Capital pursuant to the previous secured merchant agreement, entered into by and between Kash Capital and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by Kash Capital pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,

SIGN HERE

By: HAMIDREZA          POUSTI

Merchant Legal Name: OWNER

Title:

Rev. 09/18

Scanned with CamScanner

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 12

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 13

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

Please choose one of the below options to send money: 'My accounts' - Transfer money between your domestic and/or international accounts; 'My payees' - Sending money to existing payees by either wire transfer (US), wire transfer (International) or Bill Pay or 'New payee' - Create a new payee and make a wire transfer (US), wire transfer (International) or Bill Pay.

## From

**Account**

United States
**HSBC Premier Savings**
X1177004 | USD                     $3,547,147.41

Only six preauthorized, automatic, computer or telephone transfers can be made from your savings account to another account in any calendar month. If permitted by your account, checks, drafts, debit card transactions, or similar orders made payable to a third party are included in this limit of six. If you exceed this limit, the Bank may be required to close your account or convert your account to a checking account.

## To

**Move money to**

| My accounts | My payees | New payee |

**Account**

United States
**EMPEROR ENTERTAINMENT, INC - H AMIDREZA POUSTI**
First Republic Bank - California, US | USD   0.00

## Transfer details

**Amount**

USD   985,000.00

**Transfer type**

Domestic Transfer - Transfer Confirmation ID
1254470047

**When**

| Today* | Later | Recurring |

*Transfers made after 4:00 p.m. Eastern Time from your Credit Card or Select Credit accounts will be reflected in your outstanding balance and Available credit within two business days. This transaction is a cash advance and will be subject to finance charges. Other fees may also apply. Please refer to your Cardmember Agreement or Select Credit Agreement. Transfers completed on a business day from a checking account



mers | Privy    x   Carpets of Elmhurst Signed Pap.   x   https://onlinebanking.usbank.co   x   +

tion (US) | onlinebanking.usbank.com/USB/afl9kU1n0BD1avzHggibe1)/MessageCenterDashboard/MessageCenterDashboard.aspx

Hi, Francesco    Messages **122**    Locations    Need Help

**usbank**    My Accounts    Transfers    Bill Payments    Send Money    Customer Service    Products & Services

Choose an Account    My Documents    My Rewards    My Controls

## Message Center

Inbox    **Receipt**

| Receipt | From: | US Bank |
|---|---|---|
| Branch Deposit Receipt | Date: | 09/10/2019 |

Here's the receipt for your transaction made on 09/10/2019 at 05:12 PM.     Print

| | |
|---|---|
| **Reference Number:** | 00035 04264 1470 |
| **Date:** | 09/10/2019 05:12 |
| **Transaction Type:** | Deposit |
| **To Account:** | Ending in 1627 |
| **Amount:** | $100,000.00 |

If you have any questions concerning this receipt Contact Us

Checks and other items received for deposit are subject to the terms and conditions of this bank's rules and regulations governing bank accounts, "Customer Agreement," as they may be amended from time to time. All items accepted for deposit are subject to later count and verification.

Deposits may not be available for immediate withdrawal.

Member FDIC

**Close**    Delete Message

ESIGN Consent Agreement

🔒 Connection Secured

© 2019 U.S. Bank
CI_0_ICS.WEB.03.019.00.1007.1

For U.S. Bank
🏠 Equal Housing Lender. Deposit products offered by U.S. Bank National Association. Member FDIC.
U.S. Bank is not responsible for and does not guarantee the products, services or performance of U.S. Bancorp Investments.

Give Feedback | Privacy Pledge | Legal Agreements | CoBrowse



Hi, Francesco    Messages 120    Locations

**usbank.**    My Accounts    Transfers    Bill Payments    Send Money    Customer Service    Products & Services

Choose an Account    My Documents    My Rewards    My Controls

## Message Center

Inbox    Receipt

### Receipt
**Branch Deposit Receipt**

From:    US Bank
Date:    09/10/2019

Here's the receipt for your transaction made on 09/10/2019 at 05:55 PM.

Print

| | |
|---|---|
| Reference Number: | 00035 15790 3670 |
| Date: | 09/10/2019 05:55 |
| Transaction Type: | Deposit |
| To Account: | Ending in 1757 |
| Amount: | $100,000.00 |

If you have any questions concerning this receipt Contact Us

Checks and other items received for deposit are subject to the terms and conditions of this bank's rules and regulations governing bank accounts, "Customer Agreement," as they may be amended from time to time. All items accepted for deposit are subject to later count and verification.

Deposits may not be available for immediate withdrawal.

Member FDIC

**Close**    Delete Message

ESIGN Consent Agreement

🔒 Connection Secured

© 2019 U.S. Bank
OLB-KS-MEB-2C-019.09.5207-1

For U.S. Bank:
Equal Housing Lender. Deposit products offered by U.S. Bank National Association. Member FDIC.
U.S. Bank is not responsible for and does not guarantee the products, services or performance of U.S. Bancorp Investments

Give Feedback | Privacy Pledge | Legal Agreement



# DiStefano Enterprise (Checking) - 9624

**usbank.**

My Accounts  Transfers  Bill Payments  Send Money  Customer Service  Products & Services

Hi, Francesco  Messages 122  Locations  Need Help?  Security  Log

Choose an Account  My Documents  My Rewards  My Controls

I'd Like to....

**View**
Account Information
Full Account & Routing Number
Online Statements

**Take Action**
Set Up Account Alerts
Set Up Automatic Transfer
Set up Cards for Travel
Find Fast Check or Deposit Slip
Images
Order/Review Checks
Lost or Stolen Card/Check

▼ **Transfer Money**

From Account ◄

**Account Summary**

Available balance today, 9:19 a.m.    **$960,826.39**

Manage Nickname

**Account Activity**                                         Print Transactions  |  Download Transactions

**Transactions** ?    Search

Show The Past  90 days  ▼    30  ▼  Per page              |◄ ◀ 1 of 4 ▶ ▶|

**Pending Transactions** ❶

| Date ▼ | Description | Check # | Deposits | Withdrawals | Account Balance ❷ |
|--------|-------------|---------|----------|-------------|-------------------|
| 09/10/2019 | Brand Authorized Payment US Bank Transfer to WonkaUSA Encino, CA | | | $100,000.00 | Pending |

**Completed Transactions** ❶

|  | Electronic Deposit | | | | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 13

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 14

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

# Fwd: 769020632860

October 9, 2019 at 12:28 PM

From Emperor Entertainment

To Ross Reghabi, Esq., LLM

📎 ☐ image006.png 13.27 KB,  ☐ image007.png 21.04 KB,  ☐ image009.png 10.59 KB,  ☐ image010.png 14.62 KB,  ☐ image008.jpg 4.6 KB

---------- Forwarded message -- -------
From: **Mason** <morouji@gmail.com>
Date: Wed, Oct 9, 2019 at 12:26 PM
Subject: Fwd: 769020632860
To: <emperorent1@gmail.com>

Thank you
Mason

Begin forwarded message:

> **From:** Liad Chazan <lchazan@defynepay.com>
> **Date:** October 8, 2019 at 10:14:35 AM PDT
> **To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
> **Cc:** Mason <morouji@gmail.com>, Sargis IT <shidana1@yahoo.com>
> **Subject: Re: 769020632860**
>
> Ok I will resubmit
>
>
>
>
> Liad Chazan
> Vice President Financial Operations
> Office 800-711-5769
> Direct 770-573-0465
> Mobile 908-296-5380
> Fax    888-965-9440
> www.defynepayments.com
> 1165 Sanctuary Pkwy
> Suite 325
> Alpharetta, GA 30009
>
> On Oct 8, 2019, at 1:11 PM, Francesco DiStefano <francesco@distefanoenterprisesllc.com> wrote:
>
>> Liad
>>
>> I spoke to him, it is being unblocked
>>
>> Thanks
>>
>> **Francesco DiStefano**
>> President | DiStefano Enterprises LLC
>> Business Funding | Check Processing | POS Solutions | Credit Card
>> 1001 S Main Street, Suite 49
>> Kalispell, Montana 59901
>> Phone: 406-233-9699 X1001
>> Fax: 815-487-4905
>> Web: http://www.distefanoenterprisesllc.com
>> Email: francesco@distefanoenterprisesllc.com
>> <image006.png>    <image007.png>    <image008.jpg>  <image009.png>  <image010.png>
>> "To open a shop is easy, to keep it open is an art."
>> Chinese Proverbs
>>
>>
>> **From:** Mason <morouji@gmail.com>
>> **Sent:** Tuesday, October 8, 2019 12:05 PM
>> **To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>

**Cc:** Liad Chazan <lchazan@defynepay.com>; Sargis IT <shidana1@yahoo.com>
**Subject:** Re: 769020632860

I just called him, he said that he won't talking to anyone but Sargis.

Thank you
Mason

> On Oct 8, 2019, at 9:48 AM, Francesco DiStefano <francesco@distefanoenterprisesllc.com> wrote:
>
> ### *Copying Agent*
>
> Mohsen can you see what Hamid did – he has chargeback see below
>
> Thanks
>
> **Francesco DiStefano**
> President | DiStefano Enterprises LLC
> Business Funding | Check Processing | POS Solutions | Credit Card
> 1001 S Main Street, Suite 49
> Kalispell, Montana 59901
> Phone: 406-233-9699 X1001
> Fax: 815-487-4905
> Web: http://www.distefanoenterprisesllc.com
> Email: francesco@distefanoenterprisesllc.com
> <image001.png>
>
> <image002.png>
>
> <image003.jpg>
>
> <image004.png>
>
> <image005.png>
> "To open a shop is easy, to keep it open is an art."
> Chinese Proverbs
>
>
> **From:** Liad Chazan <lchazan@defynepay.com>
> **Sent:** Tuesday, October 8, 2019 11:47 AM
> **To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
> **Subject:** Re: 769020632860
>
> They put a atop payment on the debit , have them remove it
>
>
>
>
> Liad Chazan
> Vice President Financial Operations
> Office 800-711-5769
> Direct 770-573-0465
> Mobile 908-296-5380
> Fax    888-965-9440
> www.defynepayments.com
> 1165 Sanctuary Pkwy
> Suite 325
> Alpharetta, GA 30009
>
> > On Oct 8, 2019, at 12:46 PM, Francesco DiStefano <francesco@distefanoenterprisesllc.com> wrote:
> >
> > They just faxed those over apparently – also he said there is money in the account?
> >
> > **Francesco DiStefano**
> > President | DiStefano Enterprises LLC
> > Business Funding | Check Processing | POS Solutions | Credit Card
> > 1001 S Main Street, Suite 49
> > Kalispell, Montana 59901
> > Phone: 406-233-9699 X1001
> > Fax: 815-487-4905

Web: http://www.distefanoenterprisesllc.com
Email: francesco@distefanoenterprisesllc.com
<image006.png>    <image007.png>    <image008.jpg>  <image009.png>  <image010.png>
"To open a shop is easy, to keep it open is an art."
Chinese Proverbs

**From:** Liad Chazan <lchazan@defynepay.com>
**Sent:** Tuesday, October 8, 2019 11:44 AM
**To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
**Subject:** Re: 769020632860

Also I need the invoices and party details for the 2 retrievals

<image012.png>

Liad Chazan
Vice President Financial Operations
Office 800-711-5769
Direct 770-573-0465
Mobile 908-296-5380
Fax    888-965-9440
www.defynepayments.com
1165 Sanctuary Pkwy
Suite 325
Alpharetta, GA 30009

**From:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
**Date:** Tuesday, October 8, 2019 at 12:17 PM
**To:** Liad Chazan <lchazan@defynepay.com>
**Subject:** RE: 769020632860

Weird, I know that account was closed as the bank closed it down

**Francesco DiStefano**
President | DiStefano Enterprises LLC
Business Funding | Check Processing | POS Solutions | Credit Card
1001 S Main Street. Suite 49
Kalispell, Montana 59901
Phone: 406-233-9699 X1001
Fax: 815-487-4905
Web: http://www.distefanoenterprisesllc.com
Email: francesco@distefanoenterprisesllc.com
<image013.png>    <image014.png>    <image015.png>  <image016.png>  <image017.png>
"To open a shop is easy, to keep it open is an art."
Chinese Proverbs

**From:** Liad Chazan <lchazan@defynepay.com>
**Sent:** Tuesday, October 8, 2019 11:16 AM
**To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
**Subject:** Re: 769020632860

This was a stop payment not account closed

Liad Chazan
Vice President Financial Operations
Office 800-711-5769
Direct 770-573-0465
Mobile 908-296-5380
Fax    888-965-9440
www.defynepayments.com
1165 Sanctuary Pkwy
Suite 325
Alpharetta, GA 30009

On Oct 8, 2019, at 12:15 PM, Francesco DiStefano <francesco@distefanoenterprisesllc.com> wrote:

That account is closed the old one?

**Francesco DiStefano**

President | DiStefano Enterprises LLC
Business Funding | Check Processing | POS Solutions | Credit Card
1001 S Main Street, Suite 49
Kalispell, Montana 59901
Phone: 406-233-9699 X1001
Fax: 815-487-4905
Web: http://www.distefanoenterprisesllc.com
Email: francesco@distefanoenterprisesllc.com
<image001.png>    <image008.png>    <image009.jpg> <image010.png> <image011.png>
"To open a shop is easy, to keep it open is an art."
Chinese Proverbs


**From:** Liad Chazan <lchazan@defynepay.com>
**Sent:** Tuesday, October 8, 2019 11:15 AM
**To:** Francesco DiStefano <francesco@distefanoenterprisesllc.com>
**Subject:** 769020632860

| 10/08/19 | 122242843 | 055991863 | 769020632860 | CABERNET TEHRAN | 45,150.00 | 10/07/19 | MERCH CHBK | R08 |
|----------|-----------|-----------|--------------|-----------------|-----------|----------|------------|-----|

Hey the cb came back as stop payment. I want to make sure this doesn't become an issue. I will resubmit to new bank
account you gave us
 <image007.png>

Liad Chazan
Vice President Financial Operations
Office 800-711-5769
Direct 770-573-0465
Mobile 908-296-5380
Fax    888-965-9440
www.defynepayments.com
1165 Sanctuary Pkwy
Suite 325
Alpharetta, GA 30009



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 15

EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

## Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302
Telephone: (747) 333-5151 • Facsimile: (818) 584-3169

December 23, 2019

D. Pearson Beardsley
Pearson Law Group, LLC
16 Towne Park Drive
Lawrenceville, GA 30044
Fax: 770-277-0273

Greg Michell
Stanley, Esrey & Buckley, LLP
1230 Peachtree Street, N.E., Suite 2400
Atlanta, GA 30309
Fax: 404-835-6221

Francesco DiStefano
DiStefano Enterprises, LLC
1001 S. Main Street, Suite 49
Kalispell, Montana 59901
Fax: 815-487-4905

Re:   Emperor Enteratinment, Inc., et al. v. Defyne Holdings, LLC, et al.
      Los Angeles Superior Court Case Number: 19VECV01638

# EX PARTE NOTICE

Dear all:

TO DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO
DISTEFANO, an individua; DISTEFANO ENTERPRISES LLC, a limited liability
company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA,
NATIONAL ASSOCIATION AND ALL PARTIES AND THEIR RESPECTIVE
ATTORNEYS OF RECORD:

Please take notice that on December 24, 2019, at 8:30 a.m., in Los Angeles
Superior Court, Van Nuys Courthouse, located at 6230 Sylmar Avenue, Van Nuys,
California 91401, Department U, Hon. Judge Michael Convey, presiding, Plaintiffs
Emperor Entertainment, Inc and Hamidreza Pousti will apply ex parte for a Temporary
Restraining Order ("TRO"), restraining and enjoining Defendants, DEFYNE
HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity
acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the
following acts pending a hearing on a Preliminary Injunction:

1. Making, publishing, republishing, uttering, orally or in writing any false,
misleading, or fraudulent remarks concerning Plaintiffs business and its credit card
processing privileges to any person, including all third-party credit reporting
organizations, pending the resolution of this matter;
2. Proceeding with any existing investigation, claims, reports, or negative remarks
made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF")

also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the litigation herein.

FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, shall:

4. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5. Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant to the TMF/MATCH list.

This Application for preliminary injunctive relief is made upon the grounds that the conduct sought to be enjoined if allowed to occur and continue to occur will cause immediate and irreparable harm to Plaintiffs in that the Plaintiffs business will be unable to accept any credit cards for the services and goods which it provides on a daily basis to its immediate community. Defendants conduct has effectively strangled all of Plaintiffs assets and bank accounts such that he cannot withdraw any funds on any account. Also, Plaintiffs would be unable to conduct any business at its prominent location during the Holiday Season, the damages and pecuniary relief which could be afforded to the Plaintiffs due to the Defendants actions are difficult to ascertain because of the nature of the restaurant business. Also, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Plaintiff because Plaintiff will lose clients who intended to use credit cards for the transactions and the loss of income from the processing credit cards vis a vis cash transactions or checks is extremely difficult to calculate with exact certainty.

As an independent basis for injunctive relief, Plaintiffs apply for said relief pursuant to California Business & Professions Code, section 17200 et seq. which allows for injunctive relief in action such as the one herein.

Plaintiffs will also request the Court to issue an Order to Show Cause pursuant to California Rules of Court, Rule 3.1150, affording Plaintiff the opportunity to appear and

December 23, 2019
Re: Emperor Entertainement v.Defyne
EX PARTE NOTICE
Page 3 of 3

show why a Preliminary Injunction should not issue restraining and enjoining in the same manner for the remainder of this litigation.

    Please advise if you will appear to oppose this matter as soon as reasonably possible.

        Truly,

        ROSS K. REGHABI, ESQ.

 Gmail

Steve Ruiz <reghabi.assistant@gmail.com>

---

**EX PARTE NOTICE : Emperor Entertainment v. Defyne, et al. | Los Angeles Superior Court Case No: 19 VEVC01638**

---

**Steve Ruiz** <ruiz@scalg.com>                                                                                      Mon, Dec 23, 2019 at 9:07 AM
To: francesco@distefanoenterprisesll.com, gmichell@seblaw.com
Cc: Ross Reghabi <reghabi@scalg.com>, Mohammad Nadim <moenadim@gmail.com>

Dear all:

TO DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO DISTEFANO, an individua; DISTEFANO ENTERPRISES LLC, a limited liability company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

Please take notice that on Decmber 24, 2019, at 8:30 a.m., in Los Angeles Superior Court, Van Nuys Courthouse, located at 6230 Sylmar Avenue, Van Nuys, California 91401, Department U, Hon. Judge Michael Convey, presiding, Plaintiffs Emperor Entertainment, Inc and Hamidreza Pousti will apply ex parte for a Temporary Restraining Order ("TRO"), restraining and enjoining Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a Preliminary Injunction:

1. Making, publishing, republishing, uttering, orally or in writing any false,
misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;

2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the litigation herein.
FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, shall:

4. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5. Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant to the TMF/MATCH list.

This Application for preliminary injunctive relief is made upon the grounds that the conduct sought to be enjoined if allowed to occur and continue to occur will cause immediate and irreparable harm to Plaintiffs in that the Plaintiffs business will be unable to accept any credit cards for the services and goods which it provides on a daily basis to its immediate community. Defendants conduct has effectively strangled all of Plaintiffs assets and bank accounts such that he cannot withdraw any funds on any account. Also, Plaintiffs would
be unable to conduct any business at its prominent location during the Holiday Season, the damages and pecuniary relief which could be afforded to the Plaintiffs due to the Defendants actions are difficult to ascertain because of the nature of the restaurant business. Also, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Plaintiff because Plaintiff will lose clients who intended to use credit cards for the transactions and the loss of income from the processing credit cards vis a vis cash transactions or checks is extremely difficult to calculate with exact certainty.

As an independent basis for injunctive relief, Plaintiffs apply for said relief pursuant to California Business & Professions Code, section 17200 et seq. which allows for injunctive relief in action such as the one herein.

Plaintiffs will also request the Court to issue an Order to Show Cause pursuant to California Rules of Court, Rule 3.1150, affording Plaintiff the opportunity to appear and show why a Preliminary Injunction should not issue restraining and

enjoining in the same manner for the remainder of this litigation.

This Application is based upon the California Code of Civil Procedure sections 525 et seq., and California Rules of Court, Rule 3.1150 and California Rules of Court, Rules 3.1200 et seq.; upon the attached Memorandum of Points and Authorities; the Declaration of Ross K. Reghabi, Hamidreza Pousti, filed herewith, and upon the Complaint on file herein, the records and files in this action, and upon such further evidence and argument as may be presented prior to or at the time of hearing on the motion.

Truly,

--
Steven Ruiz
Law clerk
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302-1434
Tel: (747) 333-5151
Fax: (818) 584-3169

This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.



Steve Ruiz <reghabi.assistant@gmail.com>

---

## EX PARTE NOTICE : Emperor Entertainment v. Defyne, et al. | Los Angeles Superior Court Case No: 19 VEVC01638

---

**Steve Ruiz** <ruiz@scalg.com>
To: francesco@distefanoenterprisesllc.com

Mon, Dec 23, 2019 at 9:09 AM

Please see the forwarded message below

---------- Forwarded message ---------
From: **Steve Ruiz** <ruiz@scalg.com>
Date: Mon, Dec 23, 2019 at 9:07 AM
Subject: EX PARTE NOTICE : Emperor Entertainment v. Defyne, et al. | Los Angeles Superior Court Case No: 19 VEVC01638
To: <francesco@distefanoenterprisesll.com>, <gmichell@seblaw.com>
Cc: Ross Reghabi <reghabi@scalg.com>, Mohammad Nadim <moenadim@gmail.com>

Dear all;

TO DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO DISTEFANO, an individua; DISTEFANO ENTERPRISES LLC, a limited liability company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

Please take notice that on Decmber 24, 2019, at 8:30 a.m., in Los Angeles Superior Court, Van Nuys Courthouse, located at 6230 Sylmar Avenue, Van Nuys, California 91401, Department U, Hon. Judge Michael Convey, presiding, Plaintiffs Emperor Entertainment, Inc and Hamidreza Pousti will apply ex parte for a Temporary Restraining Order ("TRO"), restraining and enjoining Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a Preliminary Injunction:

1. Making, publishing, republishing, uttering, orally or in writing any false,
misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;

2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF") also known as the Member Alert to Control High Risk Merchants ("MATCH") list created by Mastercard beyond the pending litigation herein; or

3. Proceeding with any attempt to collect from Plaintiff Hamidreza Pousti, personally, the any sum of the claimed or demanded chargebacks beyond the litigation herein.
FURTHERMORE, Defendant DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, shall:

4. Contact the TMF/MATCH list created by Mastercard to inform that DEFYNE HOLDINGS, LLC its agents, assigns, partners, employees, and individuals, intend to and do hereby expressly execute any and all acts to remove any derogatory entry, data point, line of code, or other false, misleading or fraudulent remark made by DEFYNE HOLDINGS, LLC, identifying Plaintiff as a high-risk merchant pending the resolution of this action; and

5. Execute any and all further documentation or act, necessary for removal of any false, misleading, or fraudulent remark made by DEFYNE HOLDINGS, LLC identifying Plaintiff as a high-risk merchant to the TMF/MATCH list.

This Application for preliminary injunctive relief is made upon the grounds that the conduct sought to be enjoined if allowed to occur and continue to occur will cause immediate and irreparable harm to Plaintiffs in that the Plaintiffs business will be unable to accept any credit cards for the services and goods which it provides on a daily basis to its immediate community. Defendants conduct has effectively strangled all of Plaintiffs assets and bank accounts such that he cannot withdraw any funds on any account. Also, Plaintiffs would
be unable to conduct any business at its prominent location during the Holiday Season, the damages and pecuniary relief which could be afforded to the Plaintiffs due to the Defendants actions are difficult to ascertain because of the nature of

the restaurant business. Also, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief to the Plaintiff because Plaintiff will lose clients who intended to use credit cards for the transactions and the loss of income from the processing credit cards vis a vis cash transactions or checks is extremely difficult to calculate with exact certainty.

As an independent basis for injunctive relief, Plaintiffs apply for said relief pursuant to California Business & Professions Code, section 17200 et seq. which allows for injunctive relief in action such as the one herein.

Plaintiffs will also request the Court to issue an Order to Show Cause pursuant to California Rules of Court, Rule 3.1150, affording Plaintiff the opportunity to appear and show why a Preliminary Injunction should not issue restraining and enjoining in the same manner for the remainder of this litigation.

This Application is based upon the California Code of Civil Procedure sections 525 et seq., and California Rules of Court, Rule 3.1150 and California Rules of Court, Rules 3.1200 et seq.; upon the attached Memorandum of Points and Authorities; the Declaration of Ross K. Reghabi, Hamidreza Pousti, filed herewith, and upon the Complaint on file herein, the records and files in this action, and upon such further evidence and argument as may be presented prior to or at the time of hearing on the motion.

Truly,

--
Steven Ruiz
Law clerk
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302-1434
Tel: (747) 333-5151
Fax: (818) 584-3169

This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.

--
Steven Ruiz
Law clerk
SOUTHERN CALIFORNIA LAW GROUP
24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302-1434
Tel: (747) 333-5151
Fax: (818) 584-3169

This email is confidential and intended only for the use of the addressee named above. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, please be aware that any dissemination, distribution, or duplication of this communication or any attachment, is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email, and destroy/delete the original transmission and its attachments without saving them in any manner.

 Gmail

**Steve Ruiz <reghabi.assistant@gmail.com>**

---

## Successful transmission to 17702770273. Re: UNKNOWN

**MetroFax** <NoReply@metrofax.com>
To: reghabi.assistant@gmail.com

Mon, Dec 23, 2019 at 8:59 AM



Your fax was successfully sent to 17702770273 by MetroFax.

### Fax Details

**Date:** 2019-12-23 16:59:07 (GMT)
**Number of Pages:** 3
**Length of Transmission:** 173 seconds
**Receiving Machine Fax ID:** 1-678-559-0750

If you have any questions, please visit our online help center.

Thank you for choosing MetroFax.

Sincerely,
The MetroFax Team

**Tip:** Switch to an annual plan and save! Call (888) 321-3121.

### Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302
Telephone: (747) 333-5151 • Facsimile: (818) 584-3169

December 23, 2019

D. Pearson Beardsley                          Greg Michell
Pearson Law Group, LLC                        Stanley, Esrey & Buckley, LLP
16 Towne Park Drive                           1230 Peachtree Street, N.E., Suite 2400
Lawrenceville, GA 30044                       Atlanta, GA 30309
Fax: 770-277-0273                             Fax: 404-835-6221

Francesco DiStefano
DiStefano Enterprises, LLC
1001 S. Main Street, Suite 49
Kalispell, Montana 59901
Fax: 815-487-4905

Re:    Emperor Entertainment, Inc., et al. v. Defyne Holdings, LLC, et al.
       Los Angeles Superior Court Case Number: 19VECV01638

# EX PARTE NOTICE

Dear all:

TO DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO DISTEFANO, an individua; DISTEFANO ENTERPRISES LLC, a limited liability company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

Please take notice that on December 24, 2019, at 8:30 a.m., in Los Angeles Superior Court, Van Nuys Courthouse, located at 6230 Sylmar Avenue, Van Nuys, California 91401, Department U, Hon. Judge Michael Convey, presiding, Plaintiffs Emperor Entertainment, Inc and Hamidreza Pousti will apply ex parte for a Temporary Restraining Order ("TRO"), restraining and enjoining Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a Preliminary Injunction:

1. Making, publishing, republishing, uttering, orally or in writing any false, misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;
2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF")

© 2019 j2 Global, Inc. and affiliates. All rights reserved.
MetroFax is a registered trademark of j2 Global, Inc. and affiliates.
6922 Hollywood Blvd., Los Angeles, CA 90028

This account is subject to the terms listed in the MetroFax Customer Agreement.

 Gmail

**Steve Ruiz <reghabi.assistant@gmail.com>**

---

## Successful transmission to 14048356221. Re: UNKNOWN

---

**MetroFax** <NoReply@metrofax.com>
To: reghabi.assistant@gmail.com

Mon, Dec 23, 2019 at 8:58 AM

---



Your fax was successfully sent to 14048356221 by MetroFax.

> **Fax Details**
>
> **Date:** 2019-12-23 16:58:26 (GMT)
> **Number of Pages:** 3
> **Length of Transmission:** 120 seconds
> **Receiving Machine Fax ID:** unknown

If you have any questions, please visit our online help center.

Thank you for choosing MetroFax.

Sincerely,
The MetroFax Team

**Tip:** Switch to an annual plan and save! Call (888) 321-3121.

## Southern California Law Group

24007 Ventura Boulevard, Suite 205
Calabasas, CA 91302
Telephone: (747) 333-5151 • Facsimile: (818) 584-3169

December 23, 2019

D. Pearson Beardsley                          Greg Michell
Pearson Law Group, LLC                        Stanley, Esrey & Buckley, LLP
16 Towne Park Drive                           1230 Peachtree Street, N.E., Suite 2400
Lawrenceville, GA 30044                       Atlanta, GA 30309
Fax: 770-277-0273                             Fax: 404-835-6221

Francesco DiStefano
DiStefano Enterprises, LLC
1001 S. Main Street, Suite 49
Kalispell, Montana 59901
Fax: 815-487-4905

Re:    Emperor Entertainment, Inc., et al. v. Defyne Holdings, LLC, et al.
       Los Angeles Superior Court Case Number: 19VECV01638

# EX PARTE NOTICE

Dear all:

TO DEFYNE HOLDINGS, LLC, a limited liability company; FRANCESCO DISTEFANO, an individua; DISTEFANO ENTERPRISES LLC, a limited liability company; KASH CAPITAL, LLC, a limited liability company; HSBC BANK USA, NATIONAL ASSOCIATION AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:

Please take notice that on December 24, 2019, at 8:30 a.m., in Los Angeles Superior Court, Van Nuys Courthouse, located at 6230 Sylmar Avenue, Van Nuys, California 91401, Department U, Hon. Judge Michael Convey, presiding, Plaintiffs Emperor Entertainment, Inc and Hamidreza Pousti will apply ex parte for a Temporary Restraining Order ("TRO"), restraining and enjoining Defendants, DEFYNE HOLDINGS, LLC, its agents, assigns, partners, employees, and any individual or entity acting in concert with DEFYNE HOLDINGS, LLC, from engaging in any of the following acts pending a hearing on a Preliminary Injunction:

1. Making, publishing, republishing, uttering, orally or in writing any false, misleading, or fraudulent remarks concerning Plaintiffs business and its credit card processing privileges to any person, including all third-party credit reporting organizations, pending the resolution of this matter;
2. Proceeding with any existing investigation, claims, reports, or negative remarks made by DEFYNE HOLDINGS, LLC to the Terminated Merchant File ("TMF")

© 2019 j2 Global, Inc. and affiliates. All rights reserved.
MetroFax is a registered trademark of j2 Global, Inc. and affiliates.
6922 Hollywood Blvd., Los Angeles, CA 90028

This account is subject to the terms listed in the MetroFax Customer Agreement.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
Northwest District, Van Nuys Courthouse East, Department U

**19VECV01638**                                      December 24, 2019
**EMPEROR ENTERTAINMENT, INC., A CALIFORNIA**                     8:30 AM
**CORPORATION, et al. vs DEFYNE HOLDINGS, LLC., A**
**LIMITED LIABILITY COMPANY, et al.**


Judge: Honorable Virginia Keeny            CSR: None
Judicial Assistant: A. Dastaryan           ERM: None
Courtroom Assistant: K. Hoffman            Deputy Sheriff: None


APPEARANCES:

For Plaintiff(s): Khosro Reghabi

For Defendant(s): (Specially Appearing) Defyne Holdings, LLC., a limited liability company by

Scott Lieberman (Telephonic)


**NATURE OF PROCEEDINGS:** Hearing on Ex Parte Application for a Temporary Restraining Order and for Order to Show Cause Re Preliminary Injunction

The matter is called for hearing in Department NW-W.

The Court having fully considered the arguments of all parties, both written and oral, as well as the evidence presented, now rules as follows:

The Ex Parte Application for a Temporary Restraining Order and for Order to Show Cause Re Preliminary Injunction filed by Hamidreza Pousti on 12/23/2019 is Denied. The matter is set for hearing.

Hearing on Motion for Preliminary Injunction is scheduled for 02/05/2020 at 08:30 AM in Department U at Van Nuys Courthouse East.

Opposition and reply is to be filed per code.

Counsel for plaintiff is to give notice.

Minute Order                                        Page 1 of 1